MARC E. MAYER (SBN 190969)
  mem@msk.com
KARIN G. PAGNANELLI (SBN 174763)
  kgp@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Activision Publishing,
Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>        v.<br><br>WARZONE.COM, LLC,<br><br><br><br>              Defendant.<br>_____<br>WARZONE.COM, LLC,<br><br>              Counterclaimant,<br><br>        v.<br><br>ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br><br>              Counterclaim-Defendant. | CASE NO. 2:21-cv-3073-FLA (JCx)<br><br>[Assigned to Judge Fernando L. Aenlle-Rocha]<br><br>**NOTICE OF MOTION AND MOTION OF ACTIVISION PUBLISHING, INC. (1) TO DISMISS COUNTERCLAIMS, AND/OR (2) FOR JUDGMENT ON THE PLEADINGS.**<br><br>[Fed. R. Civ. P. 12(b)(6) & 12(c)]<br><br>Date:      August 27, 2021<br>Time:      1:30 pm |

Mitchell
Silberberg &
Knupp LLP

13318610.3

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD.

2    PLEASE TAKE NOTICE that on August 27, 2021, or as soon thereafter as

3   this matter may be heard, Plaintiff and Counterclaim-Defendant Activision

4   Publishing, Inc. ("Activision") will and hereby does move for an order

5   (1) dismissing each of the Counterclaims of Defendant and Counterclaimant

6   Warzone.com, LLC ("Counterclaimant") with prejudice and without leave to

7   amend, and (2) entering judgment on the pleadings in favor of Activision on its

8   claim for declaratory relief.  This Motion will be heard in the Courtroom of the

9   Honorable Fernando Aenlle-Rocha, at the First Street Courthouse, 350 West 1st

10  Street, Courtroom 6B, 6th Floor, Los Angeles, California 90012.

11   This Motion is brought on the grounds that Counterclaimant's claims for

12  trademark infringement under the Lanham Act, unfair competition, and common

13  law trademark infringement are barred in their entirety by the First Amendment of

14  the U.S. Constitution pursuant to, *inter alia, Rogers v. Grimaldi*, 875 F.2d 994 (2d

15  Cir. 1989) and *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875

16  F.3d 1192 (9th Cir. 2017).  For the same reason, Activision is entitled to judgment

17  in its favor on its claim for declaratory relief.

18   This Motion is based on this Notice of Motion and Motion, the attached

19  Memorandum of Points and Authorities, the pleadings on file herein, and any other

20  matters presented to the Court at the time of the hearing.

21   This Motion is made following conferences of counsel pursuant to C.D.

22  Local Rule 7-3, which took place on June 11 and June 24, 2021.

23  DATED:  July 29, 2021                MARC E. MAYER
24                                       KARIN G. PAGNANELLI
                                         MITCHELL SILBERBERG & KNUPP LLP
25

26                                       By:  /s/ Marc E. Mayer
27                                            Marc E. Mayer (SBN 190969)
                                              Attorneys for Activision Publishing, Inc.
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

I.      STATEMENT OF FACTS .......................................................................... 3

II.     THE LEGAL STANDARD ......................................................................... 7

III.    THE FIRST AMENDMENT PROTECTS ACTIVISION'S *CALL OF DUTY: WARZONE* TITLE ........................................................................ 9

        A.      Activision's "Call of Duty: Warzone" Easily Meets The *Rogers* Test. ................................................................................................... 12

                1.      Defendants' Use Has "Above Zero" Artistic Relevance .......... 13

                2.      Activision's Use Is Not Explicitly Misleading ........................ 14

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abilt v. Cent. Intel. Agency*,
   848 F.3d 305 (4th Cir. 2017) ..................................................... 16

*AM General LLC v. Activision Blizzard, Inc.*,
   450 F. Supp. 3d 467 (S.D.N.Y. 2020) ........................................ 11

*Amanatullah v. Obama*,
   904 F. Supp. 2d 45 (D.D.C. 2012) .............................................. 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................. 7, 8

*Bleistein v. Donaldson Lithographing Co.*,
   188 U.S. 239 (1903) .................................................................. 13

*Brown v. Elec. Arts, Inc.*,
   724 F.3d 1235 (9th Cir. 2013) ........................................ 8, 11, 12, 15

*Brown v. Entm't Merchants Ass'n*,
   564 U.S. 786 (2011) .................................................................. 12

*Cafasso v. General Dynamics C4 Systems, Inc.*,
   637 F. 3d 1047 (9th Cir. 2011) ................................................... 7

*Caiz v. Roberts*,
   382 F. Supp. 3d 942 (C.D. Cal. 2019) ................................... *passim*

*Capcom Co. v. MKR Group, Inc.*,
   2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) ......................... 11, 14

*Dickinson v. Ryan Seacrest Enterprises, Inc.*,
   No. CV 18-2544-GW(JPRX), 2019 WL 3035090
   (C.D. Cal. Mar. 26, 2019) .......................................................... 15

*Dillinger, LLC v. Elec. Arts Inc.*,
   No. 1:09-CV-1236-JMS-DKL,
   2011 WL 2457678 (S.D. Ind. June 16, 2011) ............................... 11

*Dr. Seuss Enters, LP v. Comicmix LLC*,
   983 F.3d 443 (9th Cir. 2020) ............................................ 10, 14, 17

Mitchell
Silberberg &
Knupp LLP

13318610.3

ii

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos*,
  547 F.3d 1095 (9th Cir. 2008) ................................................................ 11, 12, 14

