1  Marc E. Mayer (SBN 190969)
     mem@msk.com
2  Karin G. Pagnanelli (SBN 174763)
     kgp@msk.com
3  Alexandra L. Anfuso (SBN 333440)
     ala@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
5  Los Angeles, CA  90067-3120
   Telephone: (310) 312-2000
6  Facsimile: (310) 312-3100

7  Lindsay Edelstein (*pro hac vice*)
     lre@msk.com
8  MITCHELL SILBERBERG & KNUPP LLP
   437 Madison Ave., 25th Floor
9  New York, New York 10022-7001
   Telephone: (212) 509-3900
10 Facsimile: (212) 509-7239

11 Attorneys for Activision Publishing, Inc.

Alyssa K. Schabloski (SBN 258876)
  aks@gladiuslaw.com
GLADIUS LAW, APC
2708 Wilshire Blvd., No. 426
Santa Monica, CA 90403
Telephone: (310) 734-0720

Brett E. Lewis (*pro hac vice*)
  brett@iLawco.com
Roberto Ledesma (*pro hac vice*)
  roberto@ilawco.com
Michael D. Cilento (*pro hac vice*)
  michael@iLawco.com
LEWIS & LIN, LLC
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Telephone: (718) 243-9323
Facsimile: (718) 243-9326

Attorneys for Warzone.com, LLC

12

13              UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15  ACTIVISION PUBLISHING, INC., a
    Delaware corporation,
16
            Plaintiff,
17
        v.
18
    WARZONE.COM, LLC,
19
            Defendant.
20  _____
    WARZONE.COM, LLC,
21
            Counterclaimant,
22
        v.
23
    ACTIVISION PUBLISHING, INC., a
24  Delaware corporation,
25          Counterdefendant.
26
27

CASE NO. 2:21-cv-3073-FLA (JCx)

[Discovery Document: Referred To Magistrate Judge Jacqueline Chooljian]

**JOINT STIPULATION RE MOTION TO COMPEL FURTHER RESPONSES TO INTERROGATORY 14 (REGARDING DAMAGES) AND DOCUMENT REQUESTS 102 AND 67 (REGARDING REVENUE AND EXPENSES)**

[Notice of Motion, Declaration of Marc E. Mayer, Declaration of Michael D. Cilento in Opposition Thereto, and (Proposed) Order filed concurrently herewith]

Hearing Date: October 29, 2024
Hearing Time: 9:30 a.m.
Fact Discovery: December 17, 2024
Pretrial Conference: May 19, 2025
Trial: May 27, 2025

28

Mitchell
Silberberg &
Knupp LLP

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENTS ................................................................................1

Activision's Introductory Statement .........................................................................1

Warzone's Introductory Statement .........................................................................4

    1.    Fact Discovery is Ongoing ...................................................................4

    2.    The Parties Dispute Damages Disclosures .........................................5

    3.    Warzone Supplemented its Damages Discovery Responses Before Activision Filed this Joint Stipulation..................................................5

    4.    Activision Waxes Poetic About Irrelevant Theories ...........................6

I.    ISSUE 1:  INTERROGATORY NO. 14 .........................................................7

Activision's Position................................................................................................8

Warzone's Position ..............................................................................................10

    1.    Warzone's Supplemental Response Moots Activision's Arguments.........................................................................................10

    2.    Warzone's Response Discloses its Claims for Damages Based on the Available Information .................................................................16

II.    ISSUE 2: REVENUE DOCUMENTS .........................................................17

Activision's Position..............................................................................................17

Warzone's Position..............................................................................................21

III.    ISSUE 3:  EXPENSE DOCUMENTS .........................................................22

Activision's Position..............................................................................................23

Warzone's Statement..........................................................................................25

Mitchell
Silberberg &
Knupp LLP

i

1    Pursuant to C.D. Cal. Local Rule 37-2, Plaintiff/Counterclaim Defendant

2 Activision Publishing, Inc. ("Activision") and Defendant/Counterclaimant

3 Warzone.com, LLC ("Warzone") hereby submit the following joint stipulation

4 regarding Activision's Motion to Compel further responses to Interrogatory No. 14

5 and Document Requests Nos. 102 and 67.

6 **INTRODUCTORY STATEMENTS**

7 **Activision's Introductory Statement**

8    This is a trademark dispute involving the common word "Warzone" in the

9 title of two video games. Warzone is a small, two-person start-up that in late 2017

10 released a browser-based virtual board game (which it touts as being akin to the

11 board game "Risk") titled "Warzone." When Warzone was released, it was one of

12 dozens of video games and board games that included the word "Warzone" in its

13 title, including (by way of example) "Warzone 2100," "Halo: Warzone," "Eve

14 Valkyrie: Warzone," "Crysis: Warzone," "Anomaly: Warzone Earth," "Warzone:

15 Resurrection," and others. Warzone was not a successful game, did not penetrate

16 the mainstream video game marketplace, and generated little revenue prior to

17 2020. Warzone is free-to-play (*i.e.*, players need not purchase the game), but

18 generates revenue through advertising or "premium" subscriptions which remove

19 ads from the game and allow access to additional features. Warzone does not

20 possess – and never has possessed – a registered U.S. trademark in the name

21 "Warzone," and thus bears the burden in this litigation of proving that it possesses

22 exclusive trademark rights in the word "Warzone" in connection with video games.

23    Activision is a video game developer and publisher whose games include the

24 popular "Call of Duty" series. The "Call of Duty" games are competitive, military-

25 themed "first-person shooters," in which the player assumes the role of a soldier

26 and competes against other players across detailed computer-generated battlefields.

27 In March 2020, Activision released a "free-to-play," stand-alone "Call of Duty"

28

Mitchell
Silberberg &
Knupp LLP

1

game titled "Call of Duty: Warzone" ("CODWZ").  In CODWZ, more than 100 players compete to be the last soldier standing in a large-scale virtual warzone.

Notwithstanding that there is no evidence that any person ever played CODWZ (or spent money in the game) believing that it was Warzone's game (or vice versa), *and* that there is no evidence that Warzone's revenue declined as a result of the release of CODWZ (in fact, its revenue *increased*), Plaintiff apparently seeks tens of millions of dollars in damages.  However, Warzone has refused to articulate the legal or factual basis for its damages claims, far less the amount it is seeking in this lawsuit or how it calculated that amount.  For example, it has not explained whether it contends that its sales have declined as a result of the release of CODWZ or whether it has lost players as a result of CODWZ.  It also has not explained whether it contends that its purported "trademark" in "Warzone" has been damaged as a result of the release of CODWZ and, if so, how it intends to place a value on its trademark or calculate the diminution in value.

