Marc E. Mayer (SBN 190969)
mem@msk.com
Karin G. Pagnanelli (SBN 174763)
kgp@msk.com
Alexandra L. Anfuso (SBN 333440)
ala@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Lindsay Edelstein (pro hac vice)
lre@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239
*Attorneys for Activision Publishing, Inc.*

Jennifer A. Kash (State Bar Number 203679)
Francesca M. S. Germinario
(State Bar Number 326208)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
21-3073@cases.warrenlex.com

Alyssa K. Schabloski
(State Bar Number 258876)
GLADIUS LAW, APC
2708 Wilshire Blvd., No. 426
Santa Monica, California, 90403
Tel: (310) 734-0720
aks@gladiusaw.com
(*continued in signature*)

*Attorneys for Defendant /
Counterclaimant Warzone.com, LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ACTIVISION PUBLISHING, INC., <br><br> Plaintiff / Counterclaim Defendant <br><br> v. <br><br> WARZONE.COM, LLC, <br><br> Defendant / Counterclaimant. | CASE NO. 2:21-cv-3073-FLA (JCx) <br><br> **REDACTED VERSION** <br><br> [Discovery Document: Referred To Magistrate Judge Jacqueline Chooljian] <br><br> **JOINT STIPULATION RE MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INFORMATION REGARDING ALL USES OF WARZONE MARK** <br><br> Hearing Date:  December 17, 2024 <br> Hearing Time:  9:30 a.m. <br> Fact Discovery:  December 17, 2024 <br> Pretrial Conference:  May 19, 2025 <br> Trial:  May 27, 2025 |

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTORY STATEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Warzone's Introductory Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Activision's Introductory Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    ISSUE 1:  PRODUCTION OF DOCUMENTS RELATED TO
      ALL USES OF THE WARZONE MARK. . . . . . . . . . . . . . . . . . . . . . . . . 6

Warzone's Position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    1.    There is No Dispute That The Information Sought is Relevant
          to the Parties' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.    Activision Admits That it Must Produce Information
          Regarding Warzone Mobile, World Series of Warzone. . . . . . . . . . . . . . 8

    3.    Activision's Existing Production Points to the Existence of
          Other Relevant Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    4.    Activision's Argues Only Unsubstantiated "Burden". . . . . . . . . . . . . . 10

    5.    Activision's Production Demonstrates the Insufficiency of
          its Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Activision's Position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    1.    Activision Made A Good Faith Effort To Locate And Produce
          Responsive Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    2.    WZLLC's Remaining Arguments Are Untethered To Its
          Discovery Requests And Are Misplaced. . . . . . . . . . . . . . . . . . . . . . . 19

II.   ISSUE 2:  DISCOVERY REGARDING MONETARY AND
      NON-MONETARY BENEFIT ACTIVISION GAINED FROM ITS
      USE OF THE MARK "WARZONE". . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Warzone's Position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

    a.    Documents and Information Supporting Activision's Public Filings. . . . . 24

    b.    Documents and Information Regarding Revenues, Profits, and
          Other Financial Indicators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

    c.    Documents and Information Regarding Non-Monetary Benefit: User and Performance Metrics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    d.    Documents Regarding Marketing and Advertising Spend. . . . . . . . . . . . 32

Activision's Position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    1.    WZLLC Never Requested Documents and Information Supporting Activision's Parent's Public Filings, And Such Documents Are Irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    2.    WZLLC Is Not Entitled To And Did Not Request Documents And Information Regarding "Revenues, Profits, and Other Financial Indicators" From Separate Non-Infringing Products . . . . . . . . . . 39

    3.    WZLLC's Demand For Various Documents And Information Regarding Non-Monetary "Benefits" Is Overbroad And Seeks Materials Not Sought In Its Written Requests. . . . . . . . . . . . . . . . . . . . . . . 43

    4.    WZLLC Only Sought Documents "Sufficient To Reflect" Activision's Marketing And Advertising Spend, And It Would Be Unduly Burdensome For Activision To Collect And Produce Invoices, Bank Statements, And Other Backup Materials. . . . . . . . . . . . . 45

Pursuant to C.D. Cal. Local Rule 37-2, Plaintiff/Counterclaim Defendant Activision Publishing, Inc. ("Activision") and Defendant/Counterclaimant Warzone.com, LLC hereby submit the following joint stipulation regarding Warzone.com, LLC's motion to compel documents and information from Activision regarding: (1) Activision's uses of the WARZONE mark other than in Call of Duty Warzone, including in connection with Warzone Mobile and World Series of Warzone, and (2) monetary and non-monetary benefits that Warzone contends are attributable to Activision's use of WARZONE mark.

**INTRODUCTORY STATEMENTS**

**Warzone's Introductory Statement**

For months now, Activision has kicked the can down the road, insisting that it would be shortly producing relevant documents responsive to Warzone.com LLC's ("Warzone") discovery requests regarding Activision's widespread use of the WARZONE mark and the benefits it has obtained as a result of that use. Warzone first sent a Rule 37-1 letter in July 2024 addressing the subject matter of this motion to compel. *See* Ex. 1 (July 26, 2024 Rule 37-1 Letter). Activision issued assurance after assurance from August to October that its investigation and productions were ongoing and that engaging in the Court's Rule 37 discovery procedure would "wast[e] both parties' (and the Court's) time," and implored with Warzone to wait for Activision to complete its productions. *See* Ex. 5. But to this day, Activision's productions remain artificially and unilaterally limited to just one of Activision's uses of the WARZONE mark—the Call of Duty Warzone game title.

When no responsive production ever arrived containing the discovery sought regarding each and every one of Activision's uses of the WARZONE mark at issue in the case, Warzone put its foot down and sent another Rule 37-1 letter on November 4, 2024. Ex. 2. Only now does Activision admit, in response to correspondence and on the parties' meet and confer conference of November 14, 2024, that it has been sitting on its hands.

At base, Activision cannot dispute that its various uses of WARZONE as a source identifier—including Activision's uses of WARZONE in Call of Duty Warzone, Warzone Mobile, and World Series of Warzone, are relevant to this case.  Likewise, Activision cannot refute the responsive documents it already produced in this case, which demonstrate that ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Instead, for the first time, Activision contends that any further investigation and production of documents and information responsive to Warzone's discovery requests would be "unduly burdensome" to Activision both because it has already searched its document repositories for the term "warzone" in proximity to "trademark" and cannot be expected to do more, and because it "does not understand" the relevance of documents sufficient to show the amount and various sources of Activision's profit off of the WARZONE mark, including those ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Neither position is tenable.

The "burdens" Activision identifies only underscore the staggering insufficiency of Activision's investigative efforts thus far.  As a party to the litigation, Activision cannot run from the burden of collecting and producing documents centrally relevant to the parties' claims and defenses.

Warzone's motion should be granted.

**<u>Activision's Introductory Statement</u>**

Warzone.com, LLC's ("WZLLC") eleventh-hour motion to compel further responses to unspecified discovery requests (1) is untimely and procedurally improper, (2) deeply mischaracterizes the parties' four-month-long course of communications and meet-and-confer efforts, and (3) ultimately fails to offer any legitimate justification for its overbroad, amorphous, and burdensome demands.

*First*, WZLLC's motion is untimely.  The Court's April 11, 2024, Trial Setting Order specifically requires that "[a]ny motion challenging the adequacy of discovery responses must be filed, served, and calendared ***sufficiently in advance of the discovery cut-off date*** to permit the responses to be obtained before that date if the motion is granted." (Dkt. 79, emphasis added.)  WZLLC, however, served its joint stipulation to be heard ***on the discovery cut-off date*** (*i.e.*, December 17.)  By definition, Activision would have no time to comply with any orders on WZLLC's motion, let alone the additional discovery demanded by WZLLC through this motion that it never even requested through proper discovery requests.  This alone supports denial of this motion.  *See, e.g.*, *Sandoz Inc. v. Amgen Inc.*, No. 222CV05326RGKMARX, 2023 WL 3549513, at *5 (C.D. Cal. May 4, 2023) (denying untimely motion to compel because the relief sought "would necessarily include modifying" the Court's "scheduling order," which the Magistrate Judge lacked authority to do.)

WZLLC's motion also is procedurally improper.  Local Rule 37-2 requires that joint stipulations "contain all issues in dispute" and "not refer the Court to any other documents."  C.D. Cal. L. R. 37-2.  There is good reason for this rule: it enables the parties and the Court to clearly identify the specific discovery requests at issue and to ensure that their arguments are focused on actual, material disputes.  WZLLC disregarded Local Rule 37-2, instead claiming in a footnote that because the purported dispute covers "many of [WZLLC's] requests"—without explaining which ones—WZLLC may attach ***all 127*** requests (*i.e.*, refer the Court to "other documents") and then leave both the Court and Activision to do the work of figuring out which requests it is referring to or what it is actually seeking via this motion.  In fact, WZLLC even failed to provide copies of the actual requests it served, providing only Activision's *responses* to such requests.  Thus, the Court does not have before it the Definitions or Instructions WZLLC included in its requests.

