1   MARC E. MAYER (SBN 190969)
      mem@msk.com
2   KARIN G. PAGNANELLI (SBN 174763)
      kgp@msk.com
3   LINDSAY R. EDELSTEIN (*pro hac vice*)
      lre@msk.com
4   MITCHELL SILBERBERG & KNUPP LLP
    2049 Century Park East, 18th Floor
5   Los Angeles, CA  90067-3120
    Telephone: (310) 312-2000
6   Facsimile: (310) 312-3100

7   Attorneys for Activision Publishing, Inc.

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  ACTIVISION PUBLISHING, INC., a        CASE NO. 2:21-cv-3073-FLA (JCx)
    Delaware corporation,
12                                          [Assigned to Judge Fernando L. Aenlle-
                Plaintiff,                   Rocha]
13
         v.                                 [*REDACTED*] NOTICE OF
14                                          MOTION AND MOTION OF
    WARZONE.COM, LLC,                       ACTIVISION PUBLISHING, INC.
15                                          FOR SUMMARY JUDGMENT OR,
                Defendant.                   ALTERNATIVELY, PARTIAL
16  ─────────────────────────────          SUMMARY JUDGMENT ON
    WARZONE.COM, LLC,                       COUNTERCLAIMS OF
17                                          WARZONE.COM, LLC
                Counterclaimant,
18                                          MEMORANDUM OF POINTS AND
         v.                                 AUTHORITIES AND
19                                          DECLARATIONS OF CAROLYN
    ACTIVISION PUBLISHING, INC., a          WANG, TERRY KIEL, MARC E.
20  Delaware corporation,                   MAYER, AND LINDSAY R.
                                            EDELSTEIN IN SUPPORT
21              Counterdefendant.
22                                          [PROPOSED] JUDGMENT
                                            LODGED CONCURRENTLY
23                                          HEREWITH

24                                          Date:        March 21, 2025
                                            Time:        1:30 p.m.
25                                          Ctrm:        6B

26                                          Complaint Filed:    Apr. 8, 2021
                                            Counterclaim Filed: June 8, 2021
27                                          Pretrial Conference: May 19, 2025,
                                                        at 1:30 p.m.
28                                          Trial:       May 27, 2025,
                                                        at 8:15 a.m.

Mitchell
Silberberg &
Knupp LLP

20501414.2

                    NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 21, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard before Judge Fernando L. Aenlle-Rocha in Courtroom 6B, Sixth Floor, of the Federal Courthouse located at 350 West 1st Street, Los Angeles, California 90012, Plaintiff and Counterclaim-Defendant Activision Publishing, Inc. ("Activision") will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order: (1) dismissing the Counterclaims of Warzone.com, LLC ("WZLLC") for (a) Trademark Infringement pursuant to the Lanham Trademark Act (15 U.S.C. § 1125), (b) Unfair Competition pursuant to California Business and Professions Code §§ 17200 and 17500 *et seq.*, and (c) Trademark Infringement under California common law; and, (2) declaring that Activision's use of the word "Warzone" does not infringe, and at all times has not infringed, any purported trademark rights of WZLLC.[1]

This Motion is made following a conference of counsel pursuant to L.R. 7-3 which took place on January 29, 2025.  The parties were unable to reach a resolution to eliminate the necessity of a hearing.

This Motion is made on the following grounds:

1.      WZLLC's infringement claims fail as a matter of law because there are no genuine issues of material fact supporting its claim that there is a likelihood of consumer confusion among the relevant consuming public; that is, that WZLLC's potential customers are likely to believe that Activision is the source of WZLLC's games.

2.      Even if there were any genuine issues of material fact as to the likelihood of confusion, summary judgment is appropriate on WZLLC's two alternative theories of recovery – *i.e.*, damages for lost profits and equitable

---

[1]  Activision does not seek by this Motion adjudication of any issues pertaining to the parties' respective trademark registrations, and is prepared to voluntarily dismiss Paragraphs 4, 5, and 6 of its Prayer for Relief.

Mitchell Silberberg & Knupp LLP

20501414.2

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1  disgorgement.  WZLLC cannot meet its burden of proof on either damages theory

2  because: (a) WZLLC's lost-profits theory is entirely speculative and Activision is

3  not the "but for" cause of any such alleged lost profits; and, (b) equitable

4  disgorgement is not available here because there is no dispute that none of

5  Activision's profits are attributable to any of WZLLC's goodwill and WZLLC's

6  demand is untethered to any actual damages.

7          This Motion is based upon this Notice of Motion and Motion; the

8  accompanying Memorandum of Points and Authorities; the Statement of

9  Uncontroverted Facts; the Declarations of Carolyn Wang, Terry Kiel, Marc E.

10  Mayer, and Lindsay R. Edelstein, and the Exhibits submitted in support hereof; all

11  other matters of which the Court may take judicial notice; the pleadings and papers

12  on file herein; any Reply and supporting pleadings and exhibits that may be filed in

13  support; and upon such other or further material as may be presented at or before

14  the hearing of this matter.

15

16  DATED:  February 14, 2025          MARC E. MAYER
                                       KARIN G. PAGNANELLI
17                                     LINDSAY R. EDELSTEIN
                                       MITCHELL SILBERBERG & KNUPP LLP
18
                                       By: */s/ Marc E. Mayer*
19                                     _____
                                           Marc E. Mayer (SBN 190969)
20                                         *Attorneys for Activision Publishing, Inc.*

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

20501414.2

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

I.     STATEMENT OF UNDISPUTED FACTS ...................................................2

    A.    WZLLC And Its Games. ...................................................................2

    B.    WZLLC's Failure To Promote Any *Warzone* "Brand" .......................4

    C.    WZLLC's Failure To Enforce Its Alleged Mark ................................6

    D.    Activision's *Call of Duty: Warzone* ....................................................7

    E.    This Dispute ......................................................................................9

II.    WZLLC CANNOT ESTABLISH A PROBABLE LIKELIHOOD OF
    APPRECIABLE CONSUMER CONFUSION. ..............................................9

    A.    WZLLC's Alleged Mark Is Conceptually And Commercially
    Weak ...............................................................................................11