*Finjan, Inc. v. Sophos, Inc.*,
  No. 14-CV-01197-WHO,
  2016 WL 2988834 (N.D. Cal. May 24, 2016) ..................................................... 16

*Hidden City Philadelphia v. ABC, Inc.*,
  No. CV 18-65, 2019 WL 1003637 (E.D. Penn. 2019) ....................................... 14

*Ibanez v. U.S. Bank Nat'l Ass'n*,
  856 F. Supp. 2d 273 (D. Mass. 2012) ..................................................................... 8

*Jackson v. Netflix, Inc.*,
  506 F. Supp. 3d 1007 (C.D. Cal. 2020) ........................................................... 8, 10

*Ketab Corp. v. Mesriani & Assocs., P.C.*,
  734 F. App'x 401 (9th Cir. 2018) ........................................................................ 18

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894 (9th Cir. 2002) ........................................................................ *passim*

*Medina v. Dash Films, Inc.*,
  2016 WL 3906714 (S.D.N.Y. 2016) ....................................................... 14, 16, 17

*Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*,
  74 F. Supp. 3d 1134 (N.D. Cal. 2014) ................................................................ 11

*Milne ex rel. Coyne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) ............................................................................... 8

*Novalogic, Inc. v. Activision Blizzard*,
  41 F. Supp. 3d 885 (C.D. Cal. 2013) ....................................................... 11, 15, 16

*Rebellion Developments Ltd. v. Stardock Entertainment, Inc.*,
  No. 12-12805, 2013 WL 1944888 (E.D. Mich. May 9, 2013) ......... 11, 13, 14, 16

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ........................................................................ *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Roxbury Ent. v. Penthouse Media Grp., Inc.*,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009) ................................................. 10, 11, 14

*Stewart Surfboards, Inc v. Disney Book Grp., LLC*,
    No. CV 10-2982 GAF (SSX),
    2011 WL 12877019 (C.D. Cal. May 11, 2011) ............................................ 8, 17

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
    875 F.3d 1192 (9th Cir. 2017) .................................................................. *passim*

*VIP Prods. LLC v. Jack Daniel's Properties, Inc.*,
    953 F.3d 1170 (9th Cir. 2020) ........................................................................ 12

*Virag, S.R.L. v. Sony Computer Ent. Am, LLC*,
    No. 3:15-CV-01729-LB, 2015 WL 5000102
    (N.D. Cal. Aug. 21, 2015), *aff'd* 669 F. App'x 667 (9th Cir. 2017) ........ 8, 11, 15

*Williams v. Warner/Chappell Music*,
    2007 WL 9751921 (C.D. Cal. Sept. 26, 2007) ................................................... 8

*Winchester Mystery House, LLC v. Global Asylum, Inc.*,
    210 Cal. App. 4th 579 (2012) .................................................................. 14, 17

## STATUTES

Lanham Act .................................................................................................... 8, 10

## OTHER AUTHORITIES

Federal Rules of Civil Procedure,
    Rule 12(b)(6) ............................................................................................ 7, 8
    Rule 12(c) .......................................................................................... 3, 7, 8

*Warzone*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-
    webster.com/dictionary/war%20zone (last visited Apr. 8, 2021) ...................... 14

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **INTRODUCTION**

This case presents a textbook example of trademark overreach.  Defendant and Counterclaimant Warzone.com, LLC ("Counterclaimant") is a game developer that distributes a game titled *Warzone*.  Though Counterclaimant's *Warzone* is just one of more than a dozen games whose title includes that common English word "warzone," by this lawsuit, Counterclaimant seeks to prevent Plaintiff and Counterclaim-Defendant Activision Publishing, Inc. ("Activision") from using the word "warzone" as a subtitle for an installment in its enormously popular *Call of Duty* series of games – notwithstanding that Activision's *Call of Duty* game is about military combat in a virtual warzone.

For a variety of reasons, it is unlikely that the single word "warzone" has acquired secondary meaning as a source identifier for Counterclaimant's products (and, for that matter, Counterclaimant does not possess and has never possessed a trademark registration for that word in connection with video games.)  But irrespective of whether Counterclaimant possesses any trademark rights in that word – and assuming for purposes of this Motion only that it *does* possess such rights – Counterclaimant cannot, as a matter of law, claim for itself exclusive use of the word "warzone" in the title of expressive works about warzones and military combat.  This is because the law is absolutely clear in this Circuit (and elsewhere) that the First Amendment restricts trademark claims arising from ***titles*** of expressive works (including video games, books, records, and films) – especially where, as here, the title is a common English word that has a meaning other than to designate the source of a good or service.  Thus, numerous courts, including the Ninth Circuit, have dismissed similar claims arising from titles such as "Empire," "Rebellion," "Mastermind," "Hidden City," "Route 66," and others.

The Ninth Circuit articulated the policy and rationale behind this body of case law nearly two decades ago: "A title is designed to catch the eye and to

1    promote the value of the underlying work.  Consumers expect a title to

2    communicate a message about the book or movie, but they do not expect it to

3    identify the publisher or producer."  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d

4    894, 902 (9th Cir. 2002).

5         Thus, when analyzing trademark claims involving the titles of expressive

6    works, courts in this Circuit do not apply a "likelihood of confusion" test, but

7    instead require that the claimant first overcome the two-part test set forth in *Rogers*

8    *v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989).  Specifically, in order to proceed

9    with its claims, Counterclaimant must prove that Activision's title (*Call of Duty:*

10   *Warzone*) has ***no*** (i.e. zero) artistic relevance to the underlying work ***and*** that

11   Activision ***explicitly misleads*** customers as to the game's association with

12   Counterclaimant and its products.  Counterclaimant's Answer and Counterclaims

13   confirm that it cannot prove either element of this test.  There is no dispute that the

14   title *Call of Duty: Warzone* is artistically relevant to the content of the expressive

15   work it describes – a video game depicting a virtual warzone.  Further,

16   Counterclaimant does not even allege that Activision explicitly misleads customers

17   as to any association with its own "Warzone" game.  Accordingly, dismissal is

18   appropriate as a matter of law.