In an effort to ascertain the basis for Warzone's damages claims, Activision served written discovery on Warzone, including:

- Interrogatory No. 14, which requests that Warzone "IDENTIFY all categories or types of injuries that YOU claim to have suffered as a result of the conduct alleged in the COUNTERCLAIM, and, for each claimed injury, the amount of damage YOU suffered." Declaration of Marc E. Mayer ("Mayer Decl."), Ex. 2.

- Document requests seeking financial data necessary for Activision to assess Warzone's claims for purported lost revenue or diminution in value of its trademark – namely, documents reflecting (1) revenue received from Warzone's exploitation of the Warzone game (Request No. 102), and (2) all expenses relating to the Warzone game (such as server costs, hosting fees, and development costs) (Request No. 67).  Mayer Decl., Exs. 1 and 5.

Mitchell
Silberberg &
Knupp LLP

2

Warzone's responses to these requests were wholly inadequate.  Rather than providing any explanation of its damages theories in response to a basic contention interrogatory, Warzone provided only a conclusory statement that it seeks to recover "damages sustained" as a result of the injury.  Mayer Decl., Ex. 4.  Warzone has refused to supplement this interrogatory.  *See* Mayer Decl., Ex. 10.  Warzone also refused to produce financial data that is necessary for Activision to calculate and assess any claims of "lost revenue" or economic damage.  In response to document requests seeking revenue and expenses, Warzone initially provided only top-line (lump-sum) revenue information.  After pressure from Activision, Warzone eventually provided some revenue information related to its mobile apps (one of which was not released until ***after*** the alleged infringement.)  Warzone did not provide any documents reflecting other sources of revenue, such as advertising and website purchases.  Warzone also did not produce documents identifying its specific expenses and the nature of those expenses, such as employee salaries, hosting fees, marketing and advertising, overhead, and outside consultants.  Mayer Decl., ¶¶ 8, 13, 14.  Instead, Warzone produced only a set of tax returns, containing a single line-item for yearly deductions.

To justify its failure, Warzone claims that it does not possess such documents.  This is not credible.  In the ordinary course of business, Warzone would have received payments to a bank or other account for the advertising on its website and for website purchases.  As for expenses, it must have received invoices from third parties (such as hosting providers and consultants), written checks or made electronic transfers to pay those bills, or received credit card statements.  If this revenue and expense data is not reflected on a profit-and-loss statement, then Warzone must provide its bank account statements, credit card statements, and all invoices or receipts reflecting the inflow and outflow of money.  Without that information, it is impossible for Activision to assess Warzone's damages claims, including both its lost revenue claim ***and*** corrective advertising claim, since

Mitchell
Silberberg &
Knupp LLP

3

1    Warzone cannot recover more in corrective advertising damages than its trademark

2    is worth.  *See Van Burren v. Envii, Inc.*, 2019 WL 3220013, at *3 (C.D. Cal. Mar.

3    27, 2019) ("[B]efore awarding damages, the Court requires evidence that the

4    damages sought are not greater than the value of the trademark.")

5         Activision's motion should be granted.

6                    **Warzone's Introductory Statement**

7         Rather than supporting its burden on its motion to compel of showing that

8    Warzone has purportedly not complied with its discovery obligations, Activision

9    leaps ahead to frame and challenge the evidence it believes Warzone may proffer

10   in support of its claims, and the legal bases Warzone may argue for its damages

11   claims—none of this is properly before the court on a discovery motion. Warzone

12   reserves all rights, but does not refute each and every misstatement, insult, or

13   argument Activision presents in its attempt to lock horns over ultimate issues

14   because the matter squarely before the Court is relatively simple. In the midst of

15   the parties' fruitful discussions regarding supplementing their responses to

16   discovery, Activision served this motion to compel on Warzone. Warzone

17   expressed surprise, supplemented the interrogatory response in question—mooting

18   the motion—and continued its rolling productions of documents. To Warzone's

19   continued surprise, Activision nevertheless insisted upon filing this Joint

20   Stipulation. "Ultimately, it seems as if most, if not all, of this dispute could have

21   been resolved without the Court's involvement" and Warzone's "consistent

22   responses in a relatively short timeline cuts against any intentional delay or

23   gamesmanship." *Nat'l Cas. Co. v. Fed. Ins. Co*., No. 22-01690, 2022 WL

24   17222254, at *4 (C.D. Cal. Aug. 3, 2022).

25   **1.    Fact Discovery is Ongoing**

26        The parties' competing declarations agree that this motion comes early in the

27   discovery period. Fact discovery does not close in this matter until December 17,

28   2024, and expert disclosures are not due until January 10, 2025. Docket No. 75

Mitchell
Silberberg &
Knupp LLP

(Scheduling Order). As of the morning of this filing, Activision had only produced 163 documents, and both parties continue to produce documents on a rolling basis; Activision itself doubled its production today, producing a further 259 documents. Cilento Decl. ¶ 15. The parties have supplemented their responses to interrogatories on several occasions. Cilento Decl. ¶¶ 4, 11, 12 & Mayer Decl. ¶¶ 6, 10. And, neither party has noticed any depositions. Cilento Decl. ¶ 15.

## 2.    The Parties Dispute Damages Disclosures

In the spirit of continuing to supplement discovery responses, and as part of ongoing meet and confer discussions, Warzone's counsel wrote to Activision on September 17, 2024 to distinguish between its agreement to continue to produce requested and responsive documents and information, and Activision's claim that it was entitled to the full disclosure of specific damages calculations and dollar amounts. For damages claims based on the other parties' financial information, the application of sound economic analysis to the available evidence includes relying upon the materials produced and testimony provided during discovery by Warzone, by Activision, and by third parties, and expert analysis. Activision's soliloquy, *infra* at 17, regarding one possible asset valuation methodology evinces as much. Warzone's September 17 correspondence maintained that requiring Warzone to conduct such an analysis both without the benefit of the relevant documents from Activision and *sans* expert, was illogical and without basis in law.