*Second*, WZLLC ignored the Local Rule 37-2 requirement that "[w]hen a party states its contentions on a particular issue, such party must also state how it proposed to

resolve the dispute over that issue at the conference of counsel." For four months, Activision has offered to discuss WZLLC's first and second sets of document requests, including by discussing Activision's keyword searches and inviting WZLLC to explain what it is seeking or narrow the requests to avoid undue burden. But WZLLC declared that a meet-and-confer would be a "waste of time" and ignored Activision's invitation to clear time for a call. And as for the third set of document requests (the "Third RFPs"), WZLLC never even bothered to meaningfully discuss those before filing its motion. Instead, just 53 minutes after Activision timely served its responses and objections to the **80 new requests** in the Third RFPs, WZLLC sent its four-page letter demanding an immediate discovery conference without paying any attention to specific discovery requests. WZLLC treated the discovery conference as a box-checking exercise, venting its misplaced frustration rather than addressing Activision's objections to specific requests.

*Finally,* even if the motion were not untimely or procedurally improper, WZLLC's arguments are wholly untethered to any actual discovery requests. WZLLC seeks documents that are wholly immaterial to this "reverse confusion" trademark lawsuit, in which WZLLC—the owner of a largely unknown game that is one of dozens of games that use the term "warzone" in its title—alleges that Activision damaged or destroyed its purported trademark by offering a game titled "*Call of Duty: Warzone*" (and a tournament for that game called the "*World Series of Warzone.*").

Instead of focusing on actual issues in dispute, WZLLC's motion is an untimely effort to re-open the entire discovery process and massively burden Activision with all manner of brand new, overbroad, burdensome document demands. For example, WZLLC now apparently seeks all documents pertaining to the "use" of the term "warzone" by Activision, without identifying what it means by "use" or what types of documents it is actually seeking. It also seeks a wide swath of financial information, including bank statements, credit card statements, invoices, further profit-and-loss statements, and literally anything else that might be "related" in any manner to the actual or hypothetical

"value" or "benefit" of the *CODWZ* brand (even though its discovery requests sought only documents "sufficient" to identify the "total" revenue received or "total" marketing expenditures incurred by Activision.)  Perhaps most egregiously, WZLLC now—for the very first time—seeks financial information for at least six other games, including *Call of Duty* games that do not use the term "warzone" in their titles.  It seeks this information even though the only issue in this lawsuit is the use of "Warzone" in the **title** of *CODWZ*, the *CODWZ* mobile version, and the associated tournament.

WZLLC's motion is a last-ditch effort to burden and harass Activision at the very end of the discovery period.  If WZLLC had *bona fide* discovery disputes, it had months to raise them.  It could have taken Activision up on its offers to meet and confer.  But filing an omnibus motion on the eve of the discovery cutoff, without even attempting to meet and confer or to narrow the issues for the Court, is not the way to address those issues.  The Motion should be denied.

# I.    ISSUE 1:  PRODUCTION OF DOCUMENTS RELATED TO ALL USES OF THE WARZONE MARK

**Warzone's Position**

Despite acknowledging their relevance, Activision has failed to search for and produce documents regarding its use of the WARZONE mark in conjunction with Warzone Mobile and World Series of Warzone, choosing instead to produce only the limited documents and information it unilaterally determined to be relevant to its use of the WARZONE mark in connection with Call of Duty Warzone.  Activision now claims it is unable to locate any documents regarding its other uses of the WARZONE mark as such a search is unduly burdensome, but the volume of its production demonstrates nothing more than the usual burden a plaintiff must shoulder to litigate its claims.  The Court should compel Activision to search for and produce documents relevant to all of its uses of the WARZONE mark.[1]

---

[1] Pursuant to Civ. L. R. 37-1, Warzone moves the Court regarding the overarching issue of Activision's refusal to search for and produce an entire category of information in response to many of Warzone's requests for discovery, and so does not provide the text of

**1.      There is No Dispute That The Information Sought is Relevant to the Parties' Claims**

Activision admits to producing only those documents "pertaining to the *Warzone title*," Ex. 12 (emphasis in original), but as the party seeking to limit discovery, Activision must meet a "'heavy burden' of showing why discovery should be limited." *Philhower v. Philhower*, No. 24-74, 2024 WL 3914501, at *3 (C.D. Cal. July 8, 2024) (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)).  In light of the low threshold for relevance of party discovery, including this District's finding that "discovery should be allowed unless the information sought has no conceivable bearing on the case," Activision only half-heartedly disputes the relevance of documents and information regarding its various uses of the WARZONE mark.  *Martinez v. Knight Transportation, Inc.*, No. 21-572, 2022 WL 6632192, at *1 (C.D. Cal. Feb. 3, 2022), (citing *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995)) (quoting *Miller v. Pancucci*, 141 F.R.D. 292, 296 (C.D. Cal. 1992)).  Activision cannot dispute that the documents and information Warzone seeks regarding Activision's other uses of the WARZONE mark are also centrally relevant to both Activision's own claims as plaintiff in this litigation, and Warzone's compulsory counterclaims for Activision's infringing uses of the WARZONE mark.

In denying Activision's motion to dismiss in April of this year, the Court already expressly found that "Plaintiff is using 'WARZONE' as a source identifier" and "Plaintiff intends to use WARZONE as a trademark (if that were not already obvious from Plaintiff's trademark application alone."  Ex. 3 (Order Denying Plaintiff's Motion to Dismiss), Docket No. 69 at 6, 9.  Activision's various uses of the WARZONE mark are thus at minimum relevant to Warzone's counterclaims for infringement of the WARZONE mark.  Ex. 6, Docket No. 14,  ¶ 19.  But this discovery is also relevant to Activision's claims, as "Plaintiff [Activision] filed a complaint for declaratory judgment,

each and every affected discovery response, but identifies and attaches Activision's Responses to Warzone's First, Second, and Third Requests for Production for the Court's reference.  Exs. 36, 37, 38, 39, 40.

seeking a declaration that its use and registration of the word marks 'WARZONE' and 'CALL OF DUTY WARZONE' do not infringe." Ex. 3 (Order Denying Plaintiff's Motion to Dismiss), Docket No. 69, 2:11-13 (citing Docket No. 1 ¶ 1). Activision defined the scope of its claims by seeking immunization for all of its uses of "the marks WARZONE and CALL OF DUTY: WARZONE" and a declaration "that Activision's use of the WARZONE or CALL OF DUTY WARZONE Marks does not infringe, and at all times has not infringed." *See* Ex. 4 (Complaint) ¶¶ 1:23-1:26; 12:18-13:13.[2]

Warzone is entitled to examine each use of the WARZONE mark Activision seeks to protect—including its uses of the WARZONE mark related to Warzone Mobile and World Series of Warzone.

## 2. Activision Admits That it Must Produce Information Regarding Warzone Mobile, World Series of Warzone

Activision has long since conceded that these uses of the WARZONE mark are relevant to the litigation. In its July 1, 2024 responses to Warzone's First Set of Interrogatories, Activision responded to Interrogatory No. 3's request that Activision "[i]dentify all products or services offered by Activision within the United States that, in connection with the advertising, sale or offering, uses, or has used the term, WARZONE," by providing information for Call of Duty: Warzone, World Series of Warzone, and "Call of Duty: Warzone Mobile." *See* Ex. 7 (Activision's Responses to Warzone's First Set of Interrogatories) at 7 ("'Call of Duty: Warzone Mobile' was made available worldwide on or about March 21, 2024, for iOS and Android devices"). In its July 8, 2024 responses to Warzone's Second Set of Interrogatories, Activision identified each Warzone social media

---

[2] Activision also seeks sweeping declarations that "Defendant's pending applications for registration of the mark WARZONE should not proceed" and that "Activision's pending applications for registration of the marks WARZONE and CALL OF DUTY WARZONE may proceed to registration" and that the Court enjoin Warzone "from interfering with Activision's use and registration of the WARZONE and CALL OF DUTY WARZONE marks and from opposing, seeking to cancel, or otherwise objecting to any federal registrations and applications for registration of such marks." *Id*. at ¶¶ 13:6-13.

accounts, including the domain names, Facebook, Instagram, TikTok, and X accounts for Warzone Mobile. *See* Ex. 8 (Activision's Response to Warzone's Second Set of Interrogatories) at 6-7. In its August 23, 2024 Second Supplemental Responses to Warzone's First Set of Interrogatories, Activision identified "Call of Duty: Warzone Mobile" in response to Interrogatory No. 13, "identify all Activision games offered for sale or download that bears or incorporates WARZONE in its title." Ex. 16 at 9. In its August 30, 2024 email to Warzone, Activision confirmed that it "will provide" any "non-privileged communications between Activision and Microsoft that relate to Activision's use of the name "Call of Duty: Warzone," the use of the term "warzone" within that name, **or any other product names that use the term "warzone."** Ex. 9 (August 30, 2024 email from L. Edelstein to M. Cilento).

Activision clearly understands that information about each of its uses of the WARZONE mark—including its uses regarding Warzone Mobile and World Series of Warzone—are relevant to this action.