    B.    The Parties' Marks Are Not Confusingly Similar ............................13

    C.    The Parties' Games Are Not Sufficiently Related..............................15

    D.    The Parties' Marketing And Distribution Channels Are Distinct ......17

    E.    Relevant Customers Exercise A High Degree Of Care In Their
    Purchasing Decisions ......................................................................18

    F.    There Is No Relevant Evidence Of Actual Confusion........................18

    G.    There Is No Evidence Of Bad Faith Intent By Activision..................20

    H.    There Is No Evidence That Either Party Will Expand Into The
    Other's Market. ...............................................................................21

III.   WZLLC'S DAMAGES CLAIMS SHOULD BE DISMISSED. ..................21

    A.    WZLLC's Purported Lost Profits Are Impermissibly Speculative. ...21

    B.    WZLLC Is Not Entitled To Equitable Disgorgement.........................23

CONCLUSION.....................................................................................................24

i

1

## **TABLE OF AUTHORITIES**

2                                                                                                                        **Page(s)**

3                                                **CASES**

4    *Abercrombie & Fitch Co. v. Moose Creek, Inc.*,

5        486 F.3d 629 (9th Cir. 2007) ................................................................ 18

6    *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,

7        616 F.2d 440 (9th Cir. 1980) ................................................................ 13

8    *AMF Inc. v. Sleekcraft Boats*,
        599 F.2d 341 (9th Cir. 1979) .......................................................*passim*
9

    *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
10        457 F.3d 1062 (9th Cir. 2006) .............................................................. 18

11
    *Avco Corp. v. Turn & Bank Holdings, LLC*,
12        659 F. Supp. 3d 483 (M.D. Pa. 2023) ................................................. 22

13
    *Cleary v. News Corp.*,
14        30 F.3d 1255 (9th Cir. 1994) ................................................................ 11

15    *Color Me Mine Enters. v. S. States Mktg. Inc.*,

16        2013 WL 12119715 (C.D. Cal. Apr. 25, 2013) .................................... 23

17    *Curity AB v. Chenmed, LLC*,

18        2022 WL 18956198 (S.D. Fla. Dec. 7, 2022) ..................................... 13

19    *Down to Earth Organics, LLC v. Efron*,
        2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024) ..................................... 15
20

21    *Dreamwerks Production, Inc. v. SKG Studio*,
        142 F.3d 1127 (9th Cir. 1998) .............................................................. 10

22
    *Echo Drain v. Newsted*,
23        307 F. Supp. 2d 1116 (C.D. Cal. 2003) ......................................... 10, 11, 12, 17

24
    *Edge Games, Inc. v. Elec. Arts, Inc.*,
25        745 F. Supp. 2d 1101 (N.D. Cal. 2010) ................................... 14, 17, 20

26    *Entrepreneur Media, Inc. v. Smith*,

27        279 F.3d 1135 (9th Cir. 2002) ........................................................ 12, 15

28

ii

1

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Fancaster, Inc. v. Comcast Corp.*,
   832 F. Supp. 2d 380 (D.N.J. 2011) ................................................................... 20

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
   432 F.3d 463 (3d Cir. 2005) ............................................................................ 20

*Helix Env't Plan., Inc. v. Helix Env't & Strategic Sols.*,
   2020 WL 2556341 (S.D. Cal. May 20, 2020) .................................................. 17

*Jack Daniel's Properties, Inc. v. VIP Prods. LLC*,
   599 U.S. 140 (2023) ......................................................................................... 10

*Kibler v. Hall*,
   843 F.3d 1068 (6th Cir. 2016) ......................................................................... 12

*Lemme v. Nat'l Broad. Co.*,
   472 F. Supp. 2d 433 (E.D.N.Y. 2007) ....................................................... 20, 21

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) ......................................................................... 21

*M2 Software v. Madacy Ent.*,
   421 F.3d 1073 (9th Cir. 2005) ......................................................................... 10

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
   290 F. Supp. 2d 1083 (C.D. Cal. 2003) ...................................................... 15, 21

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) ........................................................................... 10

*McClaran v. Plastic Indus., Inc.*,
   97 F.3d 347 (9th Cir. 1996) ............................................................................. 23

*Miss World (UK) Ltd. V. Mrs. Am. Pageants, Inc.*,
   856 F.2d 1445 (9th Cir. 1988) ......................................................................... 12

*Murray v. CNBC*,
   86 F.3d 858 (9th Cir. 1996) ............................................................................... 9

*Noasha LLC v. Nordic Group of Companies, Ltd.*,
   630 F. Supp. 2d 544 (E.D. Pa. 2009) ............................................................... 15

Mitchell
Silberberg &
Knupp LLP

20501414.2

iii

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1

# TABLE OF AUTHORITIES
(continued)

2

3

**Page(s)**

4

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
  2015 WL 9028123 (N.D. Cal. Dec. 16, 2015) ...................................................23

5

6

*Oculu, LLC v. Oculus VR, Inc.*,
  2015 WL 3619204 (C.D. Cal. June 8, 2015)................................................10, 23

7

8

*Partners for Health & Home, L.P. v. Seung Wee Yang*,
  488 B.R. 431 (C.D. Cal. 2012) ..............................................................................13

9

10

*Playmakers, LLC v. ESPN, Inc.*,
  297 F. Supp. 2d 1277 (W.D. Wash. 2003) ...........................................................13

11

12

*Punchbowl, Inc. v. AJ Press LLC*,
  2024 WL 4005220 (C.D. Cal. Aug. 22, 2024) ...........................................*passim*

13

14

*Quia Corp. v. Mattel, Inc.*,
  2011 WL 2749576 (N.D. Cal. July 14, 2011) ..............................................21, 23

15

*RiseandShine Corp. v. PepsiCo, Inc.*,
  41 F.4th 112 (2d Cir. 2022) ...................................................................11, 12, 13

16

17

*Scat Enters., Inc. v. FCA US LLC*,
  2017 WL 5896182 (C.D. Cal. Jun. 8, 2017) .......................................................23

18

19

*Star Indus., Inc. v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005) .................................................................................20

20

21

*Sunenblick v. Harrell*,
  895 F. Supp. 616 (S.D.N.Y. 1995) ......................................................................17

22

23

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
  295 F.3d 623 (6th Cir. 2002) ...............................................................................19