19        At base, Counterclaimant's lawsuit is premised on its apparent annoyance

20   that Activision's game is more popular than Counterclaimant's game, and thus

21   now appears before Counterclaimant's game in a Google search for the word

22   "Warzone."  Whether or not that it true, it is not trademark infringement.  To the

23   contrary, when Counterclaimant chose a common English word for its game title, it

24   ran the risk that others might also use that word to describe their game, movie,

25   book, or other creative endeavor (and, in fact, many others had already done so).

26   Activision was entitled to select a title for its game that accurately reflects the

27   content of that game and does not mislead customers.  Since the title *Call of Duty:*

28   *Warzone* accurately communicates a message about the game itself and does not

1   falsely purport to be associated with Counterclaimant, Counterclaimant's

2   counterclaims should be dismissed, and the Court should grant judgment on the

3   pleadings in Activision's favor.

4

5   **I.      STATEMENT OF FACTS**[1]

6          **Activision and the *Call of Duty* Games.**  Activision is a video game

7   publisher engaged in the business of producing, financing, marketing, and

8   distributing a portfolio of popular video games and interactive entertainment

9   products.  Compl. ¶ 11; Answer ¶ 11.  Among Activision's most popular video

10  games are the *Call of Duty* series of games.  *Id.*  Activision's *Call of Duty* games

11  are military-themed "first-person shooter" games, in which the player assumes the

12  role of a military soldier or special forces operative and engages in intense,

13  ground-based infantry combat against computer-controlled or human-controlled

14  players across a series of computer-generated, virtual battlegrounds.  Compl. ¶ 12;

15  Answer ¶ 12.

16         The *Call of Duty* game franchise has been in existence for nearly two

17  decades.  Compl. ¶ 13; Answer ¶ 13.  Activision released its first *Call of Duty*

18  game in 2003, followed by *Call of Duty 2* in 2005.  *Id.*  Since then, Activision has

19  released new installments in the *Call of Duty* franchise on a yearly basis, through

20  and including 2020's *Call of Duty: Black Ops Cold War*.  *Id.*  To date, Activision

21  has released 16 major installments to the *Call of Duty* franchise for personal

22  computers and home game consoles such as the PlayStation and Xbox.  *Id.*  In

23  addition, Activision has released several "remasters" (*i.e.* upgraded versions of

24  prior games), "spin-offs," and mobile or handheld versions of *Call of Duty*.  *Id.*

25

26  [1] As is proper under Federal Rule of Civil Procedure 12(c), these allegations are taken from
    Activision's Complaint (ECF No. 1; "Complaint" or "Compl."), Counterclaimant's Answer

27  (ECF No. 14 at 1-7; "Answer"), and Counterclaimant's Counterclaims (ECF No. 14 at 7-22;
    "Counterclaims" or "Countercl."), and to the extent they plead uncontroverted, plausible facts,

28  are presumed true for the purposes of the motion on Rule 12(c) grounds.  Activision reserves the
    right to challenge these allegations if this lawsuit proceeds.

According to public reports, Activision has sold more than 300 million *Call of Duty* games.  Compl. ¶ 14; Answer ¶ 14.  The series is considered the most successful first-person shooter game franchise ever made, with millions of people playing Activision's *Call of Duty* games each day.  *Id.*  As a result, the *Call of Duty* name and trademark is among the strongest entertainment brands in the world and is immediately recognizable to consumers of home entertainment products throughout the United States and the world.  *Id.*  Millions of people associate the *Call of Duty* name with Activision and its military-themed first-person shooter games.  *Id.*

**Call of Duty: Warzone**.  On March 10, 2020, Activision released an online multiplayer *Call of Duty* game titled *Call of Duty: Warzone* ("*CODWZ*").  Compl. ¶ 15; Answer ¶ 15.  *CODWZ*, like other *Call of Duty* titles, is a competitive, first-person military shooter game in which the player assumes the role of a military soldier and competes against other human players.  Compl. ¶ 16, Answer ¶ 16.

*CODWZ* features a very large computer-generated battlefield (or "warzone") that accommodates up to 150 players (and sometimes 200 players) at one time.  *Id.*  In its most popular ("Battle Royale") game mode, players parachute onto the warzone, scrounge for weapons and equipment, and compete to be the last soldier (or team of soldiers) remaining alive.  *Id.*  In the game's virtual warzone, players may encounter, acquire, and use a variety of military-style equipment such as guns, explosives, traps, vehicles, and melee weapons.  *Id.*  As the game progresses, the playable area shrinks, forcing players to come into close contact with each other.  When all other players have been eliminated, the remaining player is declared the winner.  *Id.*  Below is an exemplar image of *CODWZ*, as it appears to a player

during a match:



In the *CODWZ* game itself, as well as on Activision's online store (Battle.net) and promotional website, the game's logo is displayed.  Countercl. ¶ 21.  As shown below, the CODWZ logo includes the phrase "Call of Duty" and a block-letter font that is consistent with other *Call of Duty* games:



*Id.*  Also, when launching CODWZ, the player is given the option to play other *Call of Duty* games, such as *Black Ops Cold War* and *Modern Warfare*:

*Id.*

**Counterclaimant and Warzone.com.**  Counterclaimant is the developer of a game titled *Warzone*.  *Id.* ¶ 3.  *Warzone* is a strategy game that Counterclaimant markets as "Better than Hasbro's RISK game" and with the slogan "If you like Hasbro's RISK® game, you'll love Warzone! Play alone or with friends."[2]  Compl. ¶ 19; Answer, ¶ 19.  *Warzone* is playable on personal computers via a web browser (*e.g.*, Google Chrome, Windows Explorer) and on certain mobile devices.  Compl. ¶ 20; Answer ¶ 20.  Counterclaimant's *Warzone* has never been available for video game consoles such as the Microsoft Xbox, Sony PlayStation, or Nintendo Switch. *Id.*  Counterclaimant's *Warzone* is not a first-person shooter video game and does not feature animated characters, weapons, or battlefields.  Answer ¶ 22.  Instead, it is a turn-based virtual board game in which players shift numbers (representing "armies") across a map of the world to take control of countries or territories.  *Id.*

**This Lawsuit.**  On April 8, 2021, after Counterclaimant threatened to seek injunctive relief in connection with Activision's *CODWZ* and demanded millions of dollars in damages, Activision filed this lawsuit for declaratory relief, seeking a

---

[2] Hasbro's RISK is a physical tabletop board game in which players take control of territories by moving pieces across a map of the world.  *See Risk* (game), WIKIPEDIA, https://en.wikipedia.org/wiki/Risk_(game) (last visited July 23, 2021).

declaration that its use of the name *Call of Duty: Warzone* or *Warzone* did not infringe Counterclaimant's trademark rights.  ECF No. 1.

On June 8, 2021, Counterclaimant filed an Answer and Counterclaims for (1) Unfair Competition and Trademark Infringement under the federal Lanham Act, (2) Unfair Competition and False Advertising under Cal. Bus. & Prof. Code §17200, and (3) Trademark Infringement under California common law.  ECF No. 14.  All of Counterclaimant's Counterclaims arise from allegations that Activision's use of the word "warzone" "has already and will continue to result in the relevant consuming public being confused, mistaken, or deceived as to the affiliation, connection or sponsorship of Activision's goods and services" and consumers purportedly will believe that Activision's goods and services marketed under Activision's WARZONE and CALL OF DUTY: WARZONE marks "are produced by, emanate from, or are in some way associated with [Counterclaimant]."  Countercl. ¶ 39.  Counterclaimant does ***not*** allege that Activision adopted or used its *Call of Duty: Warzone* title in order to intentionally trade off the goodwill or popularity of Counterclaimant's game or in order to confuse consumers into believing that its game was related to or affiliated with Counterclaimant's game.

## II.    THE LEGAL STANDARD

Because Counterclaimant has answered Activision's Complaint and, in doing so, has admitted all of the relevant facts that support Activision's First Amendment defense, Activision seeks both (1) judgment on the pleadings as to its single cause of action for noninfringement, and (2) dismissal of all of Counterclaimant's counterclaims.

The legal standard for a motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to the standard for a motion to dismiss under Rule 12(b)(6).  *Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F. 3d 1047, 1054

1    n.4 (9th Cir. 2011) (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188,

2    1192 (9th Cir. 1989)).  Thus, to survive either motion, the pleading must contain

3    "sufficient factual matter, accepted as true, to 'state a claim to relief that is

4    plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

5    *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

6         The Court is not required to accept as true a "legal conclusion couched as a

7    factual allegation." *Iqbal*, 556 U.S. 678 (quoting *Twombly*, 550 U.S. at 555).  Nor

8    need it countenance "unreasonable inferences or conclusory legal allegations."

9    *Williams v. Warner/Chappell Music*, 2007 WL 9751921, at *2 (C.D. Cal. Sept. 26,

10   2007) (internal quotations omitted).  However, a Rule 12(c) motion "implicates the

11   pleadings as a whole." *Ibanez v. U.S. Bank Nat'l Ass'n*, 856 F. Supp. 2d 273, 275

12   (D. Mass. 2012).  Thus, unlike a Rule 12(b)(6) motion, the court may consider

13   Counterclaimant's Answer and Counterclaims, including any allegations in the

14   Complaint that are uncontested or admitted in the Answer.  *Milne ex rel. Coyne v.*

15   *Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042 (9th Cir. 2005) ("[a] judgment on the

16   pleadings is properly granted when, taking all the allegations in the pleadings as

17   true, the moving party is entitled to judgment as a matter of law") (citation and

18   quotations omitted).

19        Courts routinely resolve trademark claims like those at issue here at the

20   pleading stage.  *See, e.g.*, *VIRAG, S.R.L. v. Sony Computer Entm't Am. LLC*, 699 F.

21   App'x 667, 668 (9th Cir. 2017) (affirming dismissal; use of trademark in video

22   game protected by the First Amendment); *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235,

23   1248 (9th Cir. 2013); *see also Jackson v. Netflix, Inc.*, 506 F. Supp. 3d 1007, 1014

24   (C.D. Cal. 2020) ("The Ninth Circuit applies *Rogers* to Lanham Act claims, often

25   at the Rule 12 stage"); *Stewart Surfboards, Inc v. Disney Book Grp., LLC*, No. CV

26   10-2982 GAF (SSX), 2011 WL 12877019, at *7 (C.D. Cal. May 11, 2011)

27   (granting motion to dismiss: "[t]he circuit . . . has never stated that a court *cannot*

28   properly apply the *Rogers* test on a motion to dismiss") (emphasis in original).