## 3.    Warzone Supplemented its Damages Discovery Responses Before Activision Filed this Joint Stipulation

Less than 24 hours after receiving the correspondence from Warzone reiterating this well-known distinction between fact and opinion discovery, counsel for Activision served this motion to compel. The motion not only asks the Court to compel what Warzone has already agreed to produce, but also sets forth hyperbolic and unwarranted characterizations of Warzone, of this litigation (in which Activision is the plaintiff seeking a declaration that it owns the mark WARZONE)

Mitchell
Silberberg &
Knupp LLP

5

1    and of case law that does not conclude in Activision's favor and is not pertinent to

2    any live discovery dispute.

3         After Warzone reviewed Activision's portion of the Joint Stipulation, on

4    September 23, Warzone aired its confusion about the sudden appearance of

5    Activision's motion without meeting and conferring under L.R. 37-1, noting that

6    Warzone confirmed as recently as September 17 that it would continue to

7    supplement its discovery responses and document productions, and that the motion

8    would be moot in view of Warzone's forthcoming supplemental response and

9    document productions. Cilento Decl. ¶ 11. Warzone served its planned

10   supplemental response to Interrogatory No. 14 the very next day, but Activision

11   refused to consider Warzone's response and restated its intention to file the Joint

12   Stipulation it had drafted prior to Warzone's operative response. *Id*. ¶ 12.

13   **4.    Activision Waxes Poetic About Irrelevant Theories**

14        This District's meet and confer requirements under L.R. 37 are but one

15   casualty of Activision's single-minded fixation on belittling Warzone. Activision

16   also spends countless pages of its motion incorrectly measuring Warzone's

17   discovery responses against Activision's own views of the merits of Warzone's

18   potential damages theories, claiming that Activision's ability to litigate the case

19   *Activision filed* rests on Warzone's bank statements and receipts, as it is otherwise

20   allegedly "impossible for Activision to assess Warzone's damages claims"; this is

21   a school of red herring.

22        First, neither Activision's academic discourse over the legal underpinnings

23   of Warzone's claims for damages nor its preferred methodology for calculating

24   trademark damages militate toward compelling further responses to discovery from

25   Warzone. The proper inquiry on a motion to compel is whether Warzone has

26   provided the relevant and discoverable information it possesses, not whether each

27   of Warzone's infringement and damages theories is viable as a matter of law. The

28   answer to both questions is yes, but the latter is a matter for later adjudication.

Mitchell
Silberberg &
Knupp LLP

6

Second, for all of its grandstanding, it is unclear whence Activision plucks many of its specious assertions, most notably its repeated assertions that Warzone "intends to seek tens of millions of dollars in damages" based on a "lost revenue claim" or "lost income theory"; this statement is supposedly critical to Activision's entitlement to the discovery it seeks, yet it appears in none of Activision's exhibits nor its declaration in support. *See generally*, Mayer Decl. & *id.*, Exs. 1-11. Indeed, Warzone's discovery responses directly contradict this claim. *See* Cilento Decl., Ex. B at 3.

Finally, the Court can dispose of the motion to compel without reaching any of Activision's extraneous arguments—Warzone has already supplemented its interrogatory response and has already produced, or agreed to produce the relevant financial information responsive to Activision's RFPs. Warzone thus submits that the Court should deny Activision's motion as moot, or in the alternative, because Warzone has appropriately complied with its discovery obligations.

## I.    ISSUE 1:  INTERROGATORY NO. 14

**Interrogatory No. 14:**

IDENTIFY all categories or types of injuries that YOU claim to have suffered as a result of the conduct alleged in the COUNTERCLAIM, and, for each claimed injury, the amount of damage YOU suffered.

**Response to Interrogatory No. 14**

Warzone objects to this Interrogatory on the grounds that it is unduly burdensome and harassing, premature, and better suited for requests for production. Subject to and without waiving the foregoing objections, Warzone states as follows: Warzone seeks various injunctive relief that, inter alia, would enjoin and restrain Activision from imitating, copying, or making any unauthorized use of the WARZONE mark or any mark confusingly similar thereto.

Warzone also seeks monetary damages as follows:

Mitchell
Silberberg &
Knupp LLP

7

a.  all damages sustained by Warzone as a result of Activision's unlawful actions;  b. the cost of corrective advertising, or other actions to address and repair any damage to Warzone's trademark as a result of Activision's unlawful actions; and c. all costs, including reasonable attorneys' fees, incurred by Warzone to stop Activision's unlawful actions.

The calculation of Warzone's damages has not yet been fully quantified at this early stage in the litigation, and it is very likely that Warzone will need an expert to testify on certain of the above. Moreover, given that Activision's unlawful actions are ongoing, any such calculation would be subject to change.

**Activision's Position.**

Warzone's response to this interrogatory is wholly insufficient.  The calculation and quantification of Warzone's alleged damages is a critically important issue in this case, and Warzone has expressed to Activision that it intends to seek tens of millions of dollars in damages.  Activision is entitled to a clear delineation of Warzone's damages theories, the amount it is seeking, and the methodology or manner by which it intends to calculate such damages.  *Ritchie v. Sempra Energy,* No. 10CV1513-CAB(KSC), 2014 WL 12637955, at *6 (S.D. Cal. Aug. 4, 2014) (the plaintiff "should provide its assessment of damages in light of the information currently available to it in sufficient detail so as to enable [the defendant] to understand the contours of its potential exposure and make informed decisions as to settlement and discovery.") Formulaic statements that Warzone will seek "all damages sustained" and costs "to address and repair any damage" are bare legal conclusions devoid of any factual basis and do not fairly apprise Activision of the basis for Warzone's damages claims.  "[W]here discovery is sought regarding the damages being claimed, '[i]t is not sufficient for a party to respond merely by stating generally that it seeks certain types of damages, or by referring to financial documents from which the information may be derived.'"

Mitchell
Silberberg &
Knupp LLP

8

*Wilkins v. Ragoodial*, No. 2:20-CV-14203, 2021 WL 1579955, at *2 (S.D. Fla. Apr. 21, 2021), *citing Friskney v. Am. Park & Play, Inc.,* No. 04-80457-CIV, 2005 WL 8156082, at *2 (S.D. Fla. June 21, 2005); *see also Vander Music, Inc. v. Azteca Int'l Corp.,* No. CV 08-8184-JHN (RCX), 2010 WL 11519369, at *2 (C.D. Cal. Apr. 14, 2010) (interrogatory response that "Plaintiff has lost licensing fees in amounts ranging from $700 to $1,000 for each alleged act of infringement based upon the usual and customary fees paid by various television networks for uses similar to Defendant's" was insufficient.)