### 3. Activision's Existing Production Points to the Existence of Other Relevant Documents

Activision's scant production contains traces of the relevant documents Warzone seeks regarding uses of the WARZONE mark other than in relation to the single title Call of Duty Warzone. For example, ███████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████

██████████████████████████████████████

█████████████████████████████████

[REDACTED] These documents are relevant to Warzone's assessment of damages, but also to the question of willfulness given Activision's expansion of its use of the WARZONE mark during this active litigation regarding its infringing use of the WARZONE mark. *See e.g., M2 Software, Inc. v. Madacy Enter.*, No. 00–2853, 2003 WL 25667610, at *1 (C.D. Cal. Jan 23, 2003) (concluding that defendant's discovery of plaintiff's mark during its trademark search created a subject of legitimate dispute as to willful infringement for claim of reverse confusion).

Activision has no answer to these questions other than its concession that the dearth of records regarding Warzone Mobile in Activision's production is due to its incomplete investigation.

### 4. Activision's Argues Only Unsubstantiated "Burden"

Faced with Warzone's overwhelming showing of relevance, Activision now claims that it is unable to collect, review, and produce responsive documents because its counsel's discovery plan for investigating and identifying relevant information from sources in Activision's control has resulted in a burden disproportionate to the relevance of the discovery sought. Ex. 12 at 4. During the November 14, 2024 meet and confer conference, Activision admitted that its document collection amounted to little more than running a search query in an unidentified document repository for the term "warzone" in proximity to the term "trademark." Germinario Decl. ¶¶ 5-6. Activision also revealed that in some instances, such as its investigation of documents and information in the custody of its game studio, Activision had not yet bothered to begin its investigation because it alternately hoped the case would "conclude before this point" and counsel "did

not know how else" to search for the responsive documents and information in Activision's possession. *Id.*

This is not a burden Activision can lay at Warzone's feet. Activision's erroneous premise that, in addition to serving discovery requests, Warzone must also formulate search terms, direct Activision's counsel on how to search its document repositories, and instruct counsel as to which of Activision's employees to contact to obtain responsive documents is unsupported by any authority, including this District's Civil Local Rules. It is black letter law that Activision has an independent obligation to conduct its own investigation, identify individuals with relevant information, and navigate its own stores of documents and communications to find and produce responsive information. *See Carrillo v. Schneider Logistics, Inc.* No. 11-8557, 2012 WL 4791614, at \*12 (C.D. Cal. Oct. 5, 2012). Activision has presented no authority supporting a brightline rule about a number of documents that *per se* renders a party's search "unduly burdensome"; the correct inquiry is whether the burden of production is disproportionate to the relevance of the information to the parties' claims and defenses, *see* Fed. R. Civ. P. 26(b)(1), and as discussed, the information sought is central to the litigation. Proportionality is directly correlated with the relevance of discovery to the scope of the claims and defenses in this matter. *See Sound View Innovations, LLC v. Hulu, LLC*, No. 17-4146, 2018 WL 6164271, at \*3 (C.D. Cal. June 12, 2018) (finding discovery was proportional because it was "limited to documents relevant to the issue of damages" related to "plaintiff's allegations"). Activision has an uphill battle to show disproportionate burden, and has made no attempt to substantiate it—Activision "has not provided any specific information to show that responding to the requests would cause **undue** burden" nor does it "explain with specificity how the requests should be narrowed." *Id.* (emphasis added). "Beyond [its] attorney arguments," Activision has "fail[ed] to serve even a single declaration from a competent witness describing the resources required to complete a manual, as opposed to electronic, search of documents responsive to [Warzone's] requests" and it provides "no estimate of the number of hours, business distraction, or cost of production," a proper

search would entail, which leaves both Warzone and the Court "to presume undue burden, as opposed to evaluating burden in light of an evidentiary record." *In Re Google Litig.*, No. 08-3172, 2011 WL 286173, at *5 (N.D. Cal. Jan. 27, 2011); *see also id.* ("This the court will not do").

Absent a bona fide showing of undue burden, Activision cannot unilaterally exclude responsive information and thus "decide what its opponent needs to prosecute or defend an action." *Sound View*, 2018 WL 6164271, at *3; *see also id.* ("defendant may not limit its production to only those documents defendant" may rely upon).

**5.    Activision's Production Demonstrates the Insufficiency of its Investigation**

As but one example of documents Activision "cannot locate" per the parties' meet and confer conference, Activision contends that no documents exist regarding Activision's decision to use the WARZONE mark in its major mobile video game release Warzone Mobile.  This argument strains credulity— ████████████████

████████████████████████████████████████████

████████████████████████████████  Ex. 18 at 30.  ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████  See e.g., Exs. 15, 23, 25.  It is implausible at best that a project of this magnitude, requiring substantial investment in development and marketing (in an amount Activision has thus far failed to produce), would proceed without equally significant documentation.

The parties agreed to a relevant timeframe for document search and production of January 1, 2008 to the present, for which Activision's production is woefully small.  *See* Germinario Decl. ¶ 9.  Activision has produced fewer than 340 internal emails and documents in response to the 127 requests Warzone propounded in this matter.  *Id.* at ¶ 10.  ████████████████████████████████

██████      *Id.*  Activision's production does not include any Activision internal documents or communications outside the time period early 2018 to late 2023 aside from a handful of emails from 2010.  *See* Germinario Decl. ¶ 8; *see e.g.*, Ex. 13.  Activision has identified just one employee in its Rule 26(a)(1) disclosures, Carolyn Wang, ███████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████[3]  Germinario Decl. ¶ 11.  Activision cannot credibly maintain that ██ emails represents the full universe of documents responsive to Warzone's requests for production in the custody of their only identified witness.  If Activision contends that only one of its employees has any knowledge relevant to this litigation, it must at minimum produce its responsive documents in the custody of this individual.

The state of Activision's production reflects a failure to discharge its own discovery duties.  Courts in this District have consistently rejected arguments about undue burden that rely upon a party's inability to effectively search its own documents, even ordering third-party vendors to review entire document collections when a party fails to adequately conduct its own investigation.  *See Carrillo*, 2012 WL 4791614, at *11 (C.D. Cal. Oct. 5, 2012); *see also Lieberman v. Unum Grp.*, No. 52-1798, 2021 WL 4807643, at *8-*9 (C.D. Cal. Oct. 14, 2021) (ordering the party to "use the information provided by their vendors to narrow the universe of claim files to search for responsive information").  If Activision is truly unable to fulfill its discovery obligations, Warzone submits that similar relief is warranted here.

Otherwise, "[t]he responding party must provide sufficient detail regarding the time, money, and procedures required to produce the requested documents.  Conclusory, unsupported statements of expense and burden are insufficient to demonstrate why the requested discovery is objectionable."  *Gold v. Kaplan*, No. 01-3204, 2021 WL 6618643,

---

[3] Despite promising to do so multiple times, including as recently as October 2, Activision has not updated its initial disclosures pursuant to Rule 26(a)(1) since December 17, 2021.

– 13 –

at *5 (C.D. Cal. Dec. 2, 2021); *Duran v. Cnty. of Riverside*, No. 23-106, 2024 WL 3468899, at *4 (C.D. Cal. June 21, 2024) (rejecting party's claim of undue burden where it "submitted no evidence or even argument as to any burden imposed to search for and retrieve the information sought, and no such significant burden is apparent on the face of the interrogatory"). Without the requisite evidence of the supposed undue burden on Activision of producing centrally relevant documents and information, Activision's version of "proportional" discovery evinces nothing more than Activision's continued disregard for Warzone's claims and this litigation.

Warzone respectfully submits that the Court should order Activision to conduct a good faith search of its documents and produce the documents responsive to its requests, including the internal documents regarding Activision's decision to use the WARZONE mark prior to the launch of Call of Duty Mobile, Warzone Mobile, and World Series of Warzone.

**Activision's Position**

WZLLC does not explain which discovery requests it is seeking to compel, what specific documents it believes should have been produced, what type of document search and collection it contends should have been performed, or how the unspecified documents it seeks have any bearing on the issues in this lawsuit. Instead, WZLLC apparently is moving to compel production for ***all 127*** of its document requests and suddenly contends that Activision must produce all documents "regarding its use of the WARZONE mark." WZLLC never explains what the scope of this demand is, what it means by the term "use,"[4] or what efforts it undertook to narrow its demand or to work with Activision to ensure that its requests would include only relevant documents and would not unduly

---

[4] At times, WZLLC claims such "other uses" are limited to documents relating solely to *CODWZ*, *WSOW*, and *CODWM*. Elsewhere, however, WZLLC argues that "other uses" could include any instances where *CODWZ* appeared on the same website as any other Activision game and could thus hypothetically drive sales to such other games.

burden Activision.  In fact, WZLLC deliberately mischaracterizes both the actual document requests and Activision's good-faith efforts to comply with those requests.[5]

Activision has engaged in a diligent and reasonable collection of documents, attempted to confer with WZLLC to resolve disputes, and objected to those requests that it believed to be overbroad and unduly burdensome.  WZLLC's suggestions to the contrary are unsupported.

## 1. Activision Made A Good Faith Effort To Locate And Produce Responsive Documents.

WZLLC's claims of "staggering insufficiency" or "failure to discharge… discovery duties" are false.   Indeed, WZLLC's own motion and accompanying declaration reflect that Activision produced numerous substantive documents, including documents that directly pertain to the issues raised in the motion.