24

25

*Walter v. Mattel, Inc.*,
  210 F.3d 1108 (9th Cir. 2000) .............................................................................14

26

*World Champ Tech LLC v. Peloton Interactive, Inc.*,
  2024 WL 665181 (N.D. Cal. Feb. 16, 2024)........................................................11

27

28

# TABLE OF AUTHORITIES
<u>(continued)</u>

**Page(s)**

### STATUTES

15 U.S.C. § 1117.......................................................................................................23

California Business and Professions Code § 17200 ..................................................11

### OTHER AUTHORITIES

3 McCarthy on Trademarks and Unfair Competition (5th ed. 2024).................7, 18

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

This trademark infringement action illustrates how the doctrine of "reverse confusion" can be misused to pursue an unjust windfall. In 2017, Warzone.com, LLC ("WZLLC") launched a browser-based virtual board game titled *Warzone* and its mobile version *Warzone – Turn Based Strategy*. In 2020, Activision Publishing, Inc. ("Activision") released a new installment of its *Call of Duty* game franchise titled *Call of Duty: Warzone*. Without any evidence of consumer confusion about the source of the games or actual damages, WZLLC seeks from Activision ███████ in hypothetical "lost profits" and ███████ in equitable "disgorgement." WZLLC's theory: by using "Warzone" in its game title, WZLLC became the exclusive worldwide owner of that word, entitling it to a payout of more than ██████ its lifetime revenue. WZLLC's warped view of trademark law is unsupported and stretches the doctrine of "reverse confusion" too far.

WZLLC's claims fail for the overriding reason that WZLLC ***never*** has been the exclusive user (far less owner) of the word "Warzone" in connection with video games, which WZLLC knew when it adopted the title. "Warzone" has been used in or as the title of ***at least 50*** video games. WZLLC never possessed a trademark registration for "WARZONE," ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████ making it ineligible for the broad protection it now seeks.

Trademarks are limited rights, intended to protect source-identifying brands from marketplace confusion. To survive summary judgment in a "reverse confusion" case, WZLLC (the senior user) must establish that an appreciable number of consumers believe that Activision (the junior user) is the source of WZLLC's games. WZLLC cannot meet its burden.

Mitchell Silberberg & Knupp LLP

20501414.2

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

Even if there were any basis to allow this case to proceed to trial, WZLLC cannot recover the damages it seeks. WZLLC's "lost-profits" claim fails because it is entirely speculative and Activision was not the "but-for" cause of any alleged lost profits. WZLLC's disgorgement theory is equally baseless because WZLLC admits that none of Activision's profits from *CODWZ* are attributable to consumer confusion; thus, any award would be untethered to any actual damage.

The Court should grant this motion.

# I.    STATEMENT OF UNDISPUTED FACTS.

## A.    WZLLC And Its Games.

████████████████████████████████████ WZLLC's entire business consists of developing and monetizing two games: (1) a "turn-based" online board game that has cycled through the titles *Warzone*, *Warzone Classic*, *Warzone (Risk ++)*, and *Warzone – Turn Based Strategy*; and (2) a companion game *Warzone Idle*. SUF1-3.

In 2008, Ficker created *WarLight* – the predecessor to *Warzone* – "as a hobby project." SUF4. *WarLight* was based on and marketed as similar to Hasbro's board game *Risk*, where players take turns shifting numbers across a world map. SUF5. Ficker initially made *WarLight* available as a "browser-based" game on his website www.warlight.net. SUF6. In 2013, Ficker released a *WarLight* mobile app. SUF7. *WarLight* was free-to-play and earned revenue through advertising and membership subscriptions. SUF8.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

1 ███████████████████████████████████████

2 ████████████████████ Indeed, by 2015 there were over a dozen publicly

3 available video games with the word "Warzone" in their title, including *WarZone*,

4 *WarZone 2*, and *WarZone 3*; *WWF: Warzone*; *Warzone Battle*; *Warzone Five*;

5 *Warzone Tower Defense*; *Anomaly: Warzone Earth*; *Warzone 2100,* and *Warzone*

6 *Chess*. SUF15. "Warzone" also was the name of a game mode in Microsoft's

7 *Gears of War*, a server for the video game *Counter-Strike*, an online magazine, a

8 podcast, and movies, comic books, and television shows. SUF16.

9     Despite the foregoing, Ficker announced the name change from *WarLight* to

10 *Warzone* on www.warlight.net in January 2015. SUF17. The market reaction was

11 overwhelmingly negative. SUF17-18. Players emphasized that *Warzone* was not a

12 unique name: "there [is] more than just one game called warzone"; "Warzone is

13 already taken"; "Googling for 'warzone' gave me a page full of results which each

14 belong to a different WarZone"; "if you change to warzone, it will be buried in a

15 mountain of other like named games"; and "there's already tons of games out there

16 called Warzone." SUF18. In response, Ficker acknowledged the existence of

17 other Warzone-titled games, but reassured players there would be no confusion

18 because, for instance, *Warzone* and *Warzone 2100* were "subtle but technically

19 different names." SUF19.

20     *WarLight* did not become *Warzone* until nearly three years later. On

21 October 25, 2017, Ficker announced plans to release a "sequel to *WarLight*," titled

22 *Warzone*, "before the end of the year." SUF20. Players again expressed concern

23 with changing *WarLight* to *Warzone*. SUF21 ("the googleplay store already have

24 games with similar name"). Between January 2015 (when WZLLC announced the

25 name-change) and November 2017 (when it finally made the change), more than a

26 dozen ***additional*** games with "Warzone" in or as their title had been released.

27 These included the PC game *Warzone* by KEA, a mobile game *Warzone: Clash of*

28 *Generals*, and a browser-based game *Warzones*. SUF22. WZLLC admitted it was

1    aware in 2017 that "there were video games with the name Warzone in it."

2    SUF23.

3        When WZLLC launched www.warzone.com in November 2017, the website

4    contained the browser-based version of *Warzone* – the same game as *WarLight* but

5    with some updates.  SUF24,30.  *Warzone* is free-to-play and earns revenue through

6    advertising and sales of subscriptions and "coins" that unlock features or allow

7    players to join tournaments.  SUF25.  WZLLC **never** made *Warzone* available on

8    any game consoles or PC distribution platforms.  SUF26.  WZLLC also changed

9    the name of its mobile app from *WarLight* to *Warzone (Risk ++)*.  SUF29.