Mitchell
Silberberg &
Knupp LLP

13318610.3

8

Indeed, when First Amendment interests are at stake, it is important to resolve the claims at the earliest opportunity to avoid the chilling effect resulting from concerns of protracted and expensive litigation.

## III.   THE FIRST AMENDMENT PROTECTS ACTIVISION'S *CALL OF DUTY: WARZONE* TITLE

Counterclaimant's entire claim arises from the use of the single word "warzone" as part of the title of Activision's video game.  But "titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion.  The title of a movie may be both an integral element of the film-maker's expression as well as a significant means of marketing the film." *Rogers*, 875 F.2d at 998.  As a result, "the expressive element of titles requires more protection than the labeling of ordinary commercial products."  *Id.*; *see also Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) ("A title is designed to catch the eye and to promote the value of the underlying work. Consumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer.").

Because of the First Amendment interests inherent in selecting a title for an entertainment product, courts in this Circuit do not apply the traditional "likelihood of confusion" test when the allegedly infringing use is in the title of an expressive work. *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017).  Instead, the plaintiff first must overcome the two-part ("artistically relevant" and "explicitly misleading") test articulated in *Rogers*.  *Id.*

In *Rogers*, actress Ginger Rogers brought trademark and right of publicity claims against the producers of a film titled *Ginger and Fred*, about two fictional Italian cabaret performers.  *Rogers*, 875 F.2d at 996-97.  The court affirmed the dismissal of all of Rogers' claims, holding that "the [Lanham] Act should be construed to apply to artistic works *only* where the public interest in avoiding

1  consumer confusion outweighs the public interest in free expression." *Id.* at 999

2  (emphasis added).  The *Rogers* court held that the "balance [between trademark

3  rights and the First Amendment] will normally not support application of the

4  [Lanham] Act unless [1] the title has ***no artistic relevance*** to the underlying work

5  whatsoever, or, [2] if it has some artistic relevance, unless the title ***explicitly***

6  ***misleads*** as to the source or the content of the work." *Id.* (emphasis added).  The

7  *Rogers* court also confirmed that when First Amendment rights are implicated by

8  the use of a trademark, the relevant inquiry is ***not*** whether some consumers might,

9  hypothetically, be confused by the defendant's use.  *Id.* at 1001.  Rather, even if

10  "some members of the public would draw the incorrect inference" that the plaintiff

11  sponsored or was affiliated with the work, "that risk of misunderstanding, not

12  engendered by any overt claim … is so outweighed by the interests in artistic

13  expression as to preclude application of the Lanham Act." *Id.*

14        Courts in this Circuit have adopted and consistently apply the two-part

15  *Rogers* test in cases involving titles of artistic or literary works.  This includes,

16  perhaps most notably, *Mattel,* in which the Ninth Circuit affirmed the dismissal of

17  claims arising from the use of the word "Barbie" as a song title, and *Empire,* in

18  which the Ninth Circuit affirmed the dismissal of claims involving the word

19  "Empire" as the title of a television series.  Last December, the Ninth Circuit again

20  applied *Rogers* to conclude that the book title *Oh, the Places You'll Boldly Go*

21  could not, as a matter of law, infringe trademark rights in the plaintiff's book, titled

22  *Oh, the Places You'll Go*.  *Dr. Seuss Enters, LP v. Comicmix LLC*, 983 F.3d 443,

23  463 (9th Cir. 2020).

24        In the Central District of California, trademark claims involving the titles of

25  expressive works likewise have been dismissed on numerous occasions.  Most

26  recently, in *Jackson v. Netflix, Inc.*, Judge Scarsi dismissed trademark claims

27  arising from the use of the title *Tiger King* for a documentary about tiger keeper

28  Joe Exotic.  *See* 506 F. Supp. 3d 1007, 1017-18 (C.D. Cal. 2020).  In *Caiz v.*

Mitchell
Silberberg &
Knupp LLP

13318610.3

10

1   *Roberts*, Judge Lew dismissed claims arising from the use of the word *Mastermind*

2   as the title of a record album.  *See* 382 F. Supp. 3d 942, 952 (C.D. Cal. 2019).

3   And, in *Roxbury Ent. v. Penthouse Media Grp., Inc.*, Judge Cooper dismissed

4   claims that the defendant infringed the plaintiff's trademark in its "Route 66"

5   television series by releasing a sexually explicit film with the exact same title.  669

6   F. Supp. 2d 1170, 1176 (C.D. Cal. 2009).

7         Since the Ninth Circuit's decision in *E.S.S. Entertainment 2000, Inc. v. Rock*

8   *Star Videos,* 547 F.3d 1095, 1101 (9th Cir. 2008) (dismissing trademark claims

9   arising from the depiction of a strip club's logo in *Grand Theft Auto*), courts

10   routinely and consistently apply *Rogers* to claims involving the use of trademarks

11   in and on video games – including claims involving the use of trademarks in video

12   game titles.  *See, e.g., Capcom Co. v. MKR Group, Inc.*, 2008 WL 4661479, at *13

13   (N.D. Cal. Oct. 20, 2008) (video game titled *Dead Rising* did not infringe

14   plaintiffs' trademark in the *Dawn of the Dead* film series); *Rebellion Developments*

15   *Ltd. v. Stardock Entertainment, Inc.*, No. 12-12805, 2013 WL 1944888 at *6 (E.D.

16   Mich. May 9, 2013) (game titled *Rebellion* did not infringe the plaintiff's

17   trademark.)[3]

18         *Rogers* applies not only to federal Lanham Act claims, but also to equivalent

19   state law claims for unfair competition and common law trademark infringement.