Warzone cannot avoid providing a fulsome response to this interrogatory by claiming "it is very likely that Warzone will need an expert."  It is well-established that "[f]uture expert analysis does not relieve plaintiff of its obligation to provide information reasonably available to it" regarding its alleged damages.  *Frontline Medical Assoc. v. Coventry Health Care,* 263 F.R.D. 567, 570 (C.D. Cal. 2009). *See also Friskney*, at *2 ("Even where it is premature for a party to provide expert opinions on the subject of damages, the party is required to provide a substantive response regarding the amount of damages based on the information it has to date."); *Seoul Semiconductor Co. v. FEIT Elec. Co.,* No. 2:22-CV-05097-AB-SHK, 2024 WL 3086641, at *9 (C.D. Cal. May 23, 2024) ("Plaintiffs' objection that the information will be provided at the appropriate time for expert discovery is not well taken because 'it is well-settled [that] Plaintiffs cannot wait until expert discovery to provide their damages contentions.'")

Nor can Warzone avoid responding to the Interrogatory on the basis that the litigation is at an "early stage."  In fact, the parties are well into the discovery process and Activision has produced extensive financial data.  To the extent that Warzone claims that it or its trademark have suffered "damage," that is information within its control.  In fact, only Warzone knows the amount or extent to which it has been damaged.  It is not unduly burdensome or inappropriate to require Warzone to state precisely how it has been damaged and how it intends to quantify

Mitchell
Silberberg &
Knupp LLP

9

that damage.  If adjustment is necessary due to additional discovery or expert testimony, Warzone may amend its response.  However, there is no reason why it cannot provide a complete and detailed response to this interrogatory and, at minimum, identify the precise ways in which it has been damaged and what facts it intends to rely on to prove the amount of such damage.

**Warzone's Position**

**1.    Warzone's Supplemental Response Moots Activision's Arguments**

Activision's motion to compel further response to Interrogatory No. 14 fails at the first hurdle; Warzone has already provided further response to this interrogatory, and the Court should deny Activision's motion as moot on this ground alone. *See* Cilento Decl., Ex. D, (citing *Robinson v. Bay Club Los Angeles, Inc.*, No. 21-03578, 2021 WL 4706705, at *2 (C.D. Cal. July 28, 2021) & *Iniguez v. Wayfair LLC*, No. 21-880, 2022 WL 2177452, at *2 (C.D. Cal. May 12, 2022) (denying motion to compel as moot and admonishing the parties for failure to confer where defendant supplemented its RFAs) & *Selim v. Fivos, Inc.*, No. 22-1227, 2023 WL 3172467, at *2 (W.D. Wash. May 1, 2023) (finding "supplementation updates" preclude a showing that the parties had "reached an impasse justifying the Court's intervention")).

Activision's claims about the contents of the response to Interrogatory No. 14 are outdated and inaccurate. Warzone's operative response is not limited to "'damages sustained' as a result of the injury"; Warzone has not "refused to supplement this interrogatory"; Warzone has not refused to "produce financial data." *Compare* Mayer Decl. *with* Cilento Decl. ¶¶ 5, 7, 9. To the contrary, Warzone prepared and served a supplemental response to Interrogatory No. 14 prior to the filing of the instant Joint Stipulation. *See* Cilento Decl. ¶¶ 11, 12. Warzone requested that Activision meet and confer about this supplemental response, but Activision refused, claiming that it preferred to file this Joint

Mitchell
Silberberg &
Knupp LLP

Stipulation without tailoring its arguments to the text of Warzone's supplemental response, stating that the response was insufficient for the same reasons it articulated previously. *Id.* ¶ 13. Warzone thus provides the text of its supplemental response below, in accordance with L.R. 37:

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

*Warzone further objects to this interrogatory on the grounds and to the extent that it is duplicative and cumulative of other requests, including but not limited to Interrogatory No. 19. Subject to and without waiving its forgoing objections, Warzone supplements its response as follows: Warzone intends to seek prospective corrective advertising damages, which are calculated with reference to Activision's expenditure and or budget regarding branding, advertising, promoting or marketing in the United States for any product or service that incorporates, includes, references, uses, or benefits from the name, word, term, or mark "WARZONE." Such calculation is necessarily based upon Activision and/or third party testimony, productions of documents, and/or responses to discovery regarding calculation of the total attributable expenditure and the percentage of such amount, up to 25%, that is recoverable.*

*Collectively or in the alternative as compensatory damages, Warzone also intends to seek profits attributable to Activision's infringing use of Warzone's trademark in the United States. Activision has been unjustly enriched by freely using Warzone's trademark. Calculation of the recoverable amount of Activision's profits attributable to such infringement is necessarily based upon Activision and/or third party testimony, productions of documents, and/or responses to discovery.*

*In addition, Warzone contends that Activision's infringement in this case has been willful, reckless and in careless disregard of Warzone's right to control its brand, goodwill, identity, and associated trademark within the overlapping markets in which both parties offer their products and services to download online*

*or as mobile applications. Activision was aware of Warzone's senior use of the WARZONE mark since at least 2020 when it filed for the trademark WARZONE and began using such mark in reference to and in connection with its Call of Duty house mark, initially providing for online download of a game titled "Call of Duty: WARZONE" or WARZONE: Call of Duty, which it regularly identified by the term WARZONE. Activision's intentional infringement of Warzone's senior rights to such mark caused immediate harm to Warzone, including but not limited to Warzone's inability to control its reputation and goodwill based on the overwhelming commercialization of the mark WARZONE in association with Call of Duty, instead of Warzone's products and services. In early 2021, in an effort to mitigate the exponentially increasing harm to Warzone's use of its own mark as a source identifier, Warzone offered Activision the option of taking a license to use the WARZONE mark or to buying the rights to its mark, including the Warzone.com domain name. Activision refused and filed this lawsuit seeking Warzone's WARZONE mark for itself. As such, Warzone not only continued to suffer harm from Activision's infringement, but has also had to incur significant legal fees and costs in an effort to defend itself and its ability to use its own trademark.*

*Prior to March 21, 2024, Activision had not offered any product or version of Call of Duty using or associated with the WARZONE mark for download on mobile devices. Since November 2017, Warzone was the only mobile gaming application using WARZONE, available for download to mobile device users on both the iOS and Android platforms. Despite being fully aware of Warzone's senior use of the WARZONE mark both online and in the mobile space, Activision released WARZONE MOBILE, the name associated with its Call of Duty: Warzone Mobile game, for download to mobile devices. Warzone intends to seek compensatory damages regarding Activision's intentional infringing use in this market as well.*