As explained below and in the Edelstein Declaration, Activision has conducted an extensive collection and review of over 20,000 documents from over 20 different custodians.  After reviewing these documents, Activision provided, ███████ :



---

[5] WZLLC repeatedly states (incorrectly) that Activision is seeking a declaration of **ownership** of the WARZONE trademark to WZLLC's exclusion.  That is not true. Activision's claims in this action are for a declaration of **non-infringement**.  Activision has never sought to prevent WZLLC from continuing to use the WARZONE title for its game.  In fact, over three years ago Activision offered co-existence as a solution to the parties' dispute.  WZLLC rejected Activision's offer, demanding an exorbitant "one-time payment of $7 million" or alternatively "a royalty of one quarter of one percent of gross revenue generated from sales of Activision WARZONE branded games." *See* Declaration of Lindsay R. Edelstein ("Edelstein Decl."), Exs. H, I.



Edelstein Decl. ¶ 15.

That WZLLC is unhappy with the ***quantity*** of documents produced by Activision—or that certain documents do not exist—is not a basis to move to compel. *See Dupree v. Cnty. of Los Angeles*, No. CV 09-1110 AHM (SSX), 2010 WL 11597454, at *3 (C.D. Cal. Feb. 3, 2010) ("A court cannot order a party to produce documents that do not exist. A party's mere suspicion that additional documents exist does not justify a motion to compel"), *citing Bethea v. Comcast,* 218 F.R.D. 328, 329 (D.D.C. 2003) (a

party's suspicion that another party has failed to respond to document requests fully and completely does not justify compelled inspection) and *Alexander v. F.B.I.,* 194 F.R.D. 305, 311 (D.D.C. 2000) (a party's mere suspicion that its opponent must have documents that it claims not to have is insufficient to warrant granting motion to compel)).

In fact, WZLLC fails to mention at all Activision's efforts to work with WZLLC to identify specific documents or categories of documents that WZLLC believed were relevant and not produced—efforts which WZLLC rejected. *See* Local Rule 37-2.1 ("When a party states its contentions on a particular issue, such party must also state how it proposed to resolve the dispute over that issue at the conference of counsel."). WZLLC deliberately omitted key correspondence between the parties on these issues.

Activision has been fully transparent about its document collection efforts. Edelstein Decl. ¶¶ 12, 21, Ex. A. In June 2024 (after the parties' unsuccessful mediation), Activision identified a number of individuals engaged in the selection and clearance of the title "Call of Duty: Warzone," as well as individuals involved in the marketing of the game. *Id.* ¶ 10. Activision collected the entire mailboxes of these individuals and ran a number of keyword searches designed to identify responsive documents. *Id.* ¶ 11. Contrary to WZLLC's counsel's misrepresentations, these keyword searches were not limited to "Warzone" and "Trademark." *Id.* ¶ 12, Ex. A. ███

███████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████ *Id.* ¶¶ 17-19, Ex. B; Declaration of Stephen Marks ("Marks Decl.") ¶ 6.[6] WZLLC never pursued the issue.

Then, in October 2024, WZLLC **rejected** Activision's offers to meet and confer about the very issues raised in this motion—*i.e.*, documents pertaining to the "use" of the

---

[6] For example, ████████████████████████████████████

█████████████████████████████ Marks Decl., ¶ 6.

word "Warzone." Specifically, on October 7, 2024, WZLLC's counsel sent a letter to Activision's counsel, arguing that "Activision is well aware that this case is not limited to the trademark CALL OF DUTY: WARZONE or the use of the trademark WARZONE in the game title Call of Duty: Warzone—it encompasses Activision's use of WARZONE/Warzone, period." Edelstein Decl. ¶¶ 23, 24, Ex. C. However, WZLLC did not explain what specific documents it was seeking or how it proposed to resolve the dispute, instead stating that "it is our goal… to avoid wasting time with a meet and confer." *Id.* ¶ 25. Activision responded by requesting a discovery conference: "I suggest that we take these matters up during the call scheduled for this Wednesday. It is not entirely clear to us what documents you believe we are withholding or what other 'Warzone' products you are referring to." *Id.* ¶ 26, Ex. D. WZLLC replied: "As specifically referenced in my correspondence to Ms. Edelstein, we are not requesting a meet and confer at this time." *Id.* ¶ 27. Activision responded as follows:

> I am, of course, disappointed that you do not wish to continue this discussion by phone. As I mentioned to Mike on one of our prior meetings*, I am a big believer in the value of meet-and-confer conversations.* I do not think that such conversations are a "waste of time" (as you state in your letter). Rather, *I believe that videoconferences or telephonic conversations allow the parties to cut through the posturing that often permeates emails and letters and get to the core issues in dispute*. Or, at the very least, such videoconferences allow the parties to narrow the issues in dispute.
>
> In any event, one of the issues that I think would benefit from a conversation is your claim that "this case is not limited to the trademark CALL OF DUTY: WARZONE or the use of the trademark WARZONE in the game title Call of Duty: Warzone—-it encompasses Activision's use of WARZONE/Warzone, period." As you certainly know, the entirety of Warzone's counterclaim in this case is concerned with the game titled "Call of Duty: Warzone." If there are other products that Warzone believes to have infringed its alleged trademark rights, these have not been identified or disclosed to us. We are unaware of any instance in which the word

"Warzone" was used by Activision on its goods and services other than in connection with or in reference to the game "Call of Duty: Warzone"….

*Again, if you would like to schedule some time for a conference to discuss these or other issues, we'd be happy to make some time later this week or early next week.*

*Id.* ¶ 28, Ex. D at 1-2.

WZLLC did not respond to that offer, and Activision heard nothing further on this issue until nearly one month later on November 4, when WZLLC sent its omnibus discovery letter purporting to address more than 100 document requests without actually identifying what it was seeking. *Id.* ¶¶ 29-30, 34-35, Ex. F. That was followed by WZLLC's cursory and pretextual discovery conference—at which WZLLC rebuffed Activision's compromise offer to work with WZLLC to identify specific documents. *Id.* ¶¶ 38-55.

At bottom, it is disingenuous for WZLLC to accuse Activision of having acted in bad faith or failing to sufficiently investigate. After refusing to discuss any discovery issues and failing to explain what it specifically was seeking, WZLLC now attempts to sandbag Activision with a motion to compel some unspecified body of documents.

## 2. WZLLC's Remaining Arguments Are Untethered To Its Discovery Requests And Are Misplaced.

WZLLC's motion also should be denied because WZLLC has failed to identify any specific document requests that it contends Activision has not complied with. *See Snitko v. United States*, No. 221CV04405RGKMARX, 2022 WL 3127922, at *6 (C.D. Cal. Mar. 30, 2022) (denying motion to compel where "[b]ecause Plaintiffs have wholly failed to discuss deficiencies specific to each request ... the Court cannot meaningfully analyze the motion or direct responses to pending discovery" (cleaned up, citation omitted)). In fact, WZLLC has not even identified what specific documents (or types of documents) it is seeking by its motion other than "documents relevant to all of its uses of the WARZONE mark." Its failure to identify specific requests is not surprising, since WZLLC ***never***

– 19 –

***issued a document request*** seeking "documents regarding Activision's use of the WARZONE mark."  What it sought were documents pertaining to the "selection, adoption, and clearance" of the *Call of Duty: Warzone* name, consumer confusion between Activision's products and WZLLC's products, and identification of "retail channels" for these products.  *See, e.g.*, Request Nos. 3, 4, 6, 7, 9.  Activision conducted a reasonable search for these documents and produced responsive documents.

WZLLC's suggestion that Activision somehow "admitted" that all documents pertaining to "various uses" of the word "Warzone" are relevant and discoverable is perplexing and wrong.  To the extent that WZLLC suggests that Activision has refused to search for or provide documents concerning the mobile version of *CODWZ* (*CODWZM*) or the *WSOW* tournament, that is false.  Activision has agreed to provide—and has provided—documents, if any, pertaining to the naming of *CODWZ*, *CODWZM*, and *WSOW*.  *See* Edelstein Declaration ¶¶ 49, 50.  Activision also searched for and produced documents mentioning WZLLC in connection with these products.

What's more, Activision agreed to produce financial information for *CODWZ*, *CODWZM*, and *WSOW*.  During the meet-and-confer, Activision advised that these documents were forthcoming.  *Id.* ¶ 51.  It has since provided such documents.  *Id.* ¶ 52.  Activision is conducting yet another sweep for documents to ensure that all documents pertaining to the selection of the name "Call of Duty: Warzone" have been captured.  *Id.* ¶ 53.