10   ███████████████████████████████████████████

11   ███████████████████████████████████████████

12   SUF31. ██████████  WZLLC changed the app name to *Warzone – Turn Based*

13   *Strategy*.  SUF32.  WZLLC **never** distributed its mobile app under the name

14   *Warzone* – only as *Warzone (Risk ++)* or *Warzone – Turn Based Strategy*.  SUF33.

15       In late November or early December 2020 – weeks after a different company

16   released a game titled *Idle Warzone* and nearly nine months after Activision

17   released *CODWZ* – WZLLC released a *Warzone* spin-off titled *Warzone Idle*.

18   WZLLC then re-titled *Warzone* to *Warzone Classic*.  SUF34.

19       **B.    WZLLC's Failure To Promote Any *Warzone* "Brand."**

20       Between the 2017 name change and 2020 release of *CODWZ*, WZLLC

21   ███████████████████████████████████████████

22   ███████████████████████████████████████████

23   ███████████████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████████████

26   ███████████████████████████████████████████

27   ███████████████████████████████████████████

28   ███████████████████████████████████████████

1

2 ████████████████████████████████████ SUF41.

3        Nor did WZLLC engage with online communities (other than its own

4  website forum) to build brand recognition and attract new players.  WZLLC did

5  not maintain a Twitter/X account.  SUF42.  It posted to Facebook

6  (@WarzoneRisk) only ***three*** times.  SUF43.  WZLLC created a Reddit forum

7  dedicated to *Warlight*, but never changed the forum name, so it is still called

8  "r/Warlight."  SUF44.  Although WZLLC maintains a Discord server (a virtual

9  community), it is "invite only."  SUF45.  WZLLC does not have a Twitch account,

10 and Ficker's most recent video available on his personal account is of *WarLight*

11 from nine years ago.  SUF46-47.

12

13

14

15

16

17        Since *CODWZ*'s release in March 2020, WZLLC has done nothing to

18 actively promote its games or develop its purported "brand" other than

19

20

21

22

23

24 ████████████████████████████████ WZLLC placed the word "Risk"

25 all over its website content and metadata.  SUF53.  The title of nearly every page

26 of www.warzone.com includes "Warzone – Better than Hasbro's Risk Game –

27 Play Online Free." SUF54.  As a result, links to www.warzone.com appear on

28 search engines like this:

warzone.com
https://www.warzone.com ⋮

**Warzone - Better than Hasbro's RISK® game - Play Online Free**

**Warzone** is a customizable strategy game where you compete with your friends to conquer the world.

SUF56. ███████████████████████████████

████████████████████████ SUF55.

### C.    WZLLC's Failure To Enforce Its Alleged Mark.

In August 2018 – nine months after WZLLC released *Warzone* – a third-party video game publisher received a U.S. trademark registration for EVE: VALKYRIE – WARZONE.  WZLLC did not oppose the registration.  SUF59-60.

WZLLC has ***never*** possessed a trademark registration for WARZONE. Until this dispute, WZLLC never even applied for one.  SUF57-58.  WZLLC ███████████████████████████████████████████████

██████████████████████████  By 2019, there were at least ***20*** mobile apps and other games with "Warzone" in their title, including *WarZone*, *Warzone Pacific*, *Warzone Quest*, *Enter the Warzone*, *Warzone World*, and *Commando Warzone*.  SUF62.  By December 2021, there were at least ***27*** "Warzone"-titled mobile apps and other games, such as *Ultimate Warzone*, *No Rule Warzone*, *Welcome to Warzone*, *Battle Royale Warzone*, and *Idle Warzone*.  SUF63.[2] ███████████████████

████████████████████████████████████████████

---

[2] The only purported measure that WZLLC ever took to "protect" its alleged trademark rights (other than this lawsuit) ███████████████████

██████████████████████████████████████████████████

website stated: "RISK® is a registered trademark of Hasbro, Inc."  SUF64-68.

1

**D.    Activision's *Call of Duty: Warzone*.**

2    Activision produces, markets, and distributes video games, including the

3    popular *Call of Duty* franchise.  *Call of Duty* games are intense, military-themed

4    "first-person shooter" games where players engage in battle from a combatant's

5    viewpoint.  SUF71-72.  Activision released its first *Call of Duty* game in 2003 and

6    has released new installments annually.  Since 2007, each has had a different

7    subtitle (*e.g.*, "Modern Warfare," "Black Ops").  By December 2019, Activision

8    had released 16 *Call of Duty* games for Windows PCs and dedicated game

9    consoles.  SUF73-74.

10

11

12

13    In this game, up to 150 players drop onto and battle across a large-

14    scale, open-world playing field – a warzone.

15

16

17

18

19

20

21

22    In 2019, the ***only*** live WARZONE trademark registration in

23    connection with video games was EVE: VALKYRIE – WARZONE.  SUF83.

24

25    [3]

26

27    [4]  These included *Eve Valkyrie: Warzone*, *Warzone 2100*, *WWF Warzone*, *Anomaly*

28    *Warzone Earth*, *Warzone Flashpoint*, *Warzone-X*, *Warzone VR*, and *Crysis*
*Warzone*.  SUF81.

Mitchell
Silberberg &
Knupp LLP

20501414.2

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1

2

3    On March 10, 2020, Activision released *CODWZ* for Windows PCs, Xbox,

4    and PlayStation.  SUF85.  Activision makes the console version available through

5    the Xbox and PlayStation stores.  SUF86.  The Windows version is and has been

6    available for download only on Activision's Battle.net and Valve's Steam

7    platforms.  SUF87.  *CODWZ* is free-to-play and generates revenue through in-

8    game purchases of items for use in the game.  SUF88.

9    Activision consistently markets and distributes its game as *Call of Duty:*

10   *Warzone* – not simply "Warzone."  SUF89.  Activision's *CODWZ* brand guidelines

11   prohibit the use of the word "Warzone" without "Call of Duty."  SUF91.  On the

12   few occasions where Activision referred to the game as "Warzone," it did so in a

13   context that clearly indicates it is a *Call of Duty* game: for example, within

14   www.callofduty.com or after the full name was already used.  SUF90.