20   *ESS*, 547 F.3d 1095 ("[T]he First Amendment defense applies equally to ESS's

21   state law claims as to its Lanham Act claims"); *Mil-Spec Monkey, Inc. v. Activision*

22   *Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1144 (N.D. Cal. 2014) (dismissing claims for

23   ───────────────

[3]  *See also*, *e.g., VIRAG*, 699 F. App'x at 668 (use of trademark as signage on a
virtual race track); *Brown*, 724 F.3d at 1248 (depiction of football player in
Madden NFL video game); *AM General LLC v. Activision Blizzard, Inc.*, 450 F.
Supp. 3d 467, 480 (S.D.N.Y. 2020) (depiction of "Humvee" vehicles in *Call of
Duty* video game); *Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.,* 74 F. Supp.
3d 1134, 1140 (N.D. Cal. 2014) (use of military patch in *Call of Duty: Ghosts*
video game)*; Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 904 (C.D.
Cal. 2013) (use of "Delta Force" name and logo in game *Call of Duty: Modern
Warfare 3*); *Dillinger, LLC v. Elec. Arts Inc.*, No. 1:09-CV-1236-JMS-DKL, 2011
WL 2457678 at *8 (S.D. Ind. June 16, 2011) (use of "Dillinger" name for video
game weapon).

1  "trademark infringement under the Lanham Act; false designation of origin; unfair

2  competition under California statute; and common law trademark infringement");

3  *Novalogic v. Activision Blizzard*, 41 F. Supp. 3d 885, 904 (C.D. Cal. 2013)

4  ("Because Plaintiff's federal claims fail, its claim for common law trademark

5  infringement also fails.")

6       A.    **Activision's "WARZONE" Easily Meets The *Rogers Test*.**

7          Under the *Rogers* test, once the defendant has made a threshold legal

8  showing that its allegedly infringing use is part of an expressive work, the plaintiff

9  bears the burden of proving that the use of its alleged trademark (1) has ***no*** artistic

10  relevance or (2) is ***explicitly*** misleading.  *See VIP Prods. LLC v. Jack Daniel's

11  Properties, Inc.*, 953 F.3d 1170, 1174 (9th Cir. 2020).  The *Rogers* test applies just

12  as forcefully to claims of reverse confusion as it does to ordinary "forward"

13  confusion.  *See Caiz*, 382 F. Supp. 3d at 949 ("[T]he court finds that the *Rogers*

14  test is not barred in this case simply because it involves reverse confusion.").

15          *CODWZ* is a highly expressive work, featuring characters, fictional

16  environments, music, dialog, sound effects, and dynamic storytelling.  *See Brown,*

17  724 F.3d at 1241 ("Every version of the game features characters (players),

18  dialogue (between announcers), plot (both within a particular simulated game and

19  more broadly), and music.  Interaction between the virtual world of the game and

20  individuals playing the game is prevalent.")  As such, the game is entitled to the

21  full and complete protection of the First Amendment.  *See Brown v. Entm't

22  Merchants Ass'n,* 564 U.S. 786, 790 (2011) ("Like the protected books, plays, and

23  movies that preceded them, video games communicate ideas – and even social

24  messages – through many familiar literary devices (such as characters, dialogue,

25  plot and music) and through features distinctive to the medium (such as the

26  player's interaction with the virtual world).")  Because, as set forth below,

27  Counterclaimant cannot meet its burden of proof on either of the two *Rogers*

28  prongs, its claim must be dismissed.

Mitchell
Silberberg &
Knupp LLP

13318610.3

12

**1.** **Defendants' Use Has "Above Zero" Artistic Relevance.**

Only the use of a trademark with "***no artistic relevance to the underlying work whatsoever***" would not merit First Amendment protection. *Rogers*, 875 F.2d at 999. "In other words, the level of relevance merely must be above zero." *E.S.S.*, 547 F.3d at 1100. The First Amendment does not require that the defendant have "no alternative avenues" to express an idea, as such a standard would provide "insufficient leeway for literary expression." *Rogers*, 875 F.2d at 999. Nor does it require that the use be a parody or commentary, or even referential. *Empire,* 875 F.3d at 1198 ("This referential requirement does not appear in the text of the *Rogers* test, and such a requirement would be inconsistent with the purpose of the first prong of *Rogers*."); *see also Rebellion*, 2013 WL 1944888 at *3 ("This referential requirement is simply not required by either prong of the *Rogers* test.").

There is sound basis for this "appropriately low" standard:  it is not the province of the Court to second-guess the decisions made by artists, authors or game designers. *Rogers,* 875 F.2d at 999; *see also Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations"). The use of the term "warzone" in connection with a game about players engaged in combat in a warzone plainly exceeds this low standard.

In *Empire*, Empire Distribution, a hip-hop and urban music record label brought infringement claims against Fox Television alleging that Fox's use of the name "Empire" as the title of its television show (about a fictional hip-hop record label) was likely to cause confusion among the consuming public as to Empire's association with the Fox television show. Applying *Rogers*, the district court concluded, and the Ninth Circuit agreed, that Fox's use of "the common English word 'Empire'" for a show about a music and entertainment conglomerate that takes place in New York, the "Empire State," was artistically relevant to the

1    subject matter of the Fox show.  875 F.3d at 1199.

2          The same is true here.  In *CODWZ*, dozens of players engage in infantry and

3    vehicle-based combat across a single, massive virtual landscape (of over nine

4    square kilometers).  The battlefield on which combat takes place has all the

5    hallmarks of a real-life warzone:  namely, it is a "zone in which belligerents are

6    waging war broadly: an area marked by extreme violence."[4]  As a result, the title

7    "Warzone" is both logically and artistically relevant to the content of CODWZ.