Mitchell
Silberberg &
Knupp LLP

12

*Warzone does not intend to seek, and has never represented that it would seek, actual damages based on its own lost revenue or lost profits as a result of Activision's infringement.*

*Warzone also intends to seek an injunction to stop Activision from using the mark WARZONE to the extent that the association amongst consumers of video games online or on mobile devices, that anything marked WARZONE, is irreparably associated with Activision's products or services (including Call of Duty or COD), beyond a compensable amount.*

*Warzone intends to seek compensatory damages as described above and in amounts to be determined after receiving the necessary documents and information not in its own possession, custody or control, during the ongoing discovery process. Warzone will seek an injunction, trebling of any damages award, attorney's fees and costs spent in connection with this litigation, punitive damages based on Activision's intentional and willful infringement, and enhanced damages as provided for by law and warranted based on the facts and circumstances in this case. Warzone will also provide expert disclosures regarding damages sought from Activision, on January 10, 2025, when opening expert reports in this matter are scheduled to be disclosed.*

Activision argues that Warzone allegedly failed to provide sufficient detail regarding the bases for the damages it intends to seek, but Warzone's supplemental response discloses the factual and legal foundations upon which it intends to calculate its damages. Courts in this Circuit have consistently held that such disclosures, at this stage, are sufficient to meet Warzone's obligations under the Federal Rules of Civil Procedure. *See Philips N. Am. LLC v. Vartanian,* No. 22-07469, 2023 WL 8937615, at *7 (C.D. Cal. Nov. 16, 2023); *see also Allfasteners USA, LLC v. Acme Operations Pty., Ltd.*, No. 18-06929, 2021 WL 4027738, at *7 (C.D. Cal. May 25, 2021) (finding sufficient plaintiff's disclosure that "damages are presently incalculable, because Plaintiff is seeking damages based on . . .

Mitchell
Silberberg &
Knupp LLP

information in the possession of defendants" given its later damages expert report). Additionally, where, as here, the disclosure expressly contemplates supplemental provision of the requested information in "the expert report of [the party's] damages expert]," such expert report "satisfies [a party's] Federal Rules of Civil Procedure, Rule 26(e)(1) duty as sufficiently as a formal filing." *Inland Empire Foods v. Zateca Foods*, No. 00-203, 2010 WL 11519550, at *1 (C.D. Cal. Sept. 13, 2010) (citing Fed. R. Civ. P. Rule 26(e)(1)) (finding that expert disclosures fulfilled plaintiff's duty to "supplement its interrogatory responses to indicate the amount of damages it was seeking for its breach of fiduciary duty claim").

The cases Activision cites provide no guidance to the contrary. Only five of the 12 cases Activision cites are even binding on this District; of those five cases, only three consider discovery proceedings; and of those three, none support the disclosures Activision advocates here. Activision cites *Seoul Semiconductor Co. v. FEIT Elec. Co.*, for the proposition that "it is well-settled [that] Plaintiffs cannot wait until expert discovery to provide their damages contentions," but this statement is a quote from a party's brief, and forms no part of the court's rationale. *Compare* No. 22-05097, 2024 WL 3086641, at *9 (C.D. Cal. May 23, 2024) *with id.* at *14. Activision selectively cites from *Frontline Med. Assocs., Inc. v. Coventry Health Care*, too, eliding the surrounding sentences, which admit that "Rule 26 does not elaborate on the level of specificity required in the initial damages disclosure," (quoting *City & County of San Francisco v. Tutor–Saliba Corp.*, 218 F.R.D. 219, 220 (N.D. Cal. 2003)); that "Plaintiff's **precise** method of calculation need not be disclosed to the extent the method is properly the subject of expert testimony and the parties will be turning over expert evidence in the future." 263 F.R.D. 567, 569 (C.D. Cal. 2009) (emphasis in original) (citing *Tutor–Saliba*, 218 F.R.D. at 222). Even omitted footnote 3 is instructive: "Defendants cannot dictate the manner in which Plaintiff computes damages." *Id.* n3.

Mitchell
Silberberg &
Knupp LLP

14

Activision cites a footnote in *Vander Music, Inc. v. Azteca Int'l Corp.*, where the court ordered further responses detailing a party's "lost licensing fees." No. 08-8184, 2010 WL 11519369, at *2 (C.D. Cal. Apr. 14, 2010). But, the damaged parties in *Frontline* and *Vander* have one thing in common—they both sought lost profits or lost income, and so the court considered that "component[s] of its lost profits computation" were "reasonably available to it" and "[f]uture expert analysis does not relieve Plaintiff of its obligation to provide information reasonably available to it." *Frontline*, 263 F.R.D. at 569. Warzone is not seeking lost revenues or lost profits; it seeks damages calculated with reference to the junior user's financial information. Cilento Decl., Ex. B at 3. Thus, the closest Activision comes to supportive authority is *Ritchie v. Sempra Energy*, a case decided outside this District, which notes that a proponent of damages "should provide its assessment of damages in light of the information currently available to it in sufficient detail so as to enable [the defendant] to understand the contours of its potential exposure and make informed decisions as to settlement and discovery." No. 10-1513, 2014 WL 12637955, at *6 (S.D. Cal. Aug. 4, 2014).

But *Ritchie* does not stand for the proposition that the level of detail required is a dollar amount, only that disclosure of damages must provide "sufficient detail so as to enable [the defendant] to understand the contours of its potential exposure." *Id.* In *Philips N. Am. LLC v. Vartanian,* this District considered the depth of disclosure that "enabled [defendant] to understand his potential exposure and make informed decisions," rejecting the argument that in not providing a "computation of each category of damages," plaintiff "undermined [defendant's] ability 'to assess and perhaps settle this matter,'" at *5, and finding disclosure that "present[s] a basis for [defendant] to understand the damages it seeks" is sufficient. No. 22-07469, 2023 WL 8937615, at *7 (C.D. Cal. Nov. 16, 2023).

Activision ultimately concedes that it is sufficient to describe "how [Warzone] has been damaged and how it intends to quantify that damage,"

allowing that "[i]f adjustment is necessary due to additional discovery or expert testimony, Warzone may amend its response." Joint Stip., *supra*, at 9. Warzone's supplemental response to the interrogatory discloses precisely this information. *Id.* at 10-11. Warzone met its obligation to disclose the theories and bases upon which it will rely for damages—having done so, Activision's stale accusations fall flat.