However, to the extent that WZLLC is attempting to seek some unspecified body of documents ***beyond*** those that Activision has agreed to provide—for example, WZLLC apparently seeks all documents "related to [CODWZ]" [Request No. 57], documents pertaining to the "decision to release [CODWZM]" [No. 2 (second set)], or documents "relating to Activision's launch of World Series of Warzone" [No. 11 (second set)])—Activision never agreed that such categories of documents were relevant or discoverable.  Such requests potentially encompass documents or communications involving every single facet of the creation, ideation, development, marketing, promotion,

release and sale of *CODWZ*, *CODWZM*, and *WSOW*—irrespective of whether the documents have anything at all to do with the inclusion of "Warzone" in the title. Activision properly and timely objected to these requests, but WZLLC has not considered or addressed Activision's objections.  As a result, WZLLC has "made it difficult for the Court to discern which specific requests they assert [the responses] are deficient, as they have not discussed specific requests or the responses and/or objections thereto." *Linden v. X2 Biosystems, Inc.*, Case No. C17-966RSM, 2018 WL 953358, at *3 (W.D. WA Feb. 20, 2018) (denying motion to compel).  That also is grounds to deny this motion.  *See Wilson v. Baker*, Case No. CIV S-06-0537 FCD GGH P., 2009 WL 635224, at * 2 (E.D. Cal. Mar. 10, 2009) (denying motion to compel further response to interrogatory where defendants did not discuss how the response was inadequate); *Johansen v. LoanDepot.com LLC*, Case No. 8:20-cv-009129-DOC (JDEx), 2021 WL 2497939, at * 5 (C.D. Cal. Apr. 5, 2021) (denying motion to compel and noting "[c]ourts may deny discovery motions for failure to comply with the Local Rules' requirements for such motions." (internal citations omitted).)

Had WZLLC taken the time to explain precisely what it was seeking (which it still has not done) while there was ample time remaining in the discovery period, the parties might have been able to work out these issues and conduct targeted searches for specific documents related to the issues in dispute—namely, the *CODWZ* and *WSOW **titles*** and the likelihood-of-confusion factors outlined in *Sleekcraft*.  (In fact, many of the issues identified by WZLLC are not actually disputed, such as Activision's awareness of WZLLC as one of the many users of titles and game modes including the term "warzone" or the contents of Activision's trademark search.)  But a blanket, undifferentiated demand for all documents pertaining to the "use" of the word "warzone" is so amorphous in its scope as to be utterly meaningless.

Finally, WZLLC falsely claims that Activision has not "substantiated" the burden of collecting and producing responsive documents.  Activision ***did*** identify relevant custodians, searched document repositories, and formulated reasonable keywords.

Edelstein Decl., ¶ 12, Ex. A.  If WZLLC had been willing to engage with Activision to discuss these issues, Activision would have provided WZLLC with hit counts for alternative search queries and to demonstrate that the type of searches it seems to be demanding now (*e.g.*, "Warzone AND Marketing" or "Warzone AND Use") would have returned an extremely large number of documents.  Indeed, as set forth in the accompanying Marks Declaration (at ¶¶ 5, 6), collecting this sort of information would be a massive undertaking that is wholly unjustified.  Moreover, such searches are not narrowly tailored to generate relevant documents.  WZLLC's claim that it is not required to "formulate search terms, direct Activision's counsel on how to search its document repositories, and instruct counsel as to which of Activision's employees to contact" misses the point.  Activision undertook these activities in a manner that it deemed to be fair and reasonable.  If WZLLC disagreed with Activision's approach, the time to voice such disagreement was ***before*** the discovery cut-off—not at the eleventh hour as part of an omnibus discovery motion that does not comply with the Local Rules.

## II.    ISSUE 2:  DISCOVERY REGARDING MONETARY AND NON-MONETARY BENEFIT ACTIVISION GAINED FROM ITS USE OF THE MARK "WARZONE"

**Warzone's Position**

Activision's production of financial information has been just as limited and incomplete as the production of information discussed above, but here, Activision primarily argues that while financial information related to other game titles is available to it, such information is irrelevant to this action.  Ex. 12 at 4.[7]  This narrow view of relevance deliberately mischaracterizes ███████████████████████████████ ████████████████████████████████████  *Apple Inc. v. Samsung Elecs. Co.,* No. 11-1846,

---

[7] To the extent that Activision refuses to provide documents based on its beliefs about the legal availability of damages theories or how Warzone should be permitted to calculate its damages, such an objection improperly seeks dispositive relief via self-help, attempting to preclude an available remedy without filing the appropriate motion.  *See Gabriela Zarate v. Victory Packaging, LP, et al.,* No. 22-0811, 2023 WL 6190706, at *10 ("declin[ing] to limit discovery based on speculative future motions").

2012 WL 1413385 at *7-8 (N.D. Cal. Apr. 24, 2012) (finding Defendant's "narrow reading" of financial discovery requests, "especially in light of [their] reassurances," harmed Plaintiff's "ability to validate its damages analysis with reliable, underlying data, especially as to the allocation of expenses to the accused products"). ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████, which renders the financial and non-monetary performance of these related titles directly relevant to Activision's advertising and marketing expenditure on its use of the WARZONE mark as well as the calculation of the ill-gotten gains Activision realized from its use of the WARZONE mark. *See Positive Techs., Inc. v. Sony Elecs., Inc.,* No. 11-2226, 2013 WL 707914, at *6 (N.D. Cal. Feb. 26) (finding the party had "made a preliminary showing of relevance for discovery purposes" which is "all that it is required to do at this point" even where it had "produced no evidence to show that its patented invention is correlated to the value of the sales of the non-accused products").

    Activision describes in internal documents ███████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), and Activision's documents demonstrate ████████████████

██████████████████████████████████████████████████████████

████ Activision identifies no reason why this information is not discoverable other than its "understanding" that Warzone should not be permitted to use this information to calculate its damages, Ex. 12 at 7, and Activision's refusal to produce the documents Warzone seeks here prejudices Warzone and its experts' efforts to prepare its damages case. *See S. California Hous. Rts Ctr. v. Krug,* No. 06-1420, 2006 WL 4122148, at *4 (C.D. Cal. Sept. 5, 2006) ("plaintiff should not be precluded from adequately preparing case as to damages").

To the extent that such rationale can be charitably interpreted as anything other than a premature summary judgment motion, it does not even remotely meet the "heavy burden" of demonstrating why discovery should be limited here to only the revenue Activision unilaterally chose to assign to the WARZONE mark. *See Philhower,*2024 WL 291401, at *3 (C.D. Cal. July 8, 2024); *Pettingill v. United States,* No. 12-2369, 2014 WL 12925623, at *1 (C.D. Cal. June 10, 2014) (citing *DirectTV, Inc. v. Trone,* 209 F.R.D. 455, 458 (C.D. Cal. 2002) ("the party opposing discovery has the burden of showing that any challenged discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections").

### a.    Documents and Information Supporting Activision's Public Filings

Activision does not dispute that it touted the integration and interdependability of these games in its 10K filings with the SEC for 2021 and 2022. In Activision's 2020 10K filing, Activision states that "[t]hese trends contributed to strong full-game and in-game content sales for Call of Duty: Modern Warfare which also benefited from the launch of

Call of Duty: Warzone™ in March," Ex. 17 (WZ00554) at WZ007559, and that
Activision experienced "a $1.7 billion increase in Activision net bookings driven by
higher net bookings from (1) Call of Duty: Modern Warfare (which was released in
October 2019, and when referred to herein, is inclusive of Call of Duty: Warzone, from
its release in March 2020 through December 16, 2020)." Ex. 17 at WZ007599. In
Activision's 10K filing from 2021, Activision states: "[w]e are increasingly dependent on
our ability to develop, enhance, and monetize free‑to‑play games, such as the games in
our Candy Crush franchise, Hearthstone, Call of Duty: *Warzone*™, and Call of Duty:
Mobile." Ex. 18 (WZ007398) at WZ007427. In Activision's 10K filing from 2022,
Activision states that the free-to-play business model "provides opportunities to further
drive player investment, as was seen with our Call of Duty: Warzone release in March
2020." Ex. 19 (WZ00751) at WZ007299.

     Activision possesses the documents and information underlying the claims it made
in its recent public filings, and such information is clearly relevant to Warzone's damages
theories, including assessment of the extent of Activision's marketing, the monetary and
non-monetary benefits Activision realized, and elements of the *Sleekcraft* factors at the
heart of both parties' infringement claims, including regarding the commercial success of
the game and the likelihood of consumer confusion arising from Activision's use of the
Warzone name.[8]

    **b.**    **Documents and Information Regarding Revenues, Profits, and Other
Financial Indicators**

     Activision produced two meager profit and loss statements that appear to provide
some variation of the same information: ███████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████

[8] This information would be responsive to at least Request for Production Nos.
10-16 (Set One) 19, 21, (Set Two), and Interrogatory Nos. 9, 11, 14, (Set One), 20, 21
(Corrected Set Two).

████████████████████████████████████████[9]  As Activision contends that both Warzone Mobile and "Call of Duty: Warzone" are "free-to-play and [] not available for 'sale' at any retail outlet," and "Activision did not receive any revenue from the 'sale' of such game[s]," these two financial documents do not sufficiently explain the provenance and meaning of purported profit and loss Activision is attributing to products and services that it claims generate no revenues. *See* Ex. 16 at 7.

Financial information related to the interdependent and integrated games Warzone identified, including Modern Warfare and BlackOps, is directly relevant to assessing the full scope of the benefit Activision derived from its use of the Warzone mark. Warzone "should not be limited, in its efforts to prove its damages, to the financial information selectively produced by" Activision. *United Artists Corp. v. United Artist Studios LLC*, No. 19-828, 2020 WL 5370615, at *4 (C.D. Cal. Apr. 27, 2020); *Apple Inc.,* 2012 WL 1413385, at *7-8.