15   In 2022, Activision announced and tested in limited jurisdictions a mobile

16   version of *CODWZ*, titled *Call of Duty: Warzone Mobile* ("*CODWZM*").  SUF93.

17   *CODWZM* was released in March 2024.  *CODWZM* always has been titled *Call of*

18   *Duty: Warzone Mobile* on all platforms, and its app icon contains **only** the words

19   "Call of Duty."[5]  SUF94-96.

20   **E.    This Dispute.**

21   Though

22

23

24

25

26

27   _____

[5] In 2021, Activision launched the first of a series of four *CODWZ* tournaments
titled *Call of Duty*: *World Series of Warzone*.  WZLLC has not alleged any

28   likelihood of confusion between its games and the tournaments.  SUF97-98.

WZLLC has no evidence that video game consumers ever associated the word *Warzone* exclusively with WZLLC's goods or services or that it lost any customer or prospective customer because of *CODWZ*. SUF104-105. There is no evidence that any prospective customer mistakenly believed that WZLLC's games were created by or associated with Activision. SUF106. WZLLC has never attempted to place any monetary value on its alleged *Warzone* trademark or to quantify any purported loss of value. SUF107.

Activision has never sought to preclude WZLLC from using "Warzone" in connection with its games. In late 2020 and early 2021, however, WZLLC threatened to seek to enjoin Activision from distributing *CODWZ* unless Activision paid WZLLC $7 million or a royalty of .25% of its "gross revenue" from *CODWZ*. SUF108-109. In response, Activision filed this action for a declaration of non-infringement. On June 8, 2021, WZLLC filed counterclaims for Trademark Infringement (under California common law and the Lanham Act) and Unfair Competition.

## II. WZLLC CANNOT ESTABLISH A PROBABLE LIKELIHOOD OF APPRECIABLE CONSUMER CONFUSION.

WZLLC's infringement claims fail as a matter of law because there are no genuine issues of material fact sufficient to meet WZLLC's burden on its trademark and unfair competition claims. *See, e.g.*, *Punchbowl, Inc. v. AJ Press LLC*, 2024 WL 4005220 (C.D. Cal. Aug. 22, 2024) (granting summary judgment where defendant could not prove likelihood of confusion). "To maintain an action for trademark infringement . . . a plaintiff must prove the defendant's use of the same or similar mark would create a likelihood of consumer confusion." *Murray v. CNBC*, 86 F.3d 858, 860 (9th Cir. 1996). "'The test for likelihood of confusion is whether a reasonably prudent consumer in the marketplace is likely to be

confused as to the origin of the good or service bearing one of the marks.'" *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003).  Because WZLLC alleges "reverse confusion," the key question is whether "consumers dealing with the senior mark holder [*i.e.*, WZLLC] believe that they are ***doing business*** with the junior one [*i.e.*, Activision]." *Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *9 (C.D. Cal. June 8, 2015) (emphasis added).  Moreover, to succeed on its reverse confusion claim, WZLLC must "show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible'" among "'*an appreciable number* of people.'"  *M2 Software v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005).

Ninth Circuit courts apply the eight-factor *Sleekcraft* test to analyze the likelihood of confusion in trademark infringement cases, including reverse confusion cases.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  These factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) actual confusion; (5) marketing channels; (6) type of goods and degree of care by the purchaser; (7) intent in selecting the mark; and (8) likelihood of expansion.  Although a court must balance all *Sleekcraft* factors, in "reverse confusion" cases courts give particular weight to the first three – strength, proximity, and similarity.  *Dreamwerks Prod., Inc. v. SKG Studio*, 142 F.3d at 1127, 1130, n.6 (9th Cir. 1998).  Additionally, because consumers "do not regard titles … in the same way as [] names of ordinary commercial products[,]" *Mattel, Inc. v. MCA Records, Inc*., 296 F.3d 894, 902 (9th Cir. 2002), the Court must consider the free speech interests in the use of common English words as titles. *See Jack Daniel's Properties, Inc. v. VIP Prods. LLC*, 599 U.S. 140, 161 (2023) ("[A] trademark's expressive message … may properly figure in assessing the likelihood of confusion.").[6]

---

[6]  The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code

1    WZLLC does not possess a federal trademark registration and has not

2    provided any evidence that its purported mark had **any** source-identifying power in

3    the games marketplace.  *See, e.g.*, *Echo Drain*, 307 F. Supp. 2d at 1122 (mark not

4    protectable where plaintiff offered "no expert reports or surveys" or "consumer

5    testimony" to prove that "a significant portion of the consuming public" associates

6    its mark with plaintiff).  But even assuming WZLLC possesses limited common

7    law trademark rights in the word "Warzone," the undisputed factual record

8    confirms that an appreciable number of WZLLC's potential customers are unlikely

9    to be confused.

10    **A.    WZLLC's Alleged Mark Is Conceptually and Commercially**

11    **Weak.**

12    Even in a "reverse confusion" case, the senior user's mark must have *some*

13    degree of strength to support an infringement claim because "if there is so little to

14    overtake, reverse confusion must be unlikely."  *World Champ Tech LLC v. Peloton*

15    *Interactive, Inc.,* 2024 WL 665181, at *15 (N.D. Cal. Feb. 16, 2024).  In assessing

16    a mark's "strength," courts must consider "its distinctiveness, or its 'origin-

17    indicating' quality, in the eyes of the purchasing public."  *RiseandShine Corp. v.*

18    *PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022).  Where the senior user's mark

19    lacks distinctiveness, it is entitled only to "an extremely narrow scope of

20    protection[.]" *RiseandShine*, 41 F.4th at 112 (affirming that "RISE" for caffeinated

21    beverages was not distinctive or entitled to broad protection).

22    WZLLC's alleged mark "WARZONE" is descriptive or, at best, suggestive;

23    either way, it is inherently incapable of broad protection, especially for games

24    involving warzones like *CODWZ.  See Riseandshine*, 41 F.3d at 123 ("Trademark

25    law does not offer robust protection to those who demand the exclusive right to use

26    words that describe or suggest a product or its virtues."); *Echo Drain,* 307 F. Supp.