8    *See, e.g. Mattel*, 296 F.3d at 902 (title "Barbie Girl" was artistically relevant to a

9    song about superficiality); *Capcom*, 2008 WL 4661479, at *13 (title "Dead Rising"

10   was artistically relevant to game about zombies); *Roxbury*, 669 F. Supp. 2d at 1175

11   (title "Route 66" was artistically relevant to an adult film about road trips and

12   cross-country travel); *Rebellion*, at *5 (title "Rebellion" was artistically relevant to

13   a game about an interplanetary civil war between "loyalists" and "rebels");

14   *Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579,

15   592 (2012) (title "Winchester" was artistically relevant to a movie about the

16   Winchester house); *Hidden City Philadelphia v. ABC, Inc*., No. CV 18-65, 2019

17   WL 1003637, at *4 (E.D. Penn. 2019) (title "Hidden City" was artistically relevant

18   to television show about interesting city landmarks.); *Medina v. Dash Films, Inc.*,

19   2016 WL 3906714, at *6 (S.D.N.Y. 2016) (title "Loisaidas," which was slang for

20   "lower east siders," was artistically relevant to a film about New York's lower east

21   side.).

22              **2.    Activision's Use Is Not Explicitly Misleading.**

23         *Rogers* and its progeny, including *Empire*, also make clear that for an

24   expressive use to be "explicitly misleading," the allegedly infringing use must

25   include an "'***explicit*** indication,' '***overt*** claim,' or '***explicit*** misstatement' about the

26   source of the work."  *Dr. Seuss Enters.*, 983 F.3d at 462 (citing *Brown*, 724 F.3d at

---

[4]  *Warzone*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/war%20zone (last visited Apr. 8, 2021).

1245) (emphasis added).  This is a "high bar."  *Id.*  "It is key here that the creator
must *explicitly* mislead consumers."  *Empire*, 875 F.3d at 1199 (*quoting Brown*,
724 F.3d at 1245) (emphasis in original).  "[T]he mere use of a trademark alone
cannot suffice to make such use explicitly misleading."  *E.S.S.*, 547 F.3d at 1100.
Thus, for example, titles such as "Jim Brown Presents Pinball," "Nimmer on
Copyright," and "Jane Fonda's Workout Book" might explicitly mislead if
inaccurate.  *See Brown*, 724 F.3d at 1245; *Rogers,* 875 F.2d at 1007.  On the other
hand, titles containing common English words (such as "Empire," "Mastermind,"
"Rebellion," and "Route 66") that do not "explicitly mislead," even if they are
similar to the titles of other pre-existing works or trademarks.

Counterclaimant does not and cannot allege that ***anything*** in the *CODWZ*
title, game, or marketing materials (including its website, key art, or store page)
even suggests – far less "explicitly misleads" (i.e. affirmatively states or overltly
claims) – that *CODWZ* or Activision has any relationship whatsoever with
Counterclaimant.  *Novalogic*, 41 F. Supp. 3d at 901 ("[I]t is undisputed that
Activision does not explicitly misrepresent or in any manner affirmatively state to
the public that Plaintiff is associated with, sponsored, endorsed, or otherwise is the
source of [*Call of Duty: Modern Warfare 3*]"); *Virag*, 2015 WL 5000102, at *12
("The plaintiffs do not allege or even suggest that the defendants explicitly
indicated, claimed, or misstated that VIRAG was a source of content for [the
games] or sponsored [the games]."); *Caiz*, 382 F. Supp. 3d at 951 (dismissal where
plaintiff "points to no evidence indicating that Defendants' use even 'implicitly
suggest[s]' that the album is associated with Plaintiff, let alone any evidence of an
overt association.").[5]  Nor does Counterclaimant allege that the *CODWZ* title

---

[5] Notably, though *Rogers* makes clear that allegations that "some members of the
public would draw the incorrect inference" of association are insufficient to
overcome First Amendment protection, *see Rogers*, 875 F.2d at 1001,
Counterclaimant does not even allege that even a single person erroneously
believed that Activision's *CODWZ* and Counterclaimant's *Warzone* originated
from the same source or otherwise are affiliated.

explicitly misleads as to the content of the game.  *Dickinson v. Ryan Seacrest Enterprises, Inc.,* No. CV 18-2544-GW(JPRX), 2019 WL 3035090, at *10 (C.D. Cal. Mar. 26, 2019), *aff'd*, 839 F. App'x 110 (9th Cir. 2020) ("A title or advertisement for an expressive work will be misleading as to content when it explicitly deceives consumers as to the content of the underlying work.")  To the contrary, the use of the word "warzone" in the title of *CODWZ* is an accurate, non-misleading description of the underlying work: a game about military combat in a warzone.  *See Mattel*, 296 F.3d at 901 ("We expect a title to describe the underlying work, not to identify the producer, and Barbie Girl does just that.").