**2.      Warzone's Response Discloses its Claims for Damages Based on the Available Information**

Activision also argues in conclusory fashion that Warzone's interrogatory response is necessarily insufficient because Activision has produced "extensive financial" documentation not reflected in Warzone's response; and in any event, Activision disputes that the damages Warzone seeks are based on information in Activision's possession, custody, or control.

Activision cannot, to borrow a word, *credibly* maintain that anything about its document production has been "extensive"; by its own admission, Activision has produced just two financial documents of the 422 total documents it has produced thus far. *See* Cilento Decl. ¶ 15. Activision designated this information "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" under the governing protective order, which restricts its use to Warzone's attorneys and experts. *Id.* ¶ 16. Activision cannot now use its own restricted production of financial information as a basis to challenge the comprehensiveness of Warzone's response. As Warzone has committed on multiple occasions, it intends to continue to supplement its responses and disclosures as and when it receives relevant Activision and third party information.

Further, to the extent that Activision disputes Warzone's damages calculus at the level of granularity of proper inputs to such calculus, Activision is clearly on notice of both the categories of damages Warzone seeks and "how it intends to quantify that damage."

Mitchell
Silberberg &
Knupp LLP

16

## II.    **ISSUE 2: REVENUE DOCUMENTS**

**Request for Production No. 102:**

DOCUMENTS sufficient to reflect all income received by YOU in connection with the WARZONE GAME on a monthly basis from 2017 to the present.

**Response to Request for Production No. 102:**

Warzone further objects to this Request on the ground that it is overbroad and unduly burdensome, oppressive and harassing, particularly as it relates to requesting a monthly breakdown as opposed to quarterly or annually, which has already been produced by Warzone. Subject to and without waiving the foregoing objections, Warzone will produce non-privileged documents in its possession, custody or control sufficient to show Warzone's income on a yearly basis, including by providing Warzone's tax returns for the requested years.

**Supplemental Response to Request for Production No. 102:**

Warzone objects to this Request on the ground that it is overbroad and unduly burdensome, oppressive and harassing, including as it relates to requesting a monthly breakdown as opposed to quarterly or annually. Subject to and without waiving the foregoing objections, Warzone has produced documents showing revenue on a monthly basis and income on an annual basis.

**Activision's Position**

To the extent Warzone has made any minimal effort to disclose its damages theories in this case (which, as discussed above, it has only done in cursory fashion), it has made clear that it intends to seek two types of damages: (1) prospective "corrective advertising" – that is, the amount required to restore the value of its mark due to the alleged infringement (*see Lodestar Anstalt v. Bacardi & Co.*, 2019 WL 8105378 (C.D. Cal. July 3, 2019), *aff'd*, 31 F.4th 1228 (9th Cir.

1   2022)); and (2) lost revenue resulting from the infringement.  In order for

2   Activision to perform its own assessment and calculation of damages under either

3   theory (especially since Warzone refuses to do so), Warzone must provide to

4   Activision substantive information concerning the sources of its revenue and the

5   amount of revenue received from each of these sources on a monthly basis.

6          To prove its entitlement to corrective advertising, Warzone must present

7   evidence that its mark actually lost value *and* the amount of value it purportedly

8   lost.  *Id.*  Additionally, it is well-settled in the Ninth Circuit that corrective

9   advertising awards *may not exceed the value of the alleged senior user's mark*.

10  *See Van Burren*, 2019 WL 3220013, at *3 ("before awarding damages, the Court

11  requires evidence that the damages sought are not greater than the value of the

12  trademark"); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992)

13  ("Expenses for repair cannot be justified when they exceed the value of the asset.")

14         As a result, one of the most important issues in this case is assessing the

15  monetary value of Warzone's alleged trademark as of the date of the alleged

16  infringement (*i.e.*, March 2020).  One of the primary ways that courts and

17  economists place a value on an intellectual property asset is through the "income

18  method."  The "income method values an asset based upon the present value of the

19  net economic benefit (net future income stream) expected to be received over the

20  life of the asset."  *A New Method to Value Intellectual Property*, 30 AIPLA Q.J.

21  353, 363–64 (2002).  *See also DHL Corp. v. Comm'r*, 285 F.3d 1210, 1219 n.4

22  (9th Cir. 2002) (under the "income approach . . . the value of the trademark is

23  based on the present value of the trademark's future stream of income"); Ted

24  Hagelin, *Valuation of Intellectual Property Assets: An Overview*, 52 Syracuse L.

25  Rev. 1133, 1140 (2002) ("The income method is best suited for the valuation of

26  contracts, licenses and royalty agreements, patents, trademarks and copyrights,

27  franchises, securities and business enterprises.")

28

Mitchell
Silberberg &
Knupp LLP

In order to assess the present value of the income stream over the life of the asset, Activision and its experts must be able to understand and analyze the various income streams that contribute to Warzone's overall revenue. Warzone has claimed that it receives revenue from at least three sources: (1) advertising on its website (www.warzone.com), (2) purchases of "memberships" on its website, and (3) in-app purchases (*i.e.*, purchases made in its mobile apps) through platforms such as the Apple App Store, the Google Play Store, and the Amazon App Store. Only by analyzing the ebb and flow of these income streams can Activision attempt to value Warzone's trademark.

The relevance of detailed income and revenue information (including the source of that revenue) to Warzone's "lost income" theory is even more apparent. If Warzone intends to prove that it lost revenue it otherwise would have received but for the alleged infringement, it must show the impact of the infringement on each of its revenue streams. Activision, for its part, must be able to analyze ***each*** of these income streams on a weekly or monthly basis to identify trends both before and after the alleged infringement. For example, if Warzone claims that its website traffic went down because Activision's release of CODWZ made it harder to find Warzone's website, then one would expect website advertising and purchase numbers to decline after the release of CODWZ in 2020. However, Warzone's mobile sales numbers would not necessarily be impacted, since CODWZ was not released on mobile devices until 2024. As another example, if the release of CODWZ actually caused website traffic to increase because customers mistakenly visited the Warzone.com website and then left after realizing their mistake, then the data would reflect an increase in Warzone's advertising revenue while website purchases stayed static. And, by the same token, if some portion of Warzone's revenue is attributable to ***other*** sources that have nothing to do with its game or its trademark, then it will be unable to seek recovery of any diminution in this revenue stream.