Documents and information sufficient to show profits, licensing revenues, brand loyalty effects, and monetary gains Activision garnered across its game portfolio are all highly responsive and discoverable in light of ████████████████████████
████████████████████████████████████  *See Diagnostics Sys. Corp. v. Symantec Corp.,* No. 06-1211, 2008 WL 9396386, at *9 (C.D. Cal. Apr. 4, 2008) (compelling production of "financial terms contained within licensing agreements" because they are "relevant to NetScout's claims"). For example, RFP No. 12 seeks "[d]ocuments and communications sufficient to identify the total revenue of products and services offered by Activision that bears or incorporates the term or trademark WARZONE," which necessarily includes financial documentation detailing revenue and profits for each product, service, in-app purchase, or other offering associated with or launched under the

---

[9] On November 14, 2024, Activision agreed to supplement these documents Exs. 20 (ATV000723), 21 (ATV000560) with complete versions including (i) financial data attributable to Warzone Mobile, (ii) data prior to Q4 2020, and (iii) updated information from Q1 2024 to the present.  Warzone reserves the right to seek an order to compel these supplements through this motion should Activision fail to produce them by November 25, 2024.

WARZONE mark or resulting from cross-promotions, bundling, or integration of services associated with Activision's use of the WARZONE mark. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F. 3d 1007, 1012 (9th Cir. 1994) ("where infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff"); *see also Yuga Labs, Inc. v. Ripps*, No. 22-4355, 2023 WL 7089922, at *13 (C.D. Cal. Oct. 25, 2023); *Intex Recreation Corp. v. Bestway USA Inc.*, No. 16-3300, 2021 WL 6618494, at *4 (C.D. Cal. Nov. 10, 2021) ("[t]hat the accessories are marketed as compatible with both accused and unaccused spas, does not change the baseline relevance of this information").

Activision has failed to produce any such financial information aside from the two profit and loss statements it produced for Call of Duty Warzone (discussed above), which nowhere list the sources of the financial information. *See* Exs. 20 (ATV000723), 21 (ATV000560). Activision has failed to provide any data covering monthly reporting from its sales channels sufficient to enable Warzone to measure and analyze the franchise-wide impact of using the Warzone mark to accurately calculate the benefits Activision realized from its infringement. But, Activision's documents support the availability of this information:

- ████████████████████████████████████████
  ██████████████████████████████████████████
  ████████████████████████████████████████
  ██████████████████████████████████████████████
  █████████████████████████████████████████
  ████████████████████████████████████████████
  ███████████████████████████████



### c.    Documents and Information Regarding Non-Monetary Benefit: User and Performance Metrics

Request for Production Nos. 13 and 16 (Set One), No. 19 (Set Two), and Nos. 54, 78, 108, 109 (Set Three) also seek related metrics evidencing enhanced user engagement, retention rates, or acquisition attributable to cross-game services or similar promotional strategies involving the mark are also essential to this analysis.  Activision must produce documents sufficient to show any intangible benefits, such as increased overall brand equity, market share, customer loyalty, or other recognition from each of Activision's uses of Warzone in commerce, as well as documents showing the influence on customer loyalty, acquisition, and retention metrics associated with other game titles and any marketing or brand studies conducted before and after launch of each use of Warzone.

Documents and information in support of the total value appropriated by Activision necessarily includes documents and information reflecting performance gains realized across associated products and services where the mark has bolstered brand engagement and other cross-title metrics.  *See Bellagio Jewelry, Inc. v. Croton Watch Co.*, No. 06-6672, 2008 WL 3905895, at *13 (C.D. Cal. Aug. 20, 2008) (granting Bellagio profits

from Croton's sales of non-infringing products that appeared in the same series as products bearing the infringing mark); *see also Kaneka Corp. v. Zhejiang Med Co.,* No. 11-2389, 2016 WL 11266869, at *15 (C.D. Cal. Oct. 18, 2016) ("many courts have concluded that information about the 'profitability' and 'costs' of 'comparable' products or patents is discoverable to determine what is customary in the industry, broadly construed"). ███████████

████████████████████████████████████████

███████████████████████████████████:

- ██████████████████████
███████████████████████████
████████████████████████████
██████████████████████████
████████████████████████████
███████████████████████████
████████████████████████████
██████████████████████████
█████████████████████████████
████████████████████
██████████████



### d. Documents Regarding Marketing and Advertising Spend

Request Nos. 8, 9 (Set One), 20 (Set Two) and Interrogatory Nos. 3, 10 (Set One), and 20 (Corrected Set Two) seek information concerning Activision's advertising and marketing in connection with the term WARZONE and are also plainly relevant to Warzone's calculation of damages under its corrective advertising theory.  Documents and information regarding Activision's marketing and advertising expenditures related to its use of the WARZONE mark should include a full accounting of all advertising expenses related to the products and services tied to the WARZONE mark, including budgets allocated across various media such as online, print, and broadcast advertising.  This data is relevant to calculation of the prospective corrective advertising required to address marketplace confusion caused by Activision's use of the WARZONE mark.

To quote Activision's own motion to compel financial information, we "expect" Activision to keep "payments to a bank or other account for the advertising on its website and for website purchases," and "[a]s for expenses, [Activision] must have received invoices from third parties (such as hosting providers and consultants), written checks or made electronic transfers to pay those bills, or received credit card statements."  Ex. 24,

Docket No. 85-1 at 3:21-23.  Where, as here, "this revenue and expense data is not reflected on a profit-and-loss statement," Activision "must provide its bank account statements, credit card statements, and all invoices or receipts reflecting the inflow and outflow of money." *Id* at 3:24-26.

Pursuant to subpoena from Warzone, one of Activision's advertising agencies, Aspect Ratio, Inc. ("Aspect"), produced dozens of invoices it sent to Activision regarding ███████████████████████████████████████████████ Germinario Decl. ¶ 7; *see e.g.,* Exs. 30, 31, 32, 33, 34, 35.  Activision has failed to produce any of these or other invoices reflecting payments made to outside agencies for marketing and advertising purposes.  Germinario Decl. ¶ 7.  Activision has also failed to produce documents sufficient to show its expenditure of internal resources (including work by employees or subsidiaries not separately invoiced) on marketing and advertising, or any budgets, costs, or reports of the same.  The documents it has produced indicate the existence of such relevant information responsive to Warzone's document requests:









Warzone respectfully submits that the Court compel Activision to produce the documents and information regarding the above-identified monetary and non-monetary benefits Activision has gained in connection with its use of the WARZONE mark.

**Activision's Position**

Under the broad, all-encompassing category of "monetary and non-monetary benefit," WZLLC collapses into "Issue 2" a vast array of documents and information potentially covering Activision's entire business. Its requests are vague and non-specific, but appear to encompass sweeping categories of documents such as (1) documents relating to Activision's parent company's corporate securities filings; (2) financial information concerning Activision's entire "game portfolio"; (3) documents "sufficient to show any intangible benefits, such as increased brand equity, market share, customer loyalty, or other recognition"; (4) "documents and information reflecting performance gains realized across associated products and services where the mark has bolstered brand engagement and other cross-title metrics;" and (5) "a full accounting of all advertising expenses related to the products and services tied to the WARZONE mark," including all invoices and bank account statements.

Once again, WZLLC has made it nearly impossible to address its arguments with any specificity.  WZLLC has failed to point to any specific document request that seeks the information it now moves to compel.  It also tellingly omits any discussion about efforts to narrow its demands or to cooperate with Activision to balance the burden of compliance with the relevance of the demands.  That is because WZLLC ***never made any such efforts.***  To the contrary, this motion is the very first time that WZLLC has even raised most of these issues with Activision.  During the parties' November 14 meet-and-confer, WZLLC never said a word about these massively overbroad categories of documents (other than briefly demanding profit-and-loss statements for games other than *CODWZ*).  WZLLC offers no reason to "excuse [its] noncompliance" with the District's rules.  *Gregorini v. Apple, Inc*., No. 2:20-CV-00406-SSS-JC, 2023 WL 4203497, at *6 (C.D. Cal. May 26, 2023) (Chooljian, J.) ("The Court does not, however, excuse Plaintiff's noncompliance with Local Rule 37-1 as to RFP No. 111, as such request was not even referenced by Plaintiff's counsel in the February 16 letter or other correspondence before the Court, there is no other indication that the parties have specifically engaged in any discussion regarding the substance of such document request, and there is a genuine dispute as to whether Defendants should be required to produce documents responsive thereto.")

In fact, WZLLC never requested the vast majority of the documents it now seeks and is trying to remedy its poor discovery efforts through this motion.  As for the related document requests it did serve, WZLLC did not engage in good faith meet-and-confer discussions and has failed to explain how the purported relevance of such documents outweighs the obvious and demonstrable burden to Activision.  WZLLC's decision to wait to raise these issues and attempt to impose a massive burden on Activision until the close of discovery is wholly improper and unfair.

## 1. WZLLC Never Requested Documents and Information Supporting Activision's Parent's Public Filings, And Such Documents Are Irrelevant.