27

28    § 17200 are 'substantially congruent' to claims made under the Lanham Act."
*Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th Cir. 1994).

2d at 1124 (explaining a suggestive mark is "presumptively weak and [user] should have anticipated some confusion with legitimate competitors").  Whatever inherent conceptual power WZLLC's alleged mark might have has been "hemmed in on all sides" by dozens of third-party games that, before and after 2017, also used "Warzone" in or as their titles.  *Miss World (UK) Ltd. V. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) ("In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.").  Put another way, "that the marketplace is replete with products using a particular trademarked word indicates . . . that consumers will *not* be confused by its use."  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1143–44 (9th Cir. 2002); *see also Kibler v. Hall*, 843 F.3d 1068, 1074 (6th Cir. 2016) ("[P]roof that third parties have extensively used a trademark . . . indicates the trademark is commercially weak…. [and] that the third parties have muddled [its] source.").

Nor is there evidence that WZLLC's alleged mark ever acquired any distinctiveness, either through WZLLC's actions or otherwise.  *See Punchbowl*, 2024 WL 4005220, at *7 (finding that because plaintiff failed to raise profile of inherently weak mark, "there is no evidence … that consumers consider Plaintiff's PUNCHBOWL mark to be particularly strong").  Instead of working to distinguish itself among the sea of games using "Warzone" in their titles, WZLLC's purported brand continued to be diluted by dozens of new entrants.  *See Partners for Health & Home, L.P. v. Seung Wee Yang*, 488 B.R. 431, 438 (C.D. Cal. 2012) ("failure to enforce [] [trademark] rights may result in the weakening of these rights"), *aff'd*, 671 F.App'x 475 (9th Cir. 2016); *Curity AB v. Chenmed, LLC*, 2022 WL 18956198, *10 (S.D. Fla. Dec. 7, 2022) ("[T]he law imposes . . . the duty to be

1  pro-active and to police the relevant market for infringers.").

2       When WZLLC changed the name of its game from *WarLight* to *Warzone* in

3  2017, ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████  In other words, when

7  WZLLC knowingly selected a "weak mark in a crowded field[,]" and then failed to

8  develop, strengthen, or protect that purported mark, WZLLC assumed the risk that

9  any rights it conceivably had might be overtaken by other entrants. *RiseandShine*,

10 41 F.4th at 125; *see also Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616

11 F.2d 440, 445 (9th Cir. 1980) (use of common word "naturally entails" risk of

12 limited protection).  SUF12-16,18-19,135.

13       **B.    The Parties' Marks Are Not Confusingly Similar.**

14       In assessing whether two marks are likely to cause confusion, "what is

15 critical is the *overall* appearance of the mark ***as used in the marketplace***, not a

16 deconstructionist view of the different components of the marks."  *Playmakers,*

17 *LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1283 (W.D. Wash. 2003), *aff'd*, 376

18 F.3d 894 (9th Cir. 2004) (emphasis added).  This principle is especially important

19 in cases where, as here, the mark is common and its use has been shared by many.

20 *RiseandShine*, 41 F.4th at 125.

21       The parties' marks are more than just "subtle but technically different," as

22 Ficker put it.  WZLLC's games are titled (1) *Warzone/Warzone – Turn Based*

23 *Strategy*, and (2) *Warzone Idle.*  Activision's game is *Call of Duty: Warzone*.

24 Activision used this full title on ***all*** store pages and in marketing materials, press

25 releases, and social media profile pages.  SUF85-87,89-91,95-96.  Activision

26 clearly communicated to consumers that the game is part of its *Call of Duty*

27 franchise and not related to any other "Warzone"-titled games, including

28 WZLLC's.  *See Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) ("[T]he

term 'Pearl Beach' in Mattel's products . . . is invariably accompanied by a
reference to Barbie, which is clearly the 'salient part of the mark indicative of the
product's origin.'"); *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101,
1105, 1116 (N.D. Cal. 2010) (marks not "confusingly similar" where "EA and EA
DICE were prominently displayed on the game's packaging and advertising").

Moreover, the Activision and WZLLC marks at issue – and the games they
are attached to – are "displayed in visually distinct ways" in the marketplace and
make a totally different commercial impression. *See Punchbowl*, 2024 WL
4005220, at *9 ("Plaintiff's logo depicts a white ladle on an orange background,
while Defendant's logo depicts an upside-down U.S. Capitol building filled with
purple/pink punch."). Activision's *CODWZ* logos use a block-letter font, and its
key art includes images of soldiers. SUF92. By contrast, WZLLC uses a stylized
gold, silver, and red logo, set against a hexagonal world map, accompanied by: "If
you like Hasbro's RISK® game, you'll love Warzone!" SUF67.

 

The visual distinctions are even more pronounced for the mobile versions of
the parties' games. WZLLC's games are listed on app stores as *Warzone – Turn-
Based Strategy* or *Warzone Idle*, never just *Warzone*, and the app icons depict a
world map. SUF2-3,33. *CODWZM* is listed as *Call of Duty: Warzone Mobile*, and
its icon says "CALL OF DUTY."

1
2
3
4
5




6
7
8

SUF95.  *See, e.g.*, *Down to Earth Organics, LLC v. Efron*, 2024 WL 1376532, at *7 (S.D.N.Y. Mar. 31, 2024) (finding marks dissimilar despite sharing phrase "Down to Earth" due to presentation in the marketplace).

9

> **C.    The Parties' Games Are Not Sufficiently Related.**

10
11
12
13
14
15
16
17
18
19
20
21
22

Courts in this Circuit "apply a sliding scale approach as to the weight that relatedness [*i.e.*, 'proximity of the goods'] will carry dependent upon the strength of the trademark holder's mark." *Entrepreneur*, 279 F.3d at 1148.  "While the public and the trademark owner have an interest in preventing consumer confusion, there is also a broad societal interest in preserving common, useful words for the public domain." *Id.*  This principle is critical since "warzone" has a well-understood meaning – a location where combat is occurring.  *See Noasha LLC v. Nordic Group of Companies, Ltd.,* 630 F. Supp. 2d 544, 556 (E.D. Pa. 2009) ("multiple uses of 'War' for toys or games in this market lessens the likelihood that a consumer would associate such a toy with a particular source").  When paired with *Call of Duty* (*i.e., Call of Duty: Warzone*), "Warzone" has a specific meaning – *Call of Duty* combat, graphics, and multiplayer action within a large, open-world map.