Any claim that the use of the word "warzone" is "explicitly misleading" is especially meritless because – just as was the case in *Empire*, *Rebellion*, and others – "warzone" is a common English word that has acquired a meaning among the general public (and the military) that has nothing to do with Counterclaimant's game.  *See, e.g., Abilt v. Cent. Intel. Agency,* 848 F.3d 305, 309 (4th Cir. 2017) (discussing military assignments to a "warzone")*; Amanatullah v. Obama,* 904 F. Supp. 2d 45, 56 (D.D.C. 2012) ("This Court agrees … that Afghanistan remains an active warzone.")  It is likely for that reason that, as Counterclaimant admits, many other video games have used the word "warzone" in their titles without complaint from Counterclaimant.  *See* Answer ¶ 21[6]; *see also Caiz*, 382 F. Supp. 3d at 950 (noting that the term "mastermind" was a common hip-hop theme, and "various different hip-hop artists" have referred to themselves as "masterminds").  As one court explained: "'If a trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function,' the same limit applies with even more logical force where the mark had a public meaning <u>before</u> it ever played a source-identifying

---

[6]  *See also Finjan, Inc. v. Sophos, Inc.,* No. 14-CV-01197-WHO, 2016 WL 2988834, at *24 (N.D. Cal. May 24, 2016) (patent case involving software program titled "Warzone.")

1   function." *Medina*, 2016 WL 3906714, at *6 (*quoting Mattel*, 296 F.3d at 900)

2   (emphasis in original).

3        In addition, *CODWZ*'s marketing (including the examples set forth in the

4   Counterclaims) makes clear that the game is part of the *Call of Duty* franchise.

5   The *Call of Duty* name and distinctive lettering are uniformly present in such

6   materials. *See NovaLogic,* 41 F. Supp. 3d at 901 (the "packaging is very clear as to

7   its origin and source. It prominently displays the title 'CALL OF DUTY—MW3,'

8   and identifies its makers as 'Activision,' and its affiliated studios"); *Stewart*, 2011

9   WL 12877019, at *7 (book not explicitly misleading: "book jacket and spine

10  include the Disney logo, the 'Disney Press' logo, and the Disney channel logo");

11  *Winchester*, 210 Cal. App. 4th at 592 (title not explicitly misleading where the

12  phrase "A MARK ATKINS Film is featured above the title on the front cover");

13  *Medina*, 2016 WL 3906714, at *5 (absence of explicitly misleading conduct

14  "particularly true where defendants employed their own source designations

15  elsewhere on the product"); *Dr. Seuss*, 983 F.3d at 463 ("[T]he cover

16  conspicuously lists David Gerrold and Ty Templeton, not Dr. Seuss, as authors.")

17       Even Counterclaimant's own exemplar images (Countercl., ¶¶ 19, 21) reflect

18  that *CODWZ*'s marketing is accompanied by images of other *Call of Duty* games,

19  *Call of Duty* characters and artwork, *Call of Duty* weapons, and related *Call of*

20  *Duty* logos such as the stylized "MW" logo (representing the game *Call of Duty:*

21  *Modern Warfare*.) Thus, when seen in context, no reasonable consumer could

22  conclude that Activision is holding *CODWZ* out as having been made by or

23  associated with anyone or anything other than Activision and its *Call of Duty*

24  franchise.[7]

25  _____

26  [7] Counterclaimant contends that in some limited instances (such as on Activision's
    investor page), Activision refers to its game as *Warzone* (rather than *Call of Duty:*
27  *Warzone*) or uses a smaller font for *Call of Duty*. Countercl. ¶ 21. The allegation
    is curious because the press release that Counterclaimant references is titled "**Call**
28  **of Duty** Delivers Game Changing Free Play Experience With **Call of Duty:**
    **Warzone** – Available Now." *Id.* (emphasis added). But even if the allegations

1    Finally, it bears noting that Activision used "Warzone" as the subtitle of

2   only a single *Call of Duty* game, among more than a dozen other games released

3   over nearly two decades. Each of these games was extremely popular and sold

4   millions of copies. *See Caiz*, 382 F. Supp. 3d at 951 ("Roberts is using

5   'Mastermind' as one album title of six albums throughout his career – a career

6   which he has established as a renowned artist under the moniker 'Rick Ross.'"). In

7   light of this fact (which Counterclaimant admits), any suggestion that Activision

8   intended to explicitly mislead its customers into believing that it was associated

9   with Counterclaimant and its browser-based strategy game defies common sense or

10  credibility.

11

12                                    **<u>CONCLUSION</u>**

13   For the reasons set forth herein, Activision requests that the Court dismiss all

14  of Counterclaimant's Counterclaims and enter judgment on the pleadings in favor

15  of Activision on its claim for declaratory relief.[8]

16

17  DATED: July 29, 2021              MARC E. MAYER
                                      KARIN G. PAGNANELLI
18                                    MITCHELL SILBERBERG & KNUPP LLP

19                                    By: /s/ Marc E. Mayer
20                                         Marc E. Mayer (SBN 190969)
                                           Attorneys for Activision Publishing, Inc.
21   _____

22  were true, this does not change the analysis since Counterclaimant never alleges
     that the title was used in an explicitly misleading manner – only on Activision's
23  websites, alongside other *Call of Duty* games, in reference to an Activision game.
     Counterclaimant does not provide even a single example in which Activision used
24  the word "warzone" outside the context of *Call of Duty* – far less in a way that
     suggests a relationship with Counterclaimant.

25  [8]  As a matter of law, once the *Rogers* test is applied to the undisputed facts here,
     all of Counterclaimant's Counterclaims are barred – and rightfully so – by the
26  protections of the First Amendment of the U.S. Constitution. Since no amount of
     repleading could impact the straightforward application of the *Rogers* test here, the
27  Court should dismiss the claims ***without*** leave to amend. *Ketab Corp. v. Mesriani
     & Assocs., P.C.*, 734 F. App'x 401, 406 (9th Cir. 2018) ("[L]eave to amend is
28  usually freely granted[,] unless it is clear that the complaint could not be saved by
     amendment.")