In response to Activision's discovery requests, Warzone has produced only (1) *aggregate*, top-level income information, undifferentiated by source, and (2) revenue from in-app purchases on two of the three app stores where its game was made available.  It did not produce *any* information concerning its advertising revenue or revenue from purchases on its website.  This information is especially important because in 2020 (when CODWZ was released), the vast majority of Warzone players accessed the game through the Warzone.com website – not through any app store.  Thus, most of Warzone's revenue from this period would be from website purchases or advertising on the website.  Activision and its experts need Warzone's complete financial picture to conduct an economic analysis or trademark valuation.

To justify its failure to produce any detailed information, Warzone has claimed that it does not possess any such information.  This is demonstrably false.  Warzone certainly has documents reflecting the amount it received from website purchases.  Each time a person made a purchase on the Warzone.com website, a transaction record was created and reflected somewhere – such as a PayPal account, credit card account, or bank account.  If Warzone did not keep receipts of its website transactions, then it certainly has access to bank or payment processor records that reflect each of these transactions – which will include the amount of the transaction, the date of the transaction, and the country from which the payment originated.  Likewise, Warzone must possesses documents reflecting payments made by the advertising broker responsible for placing ads on its website.  These payments either were made to a Warzone bank account or some other account (such as PayPal or Venmo).

If Warzone failed to keep its own internal payment records (which is itself suspect) or failed to create profit-and-loss statements for its business, that is not an excuse to avoid providing relevant financial data.  Rather, it means that Warzone

Mitchell
Silberberg &
Knupp LLP

1  must provide the raw data discussed above so that Activision can itself do the

2  analysis and create its own set of profit-and-loss statements for the company.

3

4  **Warzone's Position.**

5  Activision entitles "Issue Two" of its motion to compel "Revenue

6  Documents" and expansively argues what documents and information it assumes

7  Warzone "must" have and how any and all revenue information from Warzone is

8  relevant to claims and defenses in this case. To be clear, despite disagreement as to

9  why such information might be relevant, Warzone has never refused to produce

10  revenue documents related to any of its products and services, and many such

11  documents have been produced. Activision has also served 20 requests seeking

12  "revenue" information from Warzone, including 11 requests served August 7,

13  2024, to which Warzone responded on September 20, 2024 agreeing to produce

14  documents.  *See* Cilento Decl. ¶ 17.

15  Yet, the instant request for production No. 102 does not ask for revenue

16  information, but rather for "all income" received by "you" in connection with the

17  "Warzone Game" from 2017 to the present on a monthly basis. In the ordinary

18  course of business, Warzone does not keep track of monthly "income" regarding

19  any specific game or games—as such, its objections and response to this request

20  are appropriate.  In the spirit of cooperation, and to put substance over form in

21  providing Activision with relevant information despite this request being limited

22  on its face to "income" for "the Warzone Game," Warzone has produced, or agreed

23  to produce, ***all revenue*** for all Warzone products and services from 2017 to the

24  present. Warzone has produced total revenue for all products and services on a

25  monthly basis, including for its mobile Warzone game on iOS and Android, and

26  for the game Warzone Idle. *See* Cilento Decl. ¶ 5. During the meet and confer

27  process, Warzone explained it would continue to look for and produce additional

28  revenue information, as kept in the ordinary course of business, and it is in the

Mitchell
Silberberg &
Knupp LLP

21

process of doing so. *Id. & Nat'l Cas. Co. v. Fed. Ins. Co*., No. 22-01690, 2022 WL 17222254, at *4 (C.D. Cal. Aug. 3, 2022) (denying motion to compel where party "has never contested that Defendant is entitled to the documents, and appears to be in the process of producing them").

Activision's speculative arguments about why certain other types of documents "must" exist and why such "revenue" documents are relevant to damages theories are devoid of connection to the question before this Court— whether Activision has met its burden of showing that Warzone should be compelled to produce any documents responsive to this request that it has refused to produce or stated it will not produce. "The court cannot order a party to produce documents that do not exist" and "mere suspicion that additional documents must exist is an insufficient basis to grant a motion to compel." *Muhammad v. California*, No. 18-4017, 2020 WL 13356440, at 6 (C.D. Cal. May 26, 2020). For at least the foregoing reasons, Warzone respectfully submits that Activision has not met its burden. *Deckers Outdoor Corp. v. Sears Holdings Corp*, No. 14-02561, 2014 WL 7185355, at 1 (C.D. Cal. Dec. 15, 2014) (denying motion to compel as moot "as there is no dispute that Defendants have agreed to produce documents responsive to these requests").

## III.   ISSUE 3:  EXPENSE DOCUMENTS

### Request for Production No. 67

All DOCUMENTS that reflect or refer to YOUR expenses, on a monthly basis, from January 1, 2017 to the present, relating to the WARZONE GAME, INCLUDING any development costs, server costs, hosting fees, and maintenance fees.

## Response to Request for Production No. 67

Warzone objects to this Request as overbroad to the extent that it asks for "All" documents. Warzone further objects to this Request to the extent that the time period is not sufficiently limited. Subject to and without waiving the foregoing objection, after conferring on clarification and time limitations, Warzone will produce responsive, non-privileged documents in its possession, custody, or control, to the extent such documents exist.

## Supplemental Response to Request for Production No. 67

Warzone objects to this Request as overbroad to the extent that it asks for "All" documents. Warzone further objects to this Request as unduly burdensome, particularly as it relates to seeking documents on a monthly basis. Subject to and without waiving the foregoing objections, Warzone responds as follows: no such documents exist, and Warzone has produced documents to show expenses on an annual basis.

## Activision's Position

As discussed above, in order for Activision to assess Warzone's damages claims (under either a corrective advertising or lost profits theory) it must have a complete picture of Warzone's finances. This includes information concerning Warzone's costs incurred in generating the revenue. For example, in assessing the overall value of Warzone's alleged trademark prior to the alleged infringement, it is critical to know not just the amount of revenue received by the company, but the costs and expenses incurred in generating that revenue. If significant monthly costs were required to maintain the revenue (such as high server costs or ongoing development costs), then this could impact the assessment of overall future profitability of the company.