WZLLC's demand for all "documents and information underlying the claims [Activision] made in its recent public filings" should be denied for the overriding reason

that **such documents were never sought in discovery**.  WZLLC knows this—that is why it limits its discussion of its discovery requests to a brief footnote, claiming that "this information would be responsive to at least Request for Production Nos. 10-16, 19, 21" and certain interrogatories.  But all of these requests merely seek documents "sufficient to identify" certain financial information for "products or services offered by Activision that bears or incorporates the term or trademark WARZONE."  *See, e.g.*, Germinario Decl, Ex. 36 at 11-16, 18-19.  Activision complied with these requests by providing detailed profit-and-loss statements for *CODWZ* and *CODWZM*.  Edelstein Decl. ¶ 7.  "It is axiomatic that a request for documents 'sufficient to show' does not require the production of all conceivably relevant information."  *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 616 (C.D. Cal. 2013).  Activision also is collecting information concerning *WSOW*—but because *WSOW* is not a "game," is not "sold," does not offer "virtual currency," and cannot be "downloaded," most of the requests are inapplicable (*e.g.*, Request Nos. 10, 11, 13-16, 19, 21).  Germinario Decl, Ex. 36 at 11-16, 18-19.  Activision already has explained this to WZLLC.  Edelstein Decl. ¶ 54.

In any event, WZLLC never explains how documents "underlying" Activision's public securities filings are relevant to this lawsuit.  The filings speak for themselves, and Activision does not dispute their authenticity.  WZLLC fails to offer any serious explanation as to how documents pertaining to Activision's parent company's monetization of free-to-play games (including games like *Candy Crush* and *Hearthstone* that are entirely irrelevant to this lawsuit), overall corporate earnings, and general business trends relate to this lawsuit.  Its cursory explanation that such documents are "clearly relevant to [WZLLC's] damages theories" is conclusory.  Such documents have no bearing on WZLLC's actual damages (*i.e.*, the diminution in value of its mark).  Nor are such documents relevant to WZLLC's disgorgement theories,[10] since WZLLC already possesses financial information in connection with the titles at issue and it has never

---

[10] As discussed *infra* at 39-40, Activision disputes that disgorgement is even an available remedy here.

argued (far less presented any evidence) that the "Warzone" portion of the *CODWZ name* has any relationship to Activision's revenue from other games, especially games such as *Candy Crush.*

### 2. WZLLC Is Not Entitled To And Did Not Request Documents And Information Regarding "Revenues, Profits, and Other Financial Indicators" From Separate Non-Infringing Products.

WZLLC next demands that Activision produce "documents and information sufficient to show profits, licensing revenues, brand loyalty effects, and monetary gains Activision garnered *across its game portfolio*."  In other words, WZLLC is seeking financial and related information for Activision's *entire games business*—not just financial information for the games at issue in this lawsuit.  Activision has published at least 10 other games since 2020, including six *Call of Duty* games (none of which have "warzone" in their title) and a variety of others, such as remasters of *Tony Hawk* skateboarding games and *Crash Bandicoot* platforming games.

Again, WZLLC fails to identify any actual document requests in which it sought this information.  In fact, the *only* tangentially relevant request it even mentions in its motion is Request No. 12.  That request seeks only documents "*sufficient to identify* the *total revenue* of products and services offered by Activision that bears or incorporates the term or trademark WARZONE."  Germinario Decl, Ex. 36 at 12 (emphasis added).  No reasonable reading of that Request could support WZLLC's interpretation that it calls for "financial documentation detailing revenue and profits…. resulting from cross-promotions, bundling or integration of services associated with Activision's use of the WARZONE mark."   The *only* Activision "products and services" that "bear or incorporate the term or trademark WARZONE" are *CODWZ*, *CODWZM*, and *WSOW*. The Request also cannot possibly be read to include ███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████

Moreover, WZLLC never explains how revenue from *Call of Duty* titles that do not contain any reference to "warzone" is relevant to its trademark infringement claims. WZLLC's reference to the "full scope of the benefit Activision derived" makes little sense.  In awarding compensatory damages, especially in "reverse-confusion" cases, courts consider the damage to the value of the ***plaintiff's*** mark—not the value of the defendant's mark.  The *Ninth Circuit Manual of Model Jury Instructions* §15.27 provide, in pertinent part:

> Damages means the amount of money which will reasonably and fairly compensate the plaintiff for any [injury] [and] [or] [property damage] you find was caused by the defendant's infringement of the plaintiff's registered trademark….

> When considering prospective costs (*e.g.*, cost of future advertising, expense of preventing customers from being deceived), you must not overcompensate.  ***Accordingly, your award of such future costs should not exceed the actual damage to the value of the plaintiff's mark at the time of the infringement by the defendant.***

(Emphasis added.)

To the extent that WZLLC is relying on a disgorgement or "profits" theory, the argument fares no better, because profits awards must not only be "attributable to the infringement," but also must "constitute compensation and not a penalty."  15 U.S.C. § 1117.  WZLLC does not explain how revenue from ***other games*** that do not include "Warzone" in their title would be relevant to compensating WZLLC for its injury, especially since it has admitted that it is not claiming in this action, and has no evidence, that anyone purchased any Activision game or in-game item – or even played any Activision game – under the mistaken belief that it was playing or purchasing WZLLC's game.  *See* Response to RFA Nos. 1, 2, 3, 4, 9, 10.  Edelstein Decl, Ex. K.  Indeed, "[b]ecause in a reverse confusion case the infringer is not seeking to take away the plaintiff's customers through confusion, awarding the plaintiff the profits of an infringer is ***not a proper basis for recovery***." 3 McCarthy on Trademarks & Unfair Competition §

23:10 (5th ed.) (emphasis added); *see also Fabick, Inc. v. JFTCO, Inc.*, 944 F.3d 649, 659 (7th Cir. 2019) (affirming summary judgment that plaintiff in reverse confusion case could not recover defendant's profits because reverse confusion cases "present meager justification for profit awards."); *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, No. CIV.A. 94-CV-7408, 2002 WL 27735, at *5 (E.D. Pa. Jan. 9, 2002) ("[T]here is no indication that [defendant's] success . . . was due to the strength of [plaintiff's] mark or the confusion that was created because of the marks' similarity . . . We think that it would be unfair to award Plaintiffs a share of the profits when there is no indication that Plaintiffs' mark contributed to these profits at all."). [11]

While (despite the foregoing) Activision has provided financial information for the games that include "warzone" in their title,[12] there is no basis to demand that Activision *also* produce financial information for every one of its other games, especially since there is not a shred of evidence that anyone purchased any of these games (*e.g.*, "*Call of Duty: Black Ops Cold War*") as a result of confusion with WZLLC's game or, for that matter, as a result of the word "warzone" in the title of *CODWZ*.

Nor can WZLLC seriously claim that the "Warzone" title is so intertwined with Activision's other games such that profits are "inseparable" between them. *CODWZ* is a stand-alone, free-to-play game that generates revenue through in-game purchases (*e.g.*, cosmetic upgrades such as weapon and character skins.) Activision's other *Call of Duty* games are retail releases that must be separately purchased. Indeed, because *CODWZ* is offered for free, there would be no reason for a consumer to purchase a different game to obtain *CODWZ*.

---

[11] WZLLC's attempt to justify this demand by referring broadly to "the benefits Activision realized from its infringement" misses the point. WZLLC is not entitled to recover any abstract "benefit"—only those "benefits" that result from mistaken purchases of Activision products that deprived WZLLC of revenue from its own products.

[12] All of these uses make clear in context that such products are part of Activision's "*Call of Duty*" master brand.

The suggestion that a consumer might have purchased a different *Call of Duty* game without Warzone in its title because he or she was confused about *CODWZ*'s relationship with WZLLC or generally because *CODWZ*'s title included "Warzone" is not just speculative, but implausible and unsupported.  Under WZLLC's theory, a trademark plaintiff could always seek virtually unlimited discovery into a company's entire product line if any single product was alleged to infringe a trademark, because naturally if the product with the allegedly infringing mark is a quality product, some consumers might purchase another product from the company.  These secondary purchases of non-infringing items thus have nothing to do with the trademark, but result from the quality of the product itself.  (By contrast, no matter how compelling a trademark is, if a person dislikes the product with the infringing mark he or she is unlikely to purchase another product produced by that company.)   This is particularly true with expressive content whose title is alleged to be infringing, because a person who decides, for example, to purchase additional books by the same author, watch additional films made by the same director, or spend $60 or $70 on a *Call of Duty* game other than *CODWZ* obviously does so for reasons other than the fact that the first book, film, or game included a particular word in its title.

WZLLC does not cite a single case to support its overreaching demand for financial information for completely separate, non-allegedly-infringing products.  And Activision has not located any authority permitting a trademark plaintiff to obtain financial discovery regarding products that do not bear the allegedly infringing mark.  The cases WZLLC does cite are inapposite because each involved products that **themselves** bore the plaintiff's mark.  The issue in these cases was apportionment of the profits from the allegedly infringing product—not whether a plaintiff could seek profits from other non-infringing products.  *See, e.g., Nintendo of Am. v. Dragon Pac. Int'l,* 40 F.3d 1007, 1012 (9th Cir. 1994) (defendant's cartridges were advertised as "Nintendo products," even though the cartridges contained both Nintendo games and other third party games); *Yuga Labs, Inc. v. Ripps,* CV 22-4355-JFW(JEMx), 2023 WL 7089922,

*13-14 (C.D. Cal. Oct. 25, 2023) (permitting recovery of profits for defendants' NFTs bearing the plaintiff's marks, even though defendants argued that some elements of the work might not be infringing); *Bellagio Jewelry, Inc. v. Croton Watch Co.,* No. CV 06-6672 ODW, 2008 WL 3905895, at *13 (C.D. Cal. Aug. 20, 2008) (defendant's second series of watches was marketed as the "last of the Bellagio series").[13]

### 3. WZLLC's Demand For Various Documents And Information Regarding Non-Monetary "Benefits" Is Overbroad And Seeks Materials Not Sought In Its Written Requests.