23
24
25
26
27
28

What's more, "the mere fact that 'two products or services fall within the same general field . . . does not mean that the two products or services are sufficiently similar to create a likelihood of confusion.'" *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003).  While both *CODWZ* and *Warzone* are "games," they look completely different, are in different genres, are played on different devices, and offer different gameplay

experiences.  SUF110-111.  WZLLC's games are slow-paced online board games that appeal to those "who enjoy strategy-based civilization building games," and WZLLC has marketed them with comparisons to *Risk*.



In contrast, *CODWZ* and *CODWZM* are competitive, fast-paced shooter games that are part of a longstanding game franchise.



There is no evidence that players of one game also play the other, much less that players cannot distinguish between WZLLC's niche strategy games and a *Call of Duty* game.  SUF112.  *See Echo Drain*, 307 F. Supp. 2d at 1125 ("pop" rock band and "progressive funk and groove with elements of heavy metal" band not

1  "related"); *Sunenblick v. Harrell*, 895 F. Supp. 616, 629 (S.D.N.Y. 1995) (rap and

2  jazz recordings not sufficiently related), *aff'd*, 101 F.3d 684 (2d Cir. 1996).

3      **D.    The Parties' Marketing And Distribution Channels Are Distinct.**

4      *CODWZ* and WZLLC's games have **never** been distributed through the

5  same marketplaces and would never be encountered together. *CODWZ* is available

6  via the Xbox or PlayStation stores or on two specific PC platforms. WZLLC's

7  games have never been available for any game console or on any PC platforms.

8  SUF26,85-86. The only arguable marketplace overlap is that since March 2024

9  *CODWZM* is available on the mobile stores where **every** mobile game is available.

10 But on those platforms, the parties' games have different titles and distinct store

11 pages with detailed descriptions, screenshots, and videos. SUF2,3,89. Consumers

12 have demonstrably not been confused, since not one consumer submitted a review

13 for a WZLLC mobile game believing it was a *Call of Duty* or Activision game.

14 SUF113.

15     Finally, ███████████████████ the parties' games are not

16 marketed or advertised in the same place or manner. SUF114. Activision

17 advertised via television ads, internet banner ads, and influencers. SUF99.

18 ██████████████████████████████████

19 ██████████████████ *See Edge Games*, 745 F. Supp. 2d at 1116 (finding that junior

20 user's "significant monetary investments through sophisticated, high-profile

21 channels," compared with senior user's failure to state the amount of capital

22 invested "in developing, marketing, and selling his company's current and future

23 video-game products[,]'" weighed against confusion); *Helix Env't Plan., Inc. v.*

24 *Helix Env't & Strategic Sols.*, 2020 WL 2556341, at *6 (S.D. Cal. May 20, 2020)

25 (factor favored defendants where plaintiff did "very little marketing" and instead

26 "advertise[d] primarily through word-of-mouth").

27

28

**E.    Relevant Customers Exercise a High Degree of Care In Their Purchasing Decisions.**

Because this is a reverse confusion case, "the degree of care exercised by customers is determined with reference to" WZLLC's "customers only." *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 n.2 (9th Cir. 2007).  WZLLC's expert admits that game consumers, including WZLLC's customers, exercise care and "rely upon reviews, community feedback, and influencer endorsements before committing their time and money to a game." SUF115.  *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006).  ("Confusion is less likely where buyers exercise care and precision in their purchases….").

**F.    There Is No Relevant Evidence Of Actual Confusion.**

"[N]ot all confusion offends trademark law." *Punchbowl*, 2024 WL 4005220, at *10.  In this "reverse confusion" case, what is relevant is whether a potential consumer of ***WZLLC's games*** would mistakenly make (or not make) a purchase related to those games believing that Activision was their source.  3 *McCarthy* § 23:10.  WZLLC has not identified any actual or potential customer, licensee, or business partner who failed or refused to do business with WZLLC due to a mistaken belief that Activision was the source of or affiliated with WZLLC's games.  SUF118.  *Punchbowl*, 2024 WL 4005220, at *10.  Nor has WZLLC produced any survey evidence reflecting source confusion by likely *Warzone/Warzone Idle* customers.

WZLLC's entire claim of actual confusion is premised on two irrelevant categories of evidence.  *First*, WZLLC produced ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ But just because WZLLC "can point to some evidence of confusion in the abstract does not automatically mean that such confusion affects actual purchasing decisions."  *Punchbowl*, 2024 WL 4005220, at *10.  The misdirected emails reflect, at most, only that some *CODWZ* players were "inattentive" rather than "actually confused."  *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002).

Context also is important.  Since 2020, there have been ***100 million downloads*** of *CODWZ* ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Punchbowl*, at *11 ("Out of thousands of communications, only approximately 100 were misdirected; that amount is insignificant."). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Second*, WZLLC identified instances in which *CODWZ* players inadvertently posted their livestreams in WZLLC's Twitch category.  This also is irrelevant because there is no indication that any streamer believed that *WZTBS* was an Activision game; they simply clicked the wrong button.  *See Punchbowl*, 2024 WL 4005220, at *10 ("[B]efuddlement is part of the human condition. . . . no matter how different the names . . . some confusion is inevitable.")

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**G.    There Is No Evidence Of Bad Faith Intent By Activision.**

Activision chose "Warzone" as a subtitle not to foster confusion or destroy WZLLC's purported "brand," ████████████████████████████████████████ ████████████████████████████████████████ SUF77,84.  *See Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 418 (D.N.J. 2011) ("consumer research, which indicated that 'Fancast.com' performed the best overall" weighs against bad faith).  As this Court held, "Activision's use of the term "Warzone" is clearly relevant to the content in *CODWZ*."  Dkt. 57. *See Edge Games*, 745 F. Supp. 2d at 1116 ("[T]here [was] no evidence in the record that EA chose [the title] for any reason but to describe the visual and thematic aspects of the video game.").