Moreover, certain costs have a direct bearing on the value of a trademark. Most notably, marketing or advertising costs "most accurately reflect trademark

Mitchell
Silberberg &
Knupp LLP

value: the more one advertises a mark, the more public recognition inures to the mark, which increases its value." *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884 BAS MDD, 2015 WL 1757804, at *3 (S.D. Cal. Apr. 17, 2015). It thus is critical to know the precise costs incurred by Warzone in developing its trademark and making that trademark recognizable to the public, including costs incurred in publicizing and promoting its brand, hiring lawyers to enforce and protect its brand, retaining PR firms, printing business cards, attending trade shows and conventions, purchasing domain names related to its brand, paying or wooing online influencers, giving away promotional copies or merchandise, and paying for accounts on social media or other websites to increase the visibility of its brand. On the other hand, if Warzone's expenses were limited to server fees and employee salaries and it did not have the budget to engage in any marketing or advertising, this would indicate that its brand is of low value and could easily and inexpensively be replaced by a new brand. *Zazu Designs,* at 506 ("To justify damages to pay for corrective advertising a plaintiff must show that the confusion caused by the defendant's mark injured the plaintiff and that "repair" of the old trademark, rather than adoption of a new one, is the least expensive way to proceed.").

Warzone has not provided ***any*** evidence of its specific costs incurred in developing, operating, marketing, and distributing its game, other than a single line item in a spreadsheet purporting to reflect the salary paid to its principal Randy Ficker. Again, Warzone claims that it does not possess any such evidence. But again, this is simply not credible; Warzone simply does not want to provide that information. Warzone certainly possesses a bank account or credit card that it uses to pay expenses, and its bank account or credit card statements would reflect payments made to support its business. It also necessarily has incurred at least some costs, such as hosting costs for its website, server costs for its multiplayer matchmaking, accounting and legal fees, and equipment and overhead costs.

Mitchell
Silberberg &
Knupp LLP

These third parties must have issued invoices.  Indeed, Warzone could not have prepared valid tax returns without possessing such information.  Presumably, Warzone has retained at least some records of these costs.  If it did not maintain standard business records (as it claims), then it must provide the raw data (such as the actual invoices) so that Activision can perform its own assessment and analysis.  At the very least, it must provide the name of the vendors that it paid in order to create, distribute, and operate its game.  However, merely providing a lump sum of total expenses, without any further detail, is wholly insufficient to meet its discovery obligations, especially since Warzone is the party seeking to recover its actual damages.

**<u>Warzone's Statement.</u>**

Again, despite moving to compel response to Request for Production No. 67 alone, Activision asks the Court to broadly consider issues unrelated to the narrow category of documents called for by this request. Activision titles its final "issue" before the Court a call for "Expense Documents." Once again, as with "revenue" documents discussed in response to "Issue Two," Warzone has agreed to produce, has produced, and will continue to produce any and all non-privileged documents in its possession custody and control and as kept in the ordinary course of business, that reflect, refer, or relate to expenses incurred for or connected to Warzone's products and services. Activision's motion relies on the unfounded accusation that:

> Warzone has not provided any evidence of its specific costs incurred in developing, operating, marketing, and distributing its game, other than a single line item in a spreadsheet purporting to reflect the salary paid to its principal Randy Ficker.

Joint Mot., *supra,* at 22. This is flatly incorrect. Warzone has produced the records it keeps in the ordinary course of business that reflect all categories of expenses on an annual basis. *See* Cilento Dec. ¶ 5. Warzone's tax returns for the relevant years

Mitchell
Silberberg &
Knupp LLP

25

specifically break out by separate line items the annual operating costs by category,

including web services, hardware, software, advertising, supplies, and more. *Id.*

Warzone further produced documents showing the salaries paid by Warzone, on a

monthly basis. *Id.* ¶ 6.

Activision has served two other requests for production related to such

expenses (Request for Production Nos. 100 & 101), neither of which are the

subject of this motion. Despite Activision's repetitive and unnecessary arguments

regarding why documents related to Warzone's expenses are relevant, the singular

distinction between this document request and the two other requests Activision

does not seek to compel is that this request asks for documents reflecting expenses

on a ***monthly*** basis. As explained in response to this request and during the meet

and confer process, Warzone is not withholding documents on the basis of any

particular objection to this request. *See Carter v. Dawson*, No. 07-1325, 2010 WL

4483814, at *5 (E.D. Cal. Nov. 1, 2010) (being unable to locate responsive

documents does not provide a ground for granting a motion to compel "unless

Plaintiff can identify a specific document that Defendants have withheld").

Warzone simply does not generate or maintain records in the ordinary course of

business that reflect expenses regarding any of its products or services on a

monthly basis, and Warzone is not obligated to create such records for the

purposes of this litigation. Again, "[t]he court cannot order a party to produce

documents that do not exist." *Muhammad*, No. 18-4017, 2020 WL 13356440, at

*6. It is axiomatic that a movant demonstrate the relief sought by motion to compel

is possible, let alone warranted, and Activision's motion fails under either

standard.

Warzone produced its expense information and documents as maintained in

the ordinary course of business; there are no documents to compel in response to

Request for Production No. 67. Within the several months remaining to conduct

discovery in this matter, Activision is free to serve or seek discovery regarding the

documents and information Warzone produced regarding its expenses. However, Warzone should not be penalized or compelled to create or produce documents that do not exist. For at least the foregoing reasons, the Court should deny Activision's motion to compel further responses or documents in response to this request.

DATED:  SEPTEMBER 30, 2024          MARC E. MAYER
                                    KARIN G. PAGNANELLI
                                    ALEXANDRA L. ANFUSO
                                    LINDSAY R. EDELSTEIN
                                    MITCHELL SILBERBERG & KNUPP LLP


                                    By: */s/ Marc E. Mayer*
                                            Marc E. Mayer (SBN 190969)
                                            Attorneys for Activision Publishing, Inc.



                                    BRETT E. LEWIS
                                    ROBERTO LEDESMA
                                    MICHAEL D. CILENTO
                                    LEWIS & LIN, LLC

                                    ALYSSA SCHABLOSKI
                                    GLADIUS LAW, APC

                                    By: */s/ Michael D. Cilento*
                                            Michael D. Cilento (*pro hac vice*)
                                            Attorneys for Warzone.com, LLC



**Attestation Regarding Signatures-Local Rule 5-4.3.4(a)(2)(i)**

    I, Marc E. Mayer, attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

    DATED:  SEPTEMBER 30, 2024          */s/ Marc E. Mayer*
                                        Marc E. Mayer