WZLLC purports to seek "related metrics evidencing enhanced user engagement, retention rates, or acquisition attributable to cross-game services or similar promotional strategies involving the mark" and "documents sufficient to show any intangible benefits, such as increased overall brand equity, market share, customer loyalty, or other recognition from each of Activision's uses of Warzone in commerce, as well as documents showing the influence on customer loyalty, acquisition, and retention metrics associated with other game titles and any marketing or brand studies conducted before and after launch of each use of Warzone."   Again, the document requests cited by WZLLC do not support this extremely broad demand.

Requests Nos. 13, 16, and 19 (Set Two) seek only documents "***sufficient to identify***" certain figures.  As for the Requests Nos. 54, 78, 108, and 109 in WZLLC's third set of requests, WZLLC never conferred about these with Activision and instead went directly to motion practice (notwithstanding Activision already providing financial data).  Edelstein Decl. ¶ 43.  Request Nos. 78, 108, and 109 seek "analytics" regarding "gamer logins across Activision game titles" or "user, usage, or game analytics."  But

---

[13]  *Intex Recreation Corp. v. Bestway USA Inc.,* No. LA CV16-3300 JAK (Ex), 2021 WL 6618494 (C.D. Cal. 2021), involved **patents**, not trademarks.  Moreover, the Court specifically noted that it was permitting discovery into accessories for the infringing product because "such accessories are not purchased independently of the [infringing products]" and "Defendant has not argued, for example, that a consumer would purchase a spa drink holder for use independently of a spa."  *Id.* at *4.  By contrast, Activision's other games do not require a purchase of *CODWZ* and are stand-alone products.

WZLLC has never explained what sort of "analytics" it is seeking or why this information is relevant to the issues in this lawsuit.

In any event, WZLLC's paragraph-long hypothetical document demand is impenetrable and vastly overbroad. WZLLC never explains what it actually is seeking, what it means by "analytics," and what sorts of "customer loyalty, acquisition, and retention metrics" it would like Activision to produce. At the very minimum, WZLLC must make *some* effort to identify what specific information it is seeking to compel or to work with Activision to narrow its request to ensure that the demand is comprehensible, reasonably tailored, and not unduly burdensome. It never once did so, and its motion only compounds the problem.

Activision already has produced those documents it has been able to locate that specifically discuss the benefits (and drawbacks) of the "Call of Duty: Warzone" ***title***, which is the only element of the game that is at issue in this lawsuit. WZLLC has not explained why it also seeks all of these various "analytics" and "metrics" or how such materials relate to its claims. It certainly cannot be relevant to WZLLC's actual damages (which are based on diminution to the value of the mark), disgorgement (which are based on Activision's profits, which it has disclosed), or likelihood of confusion. WZLLC's cursory reference to purported "value appropriated" is not persuasive, because WZLLC does not claim that Activision "appropriated" or piggybacked off any of WZLLC's goodwill (to the extent it possessed any). To the contrary, WZLLC admits that Activision's sales are the result of Activision's ***own*** marketing and goodwill. Ultimately, what WZLLC is attempting to do is to recover Activision's profits from non-allegedly-infringing products, even though it does not and cannot fairly argue that the use of the term "warzone" in the *CODWZ* name contributed to any of these profits. And WZLLC certainly is not entitled to "analytics," "metrics," "overall brand equity," and "market share" information for ***all** Call of Duty* games without even attempting to explain the relationship between that information and its claims in this action.

**4. WZLLC Only Sought Documents "Sufficient To Reflect" Activision's Marketing And Advertising Spend, And It Would Be Unduly Burdensome For Activision To Collect And Produce Invoices, Bank Statements, And Other Backup Materials.**

Finally, WZLLC seeks to compel "documents and information regarding Activision's marketing and advertising expenditures related to its use of the WARZONE mark," including "a full accounting of all advertising expenses related to the products and services tied to the WARZONE mark, including budgets allocated across various media such as online, print, and broadcast advertising." WZLLC even goes so far as to demand "bank account statements, credit card statements, and all invoices or receipts reflecting the inflow and outflow of money."

Again, ***WZLLC never sought these documents in discovery***—which is reason enough to deny this portion of the motion. The requests WZLLC points to—Nos. 8, 9, and 20 (set two)—sought only documents ***"sufficient to establish the total marketing expenditure"*** or "sufficient to identify the retail channels" for the works at issue. Nowhere do these requests seek budgets, invoices, bank statements, or other documents "regarding" marketing and advertising. By contrast, Activision has produced documents reflecting not just the total marketing expenditure for CODWZ and CODWZM, but also the quarterly marketing expenditure. Edelstein Decl., ¶ 7. Activision has agreed to produce the total marketing expenditure for *WSOW*, to the extent that this can be determined. Activision also produced documents "sufficient to identify" the "retail channels" for *CODWZ* and *CODWZM*, including store pages where these products can be downloaded.

WZLLC's attempt to analogize its demand to Activision's recent demand for WZLLC's expense documents is unpersuasive and disingenuous. WZLLC's marketing expenses are directly relevant to the value of its mark as of 2019, which is the maximum amount that it can recover under its corrective advertising theory. *See HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884 BAS MDD, 2015 WL 1757804, at *3 (S.D. Cal. Apr. 17, 2015) (marketing or advertising costs "most accurately reflect trademark value: the

more one advertises a mark, the more public recognition inures to the mark, which increases its value." (citation omitted)); *Van Burren v Envii, Inc.,* No. 818CV00190JVSKES, 2019 WL 3220013, at *3 (C.D. Cal. Mar. 27, 2019) ("before awarding damages, the Court requires evidence that the damages sought are not greater than the value of the trademark" (citation omitted)).   By contrast, WZLLC never explains how ***Activision's*** advertising expenses—far less Activision's "inflow and outflow of money"—are relevant to its corrective advertising theory, other than that it intends to seek 25% of those expenses as a proxy for its corrective advertising costs up to the value of its mark. *See* Edelstein Decl., Ex. J (WZLLC's First Supplemental Response to Activision's Interrogatory 14.)

Moreover, Activision would have been prepared to accept a quarterly breakdown of WZLLC's marketing expenses.  However, WZLLC claimed that it never tracked its marketing expenditures and was unable to provide any cost information other than a few undifferentiated line items on a tax return.  That is a far cry from the detailed profit-and-loss statements produced by Activision in this lawsuit.  Edelstein Decl. ¶ 7.

Finally, WZLLC ignores the difference between production of a handful of documents reflecting its few dollars of unaccounted marketing expenses with the hundreds of thousands of documents related to Activision's millions of dollars spent on marketing and advertising.  Activision's profit-and-loss statements were carefully prepared by its accounting team, its marketing expenses were tracked and allocated, and it has offered to make a witness available to discuss those profit-and-loss statements and explain how they were prepared.  *Id.*  By contrast, WZLLC never tracked any of its expenses (which amount, in total, to just $754) and was unable to provide any information about its marketing and advertising.  As set forth in the accompanying Declaration of Evan Wingren (at ¶¶ 3-11), producing every document related to Activision's four-year marketing campaign would be a massive undertaking that is wholly unjustified.

Date:  November 25, 2024

*/s/ Marc E. Mayer*
Marc E. Mayer (SBN 190969)
Karin G. Pagnanelli (SBN 174763)
Alexandra L. Anfuso (SBN 333440)
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100
mem@msk.com
kgp@msk.com
ala@msk.com

Lindsay Edelstein (pro hac vice)
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239
lre@msk.com

*Attorneys for Activision Publishing, Inc.*

Respectfully submitted,

Jennifer A. Kash (State Bar Number 203679)
Francesca M. S. Germinario (State Bar Number 326208)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
21-3073@cases.warrenlex.com

Alyssa K. Schabloski (State Bar Number 258876)
GLADIUS LAW, APC
2708 Wilshire Blvd., No. 426
Santa Monica, California, 90403
Tel: (310) 734-0720
aks@gladiusaw.com

Brett E. Lewis (pro hac vice)
Roberto Ledesma (pro hac vice)
Michael D. Cilento (pro hac vice)
LEWIS & LIN, LLC
77 Sands Street, 6th Floor
Brooklyn, New York, 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
brett@iLawco.com
roberto@iLawco.com
michael@iLawco.com

*Attorneys for Defendant / Counterclaimant Warzone.com, LLC*

## <u>SIGNATURE ATTESTATION</u>

Under Local Rule 5-4.3.4(a)(2)(i), I attest that I have obtained concurrence in the filing of this document from the other signatories.

Date:  November 25, 2024

Francesca M. S. Germinario