That ████████████████████████████████████████ ████ "does not create an inference of bad faith."  *Lemme v. Nat'l Broad. Co.,* 472 F. Supp. 2d 433, 451 (E.D.N.Y. 2007); *see also Star Indus., Inc. v. Bacardi & Co.,* 412 F.3d 373, 388 (2d Cir. 2005) ("[E]ven where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith."). ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ SUF67-60,80-83.  *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 480 (3d Cir. 2005) (evidence that defendant was aware of plaintiff's mark after a trademark search was not indicative of bad-faith intent "given the undisputed evidence of how common the use of 'freedom' has become in the relevant marketplace").  Additionally, Activision had a meritorious First Amendment defense to infringement claims.  ECF 57.  In other words, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ *Lemme*, 472

Mitchell Silberberg & Knupp LLP

20501414.2

F. Supp. 2d at 451.

## H.    There Is No Evidence That Either Party Will Expand Into The Other's Market.

"There can be a finding of infringement under the likelihood of expansion factor only if the junior user uses the mark for the same goods or services into which the senior user had actual plans to expand at the time the junior user began using its trademark." *Matrix*, 290 F. Supp. 2d at 1096. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ SUF27,28.

## III.    WZLLC'S DAMAGES CLAIMS SHOULD BE DISMISSED.

████████████████████████████████████████ it now seeks ██████████ in lost profits and ██████ in equitable disgorgement.  SUF124,136.  Even if WZLLC's infringement claims could survive summary judgment, its damages theories are not legally viable.  *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *4 (N.D. Cal. July 14, 2011) ("If [] evidence does not create a triable issue [as] to [] damages, summary judgment is appropriate.").

### A.    WZLLC's Purported Lost Profits Are Impermissibly Speculative.

"While a plaintiff need not calculate damages with 'absolute exactness,' it must offer 'a reasonable basis for computation' to show that damages are not 'remote and speculative.'" *Quia,* 2011 WL 2749576, at *4, 6 (citation omitted). This is especially true for lost-profits claims.  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) ("To establish damages under the lost profits method, a plaintiff must make a 'prima facie showing of reasonably forecast profits.'").  WZLLC has offered only speculation.

In October 2024, WZLLC specifically represented to the Court that it was *not* seeking purported lost profits.  SUF125, 126. ("***Warzone…has never alleged***

1   *that it was seeking a theory of damages based on its lost profits or lost revenue*.")

2   (emphasis added).  WZLLC's discovery responses also never disclosed its lost-

3   profits theory.  WZLLC's newly-minted lost-profits claim is premised

4

5

6

7

8

9

10

11

12

13   The theory is meritless.

14   *First*, Geddes' opinion about

15   is pure speculation.

16

17

18

19   SUF131.

20   *Second*, WZLLC cannot establish a causal link between *CODWZ* and any

21   lost profits.  *Avco Corp. v. Turn & Bank Holdings, LLC,* 659 F. Supp. 3d 483, 495

22   (M.D. Pa. 2023), *aff'd*, 2024 WL 3439771 (3d Cir. 2024) ("plaintiffs [] only

23   entitled to recover profits [they] would have earned but for the infringement").

24

25

26

27

28   *See, e.g.*, *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir.

1   1996) (rejecting lost-profits claim where plaintiff argued that he would have

2   entered into a business venture but decided not to because of defendants'

3   infringement); *Color Me Mine Enters. v. S. States Mktg. Inc.*, 2013 WL 12119715,

4   at *9 (C.D. Cal. Apr. 25, 2013) (plaintiff's claims that "it suffered damages by the

5   reduced ability to expand into bag activity kits" were "purely speculative").

6       **B.    WZLLC Is Not Entitled To Equitable Disgorgement.**

7          WZLLC also seeks ███████ million in equitable disgorgement of Activision's

8   profits from *CODWZ.* But WZLLC admitted ██████████████████████████

9   ██████████████████████████████████ SUF133. Such an award thus

10   would be an improper windfall, untethered to any actual damages or lost profits.

11   *See* 15 U.S.C. § 1117 (profits award must be "compensation and not a penalty");

12   *Oculu*, 2015 WL 3619204, at *20 ("[i]n exercising equity to award defendant's

13   profits … the court must fashion a remedy wherein … [the] plaintiff is not ...

14   [given] a windfall"). For this reason, courts consistently have held that "an award

15   of the defendant's profits is inappropriate in cases of reverse confusion[.]" *Quia*,

16   2011 WL 2749576, at *7. *See Scat Enters., Inc. v. FCA US LLC*, 2017 WL

17   5896182, at *2 (C.D. Cal. Jun. 8, 2017) ("Plaintiff is barred as a matter of law from

18   seeking disgorgement of Defendant's profits under its reverse confusion theory.").

19          To the extent WZLLC's disgorgement demand is premised on purported

20   "unjust enrichment" or the need for deterrence, it is equally flawed. There is no

21   evidence that Activision was "unjustly enriched." WZLLC's own experts concede

22   that ██████████████████████████████████████████████████████████

23   ██████████████████████████████████ SUF134. There also is no evidence

24   that Activision selected the title *Call of Duty: Warzone* in bad faith or to cause

25   reverse confusion. *See Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,

26   2015 WL 9028123, at *2 (N.D. Cal. Dec. 16, 2015). There is no logical or factual

27   basis for equitable disgorgement, and the claim should be stricken.

28

Mitchell
Silberberg &
Knupp LLP

20501414.2

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1

**CONCLUSION**

2

Activision's motion should be granted.

3

4  DATED:  February 14, 2025          MARC E. MAYER
                                      KARIN G. PAGNANELLI
5                                     LINDSAY R. EDELSTEIN
                                      MITCHELL SILBERBERG & KNUPP LLP
6

7                                     By: */s/ Marc E. Mayer*
                                          Marc E. Mayer (SBN 190969)
8                                         *Attorneys for Activision Publishing, Inc.*

9

10          <u>**Certificate of Compliance-L.R.11-6.2.**</u>

11       The undersigned, counsel of record for Activision Publishing, Inc. certifies

12  that this brief contains 6,958 words, which complies with the word limit of L.R.

13  11-6.1.

14  DATED: February 14, 2025                    */s/ Marc E. Mayer*

15

16

17

18

19

20

21

22

23

24

25

26

27

28