Jennifer A. Kash (State Bar No. 203679)
Francesca M. S. Germinario (State Bar No. 326208)
Nicole A. Bloomfield (State Bar No. 356757)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
21-3073@cases.warrenlex.com

*Attorneys for Defendant / Counterclaimant Warzone.com, LLC*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ACTIVISION PUBLISHING, INC., | Case No. 2:21-cv-3073-FLA (JCx) |
| Plaintiff / Counterclaim Defendant, | **REDACTED VERSION** |
| v. | Hon. Fernando L. Aenlle-Rocha |
| WARZONE.COM, LLC, | **WARZONE.COM, LLC'S OPPOSITION TO MOTION OF ACTIVISION PUBLISHING, INC. FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIMS OF WARZONE.COM, LLC** |
| Defendant / Counterclaimant. | Hearing Date:  March 21, 2025<br>Hearing Time:  1:30 p.m.<br>Courtroom:  6B<br>Pretrial Conference:  May 19, 2025<br>Trial:  May 27, 2025 |

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    The WARZONE Trademark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    Warzone's use of WARZONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     1.    Warzone's 2017 Rebrand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     2.    User Acquisition and Paid Marketing Campaign . . . . . . . . . . . . . . . 4

C.    Activision's Infringing use of WARZONE . . . . . . . . . . . . . . . . . . . . . . . . 6

D.    Consumer Survey of Dr. Dimofte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    A Reasonable Jury Could Find Likelihood of Confusion . . . . . . . . . . . . . . . . . 8

    A.    Activision Uses WARZONE as a Mark . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B..    Activision Relies on Attorney Testimony, Ignores Actual Evidence . . . . . . 9

    C.    *Sleekcraft* Factors Weigh Against Summary Judgment . . . . . . . . . . . . . . . 10

       1.    Strength of the Mark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       2.    Close Proximity of the Goods and Degree of Care Favor Denial . . . 14

       3.    Marketing Channels Used . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       4.    Similarity of the Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       5.    Activision's Conduct Creates a Triable Issue of Fact on Intent . . . . 18

       6.    Expansion is Either Favors Denial or is Neutral . . . . . . . . . . . . . . 19

       7.    Evidence of Actual Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.    Damages Requires Only Reasonable Certainty, Not Absolute Certainty . . . . . . 20

III.    Defendant's Profits are a Distinct Remedy Available Here . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

*Cases*                                                                                          **Pages**

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

*Aurora World, Inc. v. Ty Inc.*,
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Belin v. Starz Ent., LLC*,
    No. 21-9586, 2024 WL 5185313 (C.D. Cal. Oct. 25, 2024). . . . . . . . . . . . . . . . . . 9

*BDO Remit (USA), Inc. v. Stichting BDO*,
    No. 11-4054, 2012 WL 12895658 (C.D. Cal. Sept. 19, 2012). . . . . . . . . . . . . . . 10

*Cash v. Interscope Geffen A & M Records*,
    No. 22-1900, 2024 WL 3914517 (C.D. Cal. July 22, 2024). . . . . . . . . . . . . . 13, 20

*Davis v. Blue Tongue Films*,
    No. 23-3968, 2024 WL 5182630 (9th Cir. Dec. 20, 2024). . . . . . . . . . . . . . . . . . . 8

*Entrepreneur Media Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fiji Water Co. v. Fiji Mineral Water USA, LLC*,
    741 F. Supp. 2d 1165 (C.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Friedman v. Live Nation Merch., Inc.*,
    833 F.3d 1180 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
    618 F.3d 1025 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
    599 U.S. 140 (2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*JIPC Mgmt., Inc. v. Incredible Pizza Co.*,
    No. 08-4310, 2008 WL 11336396 (C.D. Cal. Aug. 26, 2008) . . . . . . . . . . . . 12, 14

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# TABLE OF AUTHORITIES
*(continued)*

*Cases*                                                                                   **Pages**

*Lahoti v. VeriCheck, Inc.*,
    No. 06-1132, 2007 WL 2570247 (W.D. Wash. Aug. 30, 2007)
    *aff'd* 586 F.3d 1190 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . .    11, 13

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Long Story Short, LLC v. NFP Corp.*,
    No. 23-61943, 2023 WL 9743762 (C.D. Cal. Dec. 7, 2023) . . . . . . . . . . . . . . . 15

*Lodestar Anstalt v. Bacardi & Co. Ltd.*,
    31 F.4th 1228 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*M2 Software, Inc. v. Madacy Ent.*,
    421 F.3d 1073 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mar Vista Ent., LLC v. THQ Nordic AB*,
    253 F.3d 410 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*
    290 F. Supp. 2d 1083 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
    No. 14-4853, 2015 WL 9028123 (N.D. Cal. Dec. 16, 2015) . . . . . . . . . . . . . . . 21

*Oculu, LLC v. Oculus VR, Inc.*,
    No. 14-196, 2015 WL 3619204 (C.D. Cal June 8, 2015) . . . . . . . . . . . . . . . . . . 21

*Official Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    354 F.3d 1020 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

# TABLE OF AUTHORITIES
*(continued)*

<table>
<tr><td align="center">*Cases*</td><td align="right">**Pages**</td></tr>
</table>

*Punchbowl, Inc. v. AJ Press LLC*,
No. 21-3010, 2024 WL 4005220 (C.D. Cal. Aug. 22, 2024) . . . . . . . . . . . . . . . . . 16

*Rearden LLC v. Rearden Com., Inc.*,
683 F.3d 1190 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 10, 12-15, 19-20

*S10 Entertainment & Media LLC v. Samsung Elecs. Co.*,
No. 21-2443, 2023 WL 1936350 (C.D. Cal. Feb. 1, 2023). . . . . . . . . . . . . . . . . . 17

*Scat Enters. v. FCA US LLC*,
No. 14-7995, 2017 WL 5896182 (C.D. Cal. June 8, 2017). . . . . . . . . . . . . . . .  21

*Stitch Editing Ltd. v. Tiktok Inc.*,
No. 21-6636, 2022 WL 17348179 (C.D. Cal. Nov. 15, 2022) . . . . . . . . . 11, 14, 17

*Stone Brewing Co., LLC v. Molson Coors Beverage Co. USA LLC*,
No. 23-3142, 2024 WL 5244556 (9th Cir. Dec. 30, 2024) . . . . . . . . . . . . . . . . .  8

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
987 F. Supp. 2d 1023 (C.D. Cal. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*Talent Mobile Dev., Inc. v. Headios Grp.*,
No. 16-464, 2017 WL 6940548 (C.D. Cal. Oct. 3, 2017). . . . . . . . . . . . . . . . . . 16

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
No. 20-9091, 2021 WL 4813257 (C.D. Cal. Oct. 6, 2021). . . . . . . . . . . . . . . . . 21

*United States Pat. & Trademark Off. v. Booking.com B.V.*,
591 U.S. 549 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Vepo Design Corp. v. Am. Econ. Ins. Co.*,
No. 23-55634, 2024 WL 4658782 (9th Cir. Nov. 4, 2024) . . . . . . . . . . . . . . . . . 21

*World Champ Tech LLC v. Peloton Interactive, Inc.*,
No. 21-3202, 2024 WL 665181 (N.D. Cal. Feb. 16, 2024). . . . . . . . . . . . . . . 11, 17

*Yedi, Inc. v. Universal Connect Wholesale*,
No. 22-2202, 2022 WL 3137930 (C.D. Cal. June 22, 2022) . . . . . . . . . . . . . . 15-16

## INTRODUCTION

This Court has already found that Activision "is using 'WARZONE' as a source identifier" and so "must meet the infringement claim on the 'usual battleground of likelihood of confusion.'"  Rather than address the evidence, Activision moves on facts manufactured by its counsel, and legal arguments this Court has already rejected. Activision's Motion further proffers 135 purportedly material facts, confirming only that likelihood of confusion is not well-suited for summary judgment.

First, Activision ignores Warzone's survey evidence of actual confusion.  The presence of any actual confusion evidence creates a clear factual dispute requiring resolution by a jury.

Second, likelihood of confusion under the *Sleekcraft* factors presents multiple triable issues.  Activision mischaracterizes evidence of consumer and non-consumer confusion, focusing only on whether existing players of either game mistake one for the other.  This misapplies reverse confusion law—which requires confusion as to a single source and not complete identity of products—and ignores expert evidence supporting significant overlap in consumer base and proximity of goods.

Third, Activision misstates the law on damages, relying on pre-*Romag* standards regarding evidence of intentional bad faith that no longer apply, and requiring a degree of absolute certainty to calculate lost profits.

Genuine disputes of material fact exist on multiple matters, making summary judgment improper.

## BACKGROUND

### A.    The WARZONE Trademark

Both Activision and Warzone have applications in the field of use 009 (downloadable game software) and 041 (online non-downloadable game software) pending before the USPTO for a trademark in the standard character word mark WARZONE.  SDF 137.  The USPTO found that neither Activision's nor Warzone's use

of WARZONE is descriptive, nor lacking in secondary meaning. SDF 141. Instead, the USPTO found that WARZONE "appears to be entitled to register on the Principal Register," a register reserved for distinctive marks, "subject to any claims of concurrent use." SDF 141. On November 3, 2020, Warzone opposed Activision's application for the WARZONE trademark, and for the trademark CALL OF DUTY WARZONE. SDF 61. The parties do not dispute Warzone's priority of use, thus the question before the USPTO is whether there is a likelihood of confusion of use of WARZONE—the issue on which Activision seeks a declaration from this Court. SDF 166. The USPTO stayed the proceedings on WARZONE and CALL OF DUTY WARZONE, as well as Activision's subsequent application for a trademark in WORLD SERIES OF WARZONE, pending resolution of this matter. SDF 137.

On April 11, 2024, the Court vacated its prior order on remand from the Ninth Circuit, and found that Activision was using WARZONE as a trademark, and was not entitled to claim expressive use under *Rogers*. SDF 137.

**B.    Warzone's use of WARZONE**

With a single developer at the helm, Warzone has survived for 17 years, earning over ▮▮▮▮▮▮ (SDF 52) in lifetime revenue and reaching over 1 million users with its offerings. SDF 146. Warzone offers two video games under the WARZONE brand, the first Warzone game, known as Warzone, and Warzone Idle, and both are available on browser, and for download on PC, Mac, Linux, and on mobile applications on Android and Apple. SDF 2.

**1.    Warzone's 2017 Rebrand**

Warzone's developer Randy Ficker offered his first commercial video game, WarLight, in 2008. SDF 4. A software engineer at Microsoft, he was inspired by the strategic diplomacy of RISK, and developed a strategy game designed for multiplayer engagement. SDF 5. WarLight grew a loyal fan base, and in 2010 Mr. Ficker quit his job to develop his game full time. SDF 4. In 2014, Warzone began plans to build a more

commercially recognizable brand, ████████████████████████████,

www.warzone.com. SDF 10. Warzone.com, LLC was incorporated in June 2015. SDF

10. In November 2017, Warzone rebranded with the launch of its revamped game, and

began its use of WARZONE in commerce. SDF 10. Warzone worked with graphic

designers to unveil a new logo with ™ placed in the logo lockup, SDF 65:



This logo with the WARZONE mark has been displayed on Warzone offerings since

November 2017. SDF 139. At the time Warzone adopted the trademark WARZONE,

Warzone was aware of no other brands in the video game market using the mark

WARZONE. SDF 11. Marketing expert Mr. Geddes opined that WARZONE connotes a

"military aesthetic," and the logo implies battles for domination of a map. SDF 141. The

mark does not directly describe Warzone's video game offerings—indeed, Activision's

own marketing academic, Roman Welden, opined that WARZONE "employ[s] the

thematic fiction of playing an army general making military decisions," and thus "is

entirely abstract." SDF 141.

Just after Warzone rebranded, in February 2018, searches rose to 8,100, and over

80% clicked through to Warzone's website. SDF 142. Dr. Tully testified that this

increase in searches for "warzone" and click-throughs resulted from pre- and post-

– 3 –

rebrand players familiar with Warzone searching directly for it.  SDF 142.  As a result,
Warzone saw ▮▮▮ new signups and over ▮▮▮ monthly active players.  SDF 143.

### 2.    User Acquisition and Paid Marketing Campaign

In 2019, to ramp up engagement, Warzone made plans to develop a significant
amount of new content for a game expansion in another genre that made better use of
"microtransactions," a product known for its high earning potential in the free-to-play
game space.  SDF 3.  Throughout 2019, Warzone maintained an average of over ▮▮▮
monthly active users each month, SDF 146, and ▮▮▮▮▮▮▮▮▮▮▮▮ that
year.  SDF 146.  At the end of 2019, in anticipation of expanding its user base and
releasing Warzone Idle, Warzone retained Mr. Geddes to discuss user acquisition,
including embarking on its first paid growth campaign.  SDF 38.  In December 2019,
Warzone worked on developing its first paid advertising campaign and accompanying
brand and product updates, through which Mr. Geddes expected to garner ▮▮▮▮▮
▮▮▮▮.  SDF 48.  The marketing plan involved capitalizing on the 2020 release of
the new game mode, called Warzone Idle.  SDF 48.

Warzone began discussing and implementing the first part of its plan, the user
interface design updates, with Mr. Geddes.  SDF 39.  By January 2020, search queries for
"warzone" rose to ▮▮▮, resulting in ▮▮▮ click-throughs, SDF 144, and Warzone was
experiencing record revenues.  SDF 151.  Dr. Tully testified that in her expert opinion,
"the vast majority [of them are] in line with people knowing about the Warzone game."
SDF 144. Thus, by January 2020, tens of thousands of consumers (at minimum)
associated "warzone" with Warzone's video game offerings.  SDF 144, 149.

As Mr. Geddes opined, this level of user engagement and interest represents
exceptional performance for an independent video game developer.  SDF 146.  In the
video game industry, 50% of indie games earn less than $4,000 in their lifetimes, and
fewer than 10% of independent games earn more than their development costs; in early
2020, Warzone was leading in either metric.  SDF 153.

In early March 2020, as development continued on Warzone Idle, Warzone performance continued to climb.  SDF 152.  Then Activision released Call of Duty Warzone on March 10, 2020.  SDF 85.

Warzone saw a spike in active users and new accounts in March 2020, SDF 151-52, but as Dr. Welden testified, this spike proved to be a mere data "shock."  SDF 152.  At the time, Mr. Ficker told Mr. Geddes he was unsure whether it was due to COVID-19, or the release of Call of Duty Warzone.  SDF 49.  The surge in Warzone users was short-lived, and the ███████████████████████████████████████████████████ ███████████████████████████████████  SDF 152.

By June 2020 it was clear that Warzone had lost control over WARZONE.  By June of 2020, searches for "warzone" rocketed over 74,000, yet only 74 clicked through to Warzone.  SDF 155.  Warzone was fielding complaints, refund requests, questions, bug reports, and other communications from players asking about Activision.  SDF 119.  By July 2020, user counts had dipped ████████████████, SDF 152, and new users below 2019 levels.  SDF 152.

Warzone was determined to release the new content it had sunk almost a full year into developing.  SDF 100.  Without the steadily increasing revenues of early 2020, and in the face of Call of Duty Warzone's aggressive advertising, Warzone could not risk advertising spend, choosing the tried-and-true path of a release hyped to existing users relying on the community advocacy that had served it in the past.  SDF 115.  Warzone released the Warzone Idle game mode in late summer of 2020 to Warzone members.  SDF 34.  The game mode showed early promise.  SDF 152.  The significant bump in user metrics was accompanied by a ████████████████████████.  But without a paid advertising campaign, the mode did not perform as well as Warzone anticipated.  SDF 49.

By the latter part of 2020, Warzone was aware that Activision was not only using WARZONE as part of its Call of Duty Warzone offerings, but that Activision had filed for a trademark in both WARZONE and CALL OF DUTY WARZONE.  SDF 100.  Warzone

– 5 –

filed its own trademark applications for WARZONE on October 30, 2020, and filed opposites to Activision's applications on November 3, 2020.  SDF 58.

## C.   Activision's Adoption of WARZONE

In 2019, 

SDF 75, 77.

SDF 100.

On March 10, 2020, Call of Duty Warzone was released.  SDF 85.

SDF 100.  Two days later, Activision filed its WARZONE applications at the USPTO.  SDF 100.  Activision has expanded its WARZONE offerings over the past 4 years, promoting Warzone Mobile, World Series of Warzone, Warzone 2.0, Warzone Caldera, Warzone Pacific, and in January 2025, in collaboration with Netflix's Squid Game: WARZONE.  SDF 91.

## D.   Consumer Survey of Dr. Dimofte

Warzone's survey expert Dr. Claudiu Dimofte opined that his survey revealed significant confusion among respondents regarding the WARZONE name in the context of video games.  Respondents overwhelmingly reported that they would find it confusing for two different video games to use the same or highly similar names, and among the relevant respondents, "[t]here is clear potential for consumer confusion if different games employ the same or highly similar names."  SDF 105.  He opined that a substantial portion of those surveyed associated the game available at the senior user's website with Activision.  SDF 105. Among respondents who reported playing Warzone, 92.9% responded that the "Warzone" was associated with Call of Duty, and "21.4% of the sample said they had played the game at Warzone.com."  SDF 105.  Of those respondents who reported playing games at "Warzone.com," "83.3% recalled that the game was a Call

of Duty one." SDF 105.  Dr. Dimofte opined that these findings strongly suggest that consumers are confused about the source of products associated with the WARZONE name, SDF 105, and Activision's use of WARZONE "produced consumer confusion regarding WARZONE, resulting in likely benefit to Activision and detriment to Warzone." SDF 105.  He further opined that Activision's "market dominance has shifted marketplace associations away from the senior user into a category with negative connotations for it." SDF 105.

"Consumers report more interest in the Call of Duty franchise due to its use of the WARZONE name," SDF 105, and many respondents who had played Call of Duty: Warzone or Call of Duty: Warzone Mobile responded that they referred to those games simply as "Warzone." SDF 105.  Dr. Dimofte's findings identify evidence of actual consumer confusion, and demonstrate that the relevant marketplace features significant overlap in consumers of different genres of games or game types.  SDF 105.

## ARGUMENT

Activision's Motion does not dispute that Warzone has a valid mark; Warzone used the mark in commerce three years before Activision.  SDF 104, 138.  Instead, it disputes likelihood of confusion, a highly factual, "open-ended" inquiry with eight separate factors.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979).  As the moving party, Activision "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016).  It "must either produce evidence negating an essential element of [Warzone's] claim" or show that Warzone "does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). Activision does neither.  Its facts are argumentative and disputed, and the Motion overlooks significant evidence, including survey evidence of likelihood of confusion.

Activision devotes two pages of its motion to the second issue on which it seeks summary judgment, arguing that Warzone's lost profits calculation is "entirely speculative" and its disgorgement calculation is "untethered to any actual damages." Mot. at 21-23. Activision is incorrect as a matter of law.

## I.    A Reasonable Jury Could Find Likelihood of Confusion

The core inquiry in trademark infringement is likelihood of confusion, or "whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." *Rearden LLC v. Rearden Com., Inc*., 683 F.3d 1190, 1209 (9th Cir. 2012); *see Stone Brewing Co., LLC v. Molson Coors Beverage Co. USA LLC*, 2024 WL 5244556, at *2 (9th Cir. Dec. 30, 2024). The Ninth Circuit has "cautioned that summary judgment rulings based on the *Sleekcraft* factors should be granted 'sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record[.]'" *Davis v. Blue Tongue Films*, 2024 WL 5182630, at *2 (9th Cir. Dec. 20, 2024). Before turning to *Sleekcraft*, two fatal flaws in Activision's Motion warrant attention.

### A.    Activision Uses WARZONE as a Mark

For the third time, Activision urges the Court to consider its use of WARZONE as a title and not a mark, referring to cases decided before *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023) and pointing to findings vacated after the Ninth Circuit's decision. *See* Mot. at 10. This Court already ruled on the nature of Activision's use of WARZONE, holding:

> Plaintiff argues the *Rogers* test still applies despite *Jack Daniel*'s because Plaintiff is merely using a 'common' English word that has expressive qualities to describe its game—i.e., Plaintiff uses 'warzone' to express that its game takes place in a warzone . . . The court disagrees.

Docket No. 69.[1]  Activision's argument also conflicts with this District's precedent that
use of another's mark as a title does not preclude trademark infringement as a matter of
law.  In *Mar Vista Ent., LLC v. THQ Nordic AB*, this District held that "where it appears
that the junior user—despite the limits of trademark law—is attempting to use a title as a
source identifier, that can constitute trademark infringement."  2024 WL 3468933, at *3
(C.D. Cal. July 8, 2024).  Activision's argument that "'Warzone' has a specific meaning"
when "paired with *Call of Duty*" (Mot. at 15) fails on the law; in *Belin v. Starz Ent., LLC*,
the court found that "us[ing] other source-identifying terms in conjunction with the BMF
Mark, 'such as STARZ, STARZPLAY,' and references to 'the executive producer of the
Series, Mr. Jackson, aka '50 Cent,' and his company, G-Unit,' 'does not take away from
[Defendants'] use of '[BMF]' in [their] mark, as a mark.'"  2024 WL 5185313, at *3
(C.D. Cal. Oct. 25, 2024) (alterations in original).  Here, too, to the extent that Activision
uses WARZONE with "Call of Duty," this does not negate its function as a source
identifier.  *Id.*; *see* SDF 90 ("if you called it Call of Duty: Coca Cola, obviously that is
going to have a negative thing").

 The Court should reject this recycled argument as it did before, and because
evidence of Activision's own conduct before the USPTO and in the marketplace confirms
that it uses WARZONE as a trademark.  *Supra* Background § C.

### B. Activision Relies on Attorney Testimony, Ignores Actual Evidence

 The Court should view Activision's attempted disavowal of the mark in concert
with Activision's newfound interest in "voluntarily strik[ing]" its own declaratory relief.
Docket Nos. 120-121.  Now that Activision has rapidly expanded its WARZONE
offerings, it no longer needs exclusive rights to associate itself with WARZONE, and
claims the mark is weak and Warzone is greedy.  Mot. at 1.  Activision's Motion leans on
self-serving declarations, attorney-drafted exhibits, and an argumentative recitation of

---

[1] In so ruling, the Court previously took judicial notice of Activision's trademark
filings, noting that it represented under penalty of perjury to the USPTO that it uses
WARZONE as a trademark and has done so since March 10, 2020.

facts: Warzone "has done nothing to actively promote its games" (Mot. at 5); nothing to "develop its purported 'brand'" *id*.; "***nothing*** at all – no marketing, advertising, or promotion." Mot. at 12:19-24.

Nowhere are these mischaracterizations more evident than Activision's slanted conclusion: "Nor has [Warzone] produced any survey evidence reflecting source confusion by likely Warzone/Warzone Idle customers." Mot. at 18. But Warzone provided survey evidence from its expert Dr. Claudiu Dimofte, whom Activision deposed at length. *See supra* Background § D. Because "[i]n trademark cases, surveys are to be admitted as long as they are conducted according to accepted principles and are relevant," *BDO Remit (USA), Inc.,* 2012 WL 12895658, at *13 (C.D. Cal. Sept. 19, 2012), Warzone's survey evidence stands unrebutted by Activision. Activision's failure to address or even acknowledge evidence highly probative of likelihood of confusion weighs heavily against the propriety of summary judgment. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1027 (9th Cir. 2004) (noting that an expert survey "alone probably preclude[d] summary judgment").

### C.    Sleekcraft Factors Weigh Against Summary Judgment

Turning to analysis of the *Sleekcraft* factors, because "there are genuine issues of material fact present in this case with respect to at least some of the factors as well as the overall *Sleekcraft* inquiry itself," summary judgment should be denied. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012).

### 1.    Strength of the Mark

Activision concedes that WARZONE is conceptually either suggestive or at worst descriptive, but claims that Warzone has failed to achieve commercial strength in the mark, and that third party uses and Warzone's 'failure to enforce' its rights against those uses have further weakened the mark. Mot. at 11-13.

"In reverse confusion cases, courts compare the conceptual strength of the [senior user's] mark with the commercial strength of the [junior user's] mark," because "the issue

– 10 –

in a reverse confusion case 'is whether the junior mark is so strong as to overtake the senior mark.'" *World Champ*, 2024 WL 665181, at *9. The parties do not dispute that Activision has a "strong market presence," and a junior user's "strong market presence" actually "supports [a] reverse confusion claim." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1108-09 (9th Cir. 2016). Activision misapplies the strength of the mark factor in contending that Warzone's mark is so "conceptually and commercially weak" that it warrants special treatment. First, Activision contends that Warzone exhibits commercial weakness on par with the senior user in *World Champ Tech LLC v. Peloton Interactive, Inc*., 2024 WL 665181 (N.D. Cal. Feb. 16, 2024). In *World Champ*, the senior user half-developed an app that achieved zero sales and was functionally inoperative, which facts are undisputedly not present here.

The "question of distinctiveness" is "ordinarily for the trier-of-fact," *Lahoti v. Vericheck, Inc*., particularly where, as here, the parties dispute conceptual strength of the mark. 2007 WL 2570247, at *5 (W.D. Wash. Aug. 30, 2007), *aff'd*, 586 F.3d 1190 (9th Cir. 2009) (concluding "that a reasonable jury could find the mark suggestive" and denying summary judgment). As Activision's expert opines, WARZONE as applied to a battle field in a video game is by nature "abstract," and Warzone agrees it is at least suggestive, "requir[ing] a consumer to 'use imagination or any type of multistage reasoning to understand the mark's significance.'" *Stitch Editing Ltd. v. Tiktok Inc*., 2022 WL 17348179, at *5 (C.D. Cal. Nov. 15, 2022).

Activision does not address the USPTO's actions in the prosecution of the WARZONE marks, which shed light on Activision's arguments regarding descriptiveness. *Lahoti v. VeriCheck, Inc*., 586 F.3d 1190, 1199 (9th Cir. 2009) ("Deference to the PTO's classification decision is sensible because the PTO has special expertise that we lack on this fact-intensive issue.") Activision cannot dispute that the USPTO approved WARZONE for publication on the Principal Register, and Activision affirmatively admits that the USPTO issued no Office Action regarding the descriptiveness of the WARZONE

– 11 –

mark before deciding to publish it. SDF 164. Whereas "[t]he supplemental register contains other product and service designations," such as descriptive marks that "could one day gain eligibility for the principal register," by acquiring secondary meaning, *United States Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 552 (2020), the USPTO communication notes that the WARZONE mark "appears to be entitled to register on the Principal Register, subject to any claims of concurrent use." SDF 164. As descriptive terms "are not eligible for the principal register based on their inherent qualities alone," *United States Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 553 (2020), the USPTO filing suggests the mark is inherently distinctive.

Activision next claims that while WARZONE may be suggestive, Mot. at 12, Warzone has weakened it by allowing third-party uses of variations on "war" and "zone"; Activision again misapprehends the law. The relevant universe of evidence of a crowded field is third party uses of WARZONE **as a mark**, not simply as any part of any description of any offering. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1211 (9th Cir. 2012) (citing *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087–88 (9th Cir. 2005)) (indicating that district court properly excluded evidence of unrelated third party marks). To the extent it argues that WARZONE occupies a crowded field, it is Activision's "burden [to] show[] how extensive the uses are and how long they have continued" to form a purported crowd. *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, 2008 WL 11336396, at *15 (C.D. Cal. Aug. 26, 2008). But, Activision provides no admissible evidence of third party uses of WARZONE as a mark, and "[a]bsent evidence of the location, extent, and length of competitors' use of similar marks, the court is unable to evaluate whether [Warzone] indeed uses its mark in a crowded field." *JIPC Mgmt, Inc.,* 2008 WL 11336396, at *15.

Although Activision submits the vast majority of its purported evidence in support of its Motion—at least 82 of its 152 exhibits—in support of this subfactor, the record is devoid of evidence of a crowded field of trademarks for WARZONE in the gaming

– 12 –

industry.  SDF 70; *see generally* Mot.  *Rearden* rejected a similar argument that the disputed "marks are especially weak because over 840 other companies use the word 'Rearden,' or some variation thereof, in their respective names," because only other **marks** can crowd the field.  *Id.*  None of the cases Activision cites hold otherwise. Instead, according to its own 'undisputed facts,' "[i]n 2019, the only live WARZONE trademark registration in connection with video games was EVE: VALKYRIE – WARZONE."  SUF 83.  A single mark does not crowd the field.  *Lahoti*, 636 F.3d at 508.

As a matter of law, Warzone is not required to make a showing of secondary meaning for its suggestive mark, but its showing does bolster the protection afforded to WARZONE.  "To show secondary meaning, a plaintiff must demonstrate," not Activision's globally dominant position, but "a mental recognition in buyers' and potential buyers' minds that products connected with the mark are associated with the same source."  *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1212-13 (9th Cir. 2012).  In *Cash v. Interscope Geffen A & M Records*, this District found relatively modest audience figures created a triable issue of fact as to secondary meaning.  2024 WL 3914517, at *6 (C.D. Cal. July 22, 2024).  The *Cash* defendant advanced arguments similar to Activision's, "arguing that Cash's 'advertising has been nominal, at best' and that her 'record sales are negligible,'" but the court considered that "by 2019, Cash's music on Spotify had been streamed approximately 52 thousand times by approximately 26 thousand listeners," and found this evidence sufficient to raise a genuine dispute.  *Id.* On this record, Warzone's reach easily meets the threshold deemed sufficient in *Cash*. Over a million users played Warzone's offerings under the WARZONE mark, and tens of thousands of users have engaged on a monthly basis between 2017 and 2020.  *Supra* § B. Warzone's offerings have received millions of page views and hundreds of thousands of mobile downloads, demonstrating that a substantial number of the relevant gaming public engaged with the Warzone under the WARZONE mark.  *Supra* § B.  In light of the evidence, there is at minimum a genuine dispute of material fact strength of the mark.

### 2.    Close Proximity of Goods and Degree of Care Favor Denial

Activision's effort to distinguish the parties' offerings under the WARZONE mark relies on excessive market segmentation to ultimately claim that because Call of Duty: Warzone is a "fast-paced first-person shooter (FPS)" and Warzone's offerings are "slow-paced" "turn-based strategy games," they are so distinct that no consumer would ever confuse one for the other.  Mot. at 16; SDF 141.[2]  This misconstrues how trademark law evaluates competitive proximity.  Courts do not require products to be identical or direct substitutes, only that they are related enough that they "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (quoting *Sleekcraft*, 599 F.2d at 348 n.10).  As Activision's marketing expert testified, the marketplace does not neatly separate game genres from one another, largely because any one game can fall under multiple genres and subgenres.  The Ninth Circuit's "flexible approach" to this factor, easily finds proximity here.  *Stitch Editing Ltd. v. Tiktok Inc.*, 2022 WL 17348179, at *7 (C.D. Cal. Nov. 15, 2022).  Warzone's video game marketing expert testified that in his 25 years of experience, he has found that consumers do not have rigid expectations for the source of different genres.  SDF 16.  Activision's claim that no "players of one game also play the other" is refuted by experts and internal documentation, showing 45% overlap between consumers playing both Call of Duty Warzone and strategy-type games.  SDF 112.

Activision cites *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, which found "the mere fact that 'two products or services fall within the same general field . . . does not mean that the two products or services are sufficiently similar to create a likelihood of confusion.'"  290 F. Supp. 2d 1083 (C.D. Cal. 2003); Mot. at 15.  But, the products in *Matrix Motor* are distinguishable on this factor and the degree of care factor. The *Matrix Motor* parties sold on the one hand, "custom-made and specialized racing

---

[2] Activision is incorrect in any event—Warzone's games are not all "turn based strategy" games. SDF 2.

– 14 –

vehicles" retailing at "$375,000 to $450,000 to a highly sophisticated niche of consumers," and on the other, "inexpensive passenger cars" for hundreds of thousands of dollars less, 290 F. Supp. 2d at 1082, and the plaintiff conceded that the "parties' respective goods are not complementary, are not sold to the same class of purchasers, and are not similar in use and function." *Id.* at 1092. Warzone makes no such concession. Both parties' offerings under the WARZONE mark are similar in use and function—both are shades of the same product, free-to-play multiplayer battle video games. SDF 110. They "have slight differences," but "they are at minimum used for similar purposes." *A Long Story Short, LLC v. NFP Corp.*, No. 23-61943, 2023 WL 9743762, at *9 (C.D. Cal. Dec. 7, 2023). These factors weigh in favor of likelihood of confusion or, at minimum, require resolution of disputed material facts.

### 3.    Marketing Channels Used

To determine whether marketing channels overlap, "courts consider whether the parties' customer bases overlap and how the parties advertise and market their products," *Pom Wonderful, LLC*, 775 F.3d at 1130. Activision argues that it is undisputed that Warzone and Activision do not use the same marketing channels, but "the parties' outlets and customer bases need not be identical; rather, some degree of overlap suffices." *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. 08-4310, 2008 WL 11336396, at *20 (C.D. Cal. Aug. 26, 2008). The Ninth Circuit has "adopted a rather flexible approach" to this factor, finding proximity where, for example, "both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012). The record here reflects an overlap in consumer bases, as video gamers play many types of games, (SDF 112), and the parties both use the "[w]eb, as a marketing channel," as well as Youtube, Twitch, Reddit, SEO, and word of mouth, SDF 114, which "allows for competing marks to be encountered at the same time, on the same screen."

*Yedi, Inc. v. Universal Connect Wholesale*, 2022 WL 3137930, at *4 (C.D. Cal. June 22, 2022).  This factor at minimum requires resolution of disputed material facts.

### 4.    Similarity of the Marks

Courts have consistently held that "the more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion, where "similarities are weighed more heavily than differences." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1032 (9th Cir. 2010) (citing *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1206 (9th Cir. 2000).  Activision and Warzone.com's marks are nearly identical across all three dimensions of similarity—sight, sound, and meaning—favoring a likelihood of confusion.  *Id.*

First, both Warzone and Activision's product prominently use the word "WARZONE" as the dominant term. SUF 112.  The parties dispute whether Activision's WARZONE appears without the house mark "Call of Duty," and Warzone has identified significant evidence of this shorthand branding, but these differences are not determinative.  Activision cites *Punchbowl, Inc. v. AJ Press LLC* in support of its argument that the WARZONE marks are "displayed in visually distinct ways," but the *Punchbowl* court ultimately found for the senior user on this factor.  2024 WL 4005220 (C.D. Cal. Aug. 22, 2024).  The court considered the major difference in display of the marks was the addition of "News" to one PUNCHBOWL mark, but in light of evidence that consumers frequently shortened PUNCHBOWL NEWS to "PUNCHBOWL," there remained a triable issue of fact as to how similarly consumers would consider the marks to be.  *Id.* at * 8-9.  When assessing similarity in sound, courts focus on how consumers refer to the marks in everyday use.  *Id*.  Here, both marks are aurally identical.  SUF 110.  In *Talent Mobile Dev., Inc. v. Headios Grp*., too, the court found this factor favored the senior user despite the "significant" differences between the respective logos because it acknowledged that "the marks also 'often appear[ ] . . . without the logo[s]," in comments, reviews, descriptions, and elsewhere, 'leaving only the slight difference in

spelling'" and "the marks sound identical and the marks are virtually identical in meaning."  2017 WL 6940548, at *6 (C.D. Cal. Oct. 3, 2017).

*S10* likewise found that "while Samsung argues," as Activision does, "that its use of the [mark] forms part of its 'brand architecture' of 'Samsung' and 'Galaxy,'" several examples "in the record do not display a consistent labelling of this brand architecture—indeed, in one image of Samsung's own proffered evidence, "S10" is featured on the image by itself.  Indeed, although Activision contends that their use of WARZONE often appears alongside the Call of Duty housemark, this does not alleviate confusion in reverse confusion cases.  "While the jury may make its own determination as to any potential significance of the similarities parties' marks, the Court cannot rule as a matter of law that the marks are not similar." *S10 Ent. & Media LLC v. Samsung Elecs. Co*., 2023 WL 1936350, at *9 (C.D. Cal. Feb. 1, 2023). "In a reverse confusion case[,] the junior user's use of a house mark can . . . aggravate confusion by reinforcing the association between the mark and the junior user." *World Champ*, 2024 WL 665181, at *12.  The *World Champ* court considered Peloton's use of "Bike +," finding that "[d]espite differences in how the marks have been encountered in the marketplace at times (for example, the plaintiff's mark's being encountered in an app store with "bike more" next to it), in the specific context of reverse confusion, the defendant's use of its housemark means that 'a reasonable jury could find that the marks are similar.'" *Id.* (quoting *Ironhawk Techs*., 2 F.4th at 1165); *see Stitch Editing Ltd. v. Tiktok Inc*., 2022 WL 17348179, at *6 (C.D. Cal. Nov. 15, 2022) (denying summary judgment, finding "[t]he use of Defendants' "TikTok" mark near their "Stitch" feature does not, as Defendants suggested at the hearing, eliminate the possibility of confusion; it lessens it somewhat as to forward confusion while potentially increasing the risk of reverse confusion").  Here, Activision's association of WARZONE with Call of Duty is inconsistent, but at best, only exacerbates consumer confusion, such that a triable issue of fact exists regarding how the marks are perceived in the marketplace.

### 5.    Activision's Conduct Creates a Triable Issue of Fact on Intent

While "intent is not a necessary element," a party that can prove intent "is likely to prevail because the courts then presume that the public will be deceived." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993).  Activision's Motion argues that it never intended to "trade off" Warzone's goodwill, and thus the intent factor should weigh against confusion.  Mot. at 20.  But other conduct supports intent, including whether defendant "knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion."  2024 WL 665181, at *14. "Knowing adoption of a mark closely similar to one used by another is a basis for inferring intent to deceive." *Aurora World, Inc. v. Ty Inc*., 719 F. Supp. 2d 1115, 1164 (C.D. Cal. 2009); *Fiji Water Co. v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1181 (C.D. Cal. 2010) ("[o]bvious similarity" between products also "permits an inference of intent").  Activision had actual knowledge of Warzone's prior use of WARZONE before it launched Call of Duty:  Warzone, but proceeded anyway.  *See* SDF 61, 80.  Activision's deliberate selection of WARZONE after its trademark search uncovered Warzone's prior use creates an intent inference supporting likely consumer deception.  Activision then adopted a nearly identical mark, *supra*; upon discovering that its own paid streamers were confused and streaming in Warzone's Twitch channel, immediately filed to register WARZONE as its own trademark, SDF 98, 105; when Warzone opposed the registration, stalled Warzone in unfruitful talks, SDF 108-09, before blocking Warzone's trademark registration by filing this action, despite knowing that Warzone had priority; and litigating for years while aggressively expanding use of the mark.  SDF 156.

Unlike the defendant *Stonefire Grill, Inc. v. FGF Brands, Inc*., Activision did not take meaningful steps to avoid confusion after discovery of Warzone's use, instead engaging in direct efforts to cancel Warzone's registration.  987 F. Supp. 2d 1023, 1055-56 (C.D. Cal. 2013).  These facts are closer to S*urfvivor Media, Inc. v. Survivor*

*Prods.*, where the Ninth Circuit noted that "[a]bsence of malice is no defense to trademark infringement." 406 F.3d 625, 635 (9th Cir. 2005). Even if this Court credits some evidence that Activision took steps to avoid direct consumer confusion, intent remains a fact-intensive analysis, and a jury should assess Activision's intent on the full record.

### 6.    Expansion is Either Favors Denial or is Neutral

Where products are related, as here, "*any* expansion is likely to result in direct competition." *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1260 (9th Cir. 2022). This factor thus considers both the possibility that the junior user may "hinder" the senior user's "expansion plans," *Surfvivor*, 406 F.3d at 634, and that markholders may properly choose to expand offerings, and thus have "the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield*, 174 F.3d at 1047. When both parties diversify, as here, SDF 75, "[t]he potential that one or both of the parties will enter the other's submarket with a competing model is strong." *Sleekcraft*, 599 F.2d at 354.

### 7.    Evidence of Actual Confusion

Finally, although likelihood of confusion does not "require evidence of actual confusion," and its absence is "generally unnoteworthy," *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1132 (9th Cir. 2014), the Ninth Circuit has acknowledged that even "very little evidence of actual confusion" is probative. SDF 105, 106. Even without its survey evidence, Warzone's evidence clears this threshold. Warzone produced several hundred emails from consumers contacting Warzone, believing they were contacting Activision. SDF 119.

Warzone disputes Activision's characterization of this evidence as non-consumer confusion, but even that characterization does not render the evidence irrelevant or inadmissible—"'actionable confusion need not be limited to potential purchasers whose confusion could cause a direct loss of sales.'" *Rearden LLC v. Rearden Com., Inc.*, 683

– 19 –

F.3d 1190, 1216-17 (9th Cir. 2012) ("[plaintiff] received dozens of misdirected e-mails actually intended for Rearden Commerce, some of which were sent by Rearden Commerce's own customers").  Non-consumer confusion could "turn into actual consumer confusion" such as if they are "potential consumers" or non-consumers "could influence consumer perceptions" on the part of consumers.  683 F.3d 1190, 1216-17.  At minimum, such evidence gives rise to a genuine issue of material fact as "[t]he degree of the confusion, and whether the confusion is sufficiently 'likely,' is a question of fact for the jury." *Cash v. Interscope Geffen A & M Recs.*, 2024 WL 3914517, at *7 (C.D. Cal. July 22, 2024).

Activision cites *Entrepreneur Media, Inc. v. Smith*, for the proposition that "use of a mark must be likely to confuse an appreciable number of people as to the source of the product," but the *Entrepreneur* court went on to find that just one instance of actual confusion can weigh against summary judgement.  279 F.3d 1135, 1151 (9th Cir. 2002).  Warzone's proportionally voluminous evidence of actual consumer and non-consumer confusion, raises a genuine issue of material fact regarding the likelihood of confusion, making summary judgment inappropriate.

## II.    Damages Requires Only Reasonable Certainty, Not Absolute Certainty

Activision seeks judgment on Warzone's claim for compensatory damages, claiming Warzone must show that its loss of business opportunity was a **guarantee**—this is not the law.  The calculation of actual damages attributable to trademark infringement requires only reasonable certainty of monetary harm. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993).  Activision mischaracterizes the record—Mr. Ficker and Mr. Geddes had worked through the preparatory stages of the campaign by the time Activision began its unauthorized use of WARZONE.  SDF 51.  As Mr. Geddes opined, the campaign he intended to run for Warzone was at the bottom end of his skillset; he was "almost certain" that the campaign he set out would achieve ████████████ based on his understanding of the industry, his command of social media marketing, and

– 20 –

his evaluation of the strength and appeal of Warzone's offerings.  SDF 130.  Activision proffers little toward its burden of production, weighing the credibility of email correspondence and expert testimony, Mot. at 22, but the record substantiates a genuine dispute of material fact.  *See Vepo Design Corp. v. Am. Econ. Ins. Co.*, 2024 WL 4658782, at *1 (9th Cir. Nov. 4, 2024).  Whether the company "would have successfully" marketed Warzone as set out in Mr. Geddes' expert report, "and how much income it would have lost, are for a jury to decide." *Id.*

## III.    Defendant's Profits are a Distinct Remedy Available Here

Activision's arguments against disgorgement fail.  ***First,*** defendant's profits are an independent remedy under the Lanham Act, and although Activision argues that defendant's profits must be equivalent to actual loss suffered by the plaintiff, this contravenes § 1117(a), which provides distinct bases for recovery including defendant's profits.  *Id.*  Activision produced financial statements and 30(b)(6) testimony substantiating profits attributable to its use of the mark, and its argument that it must retain those profits despite the impact on Warzone is unsound.  ***Second***, Activision's challenge to Warzone's disgorgement damages cites cases that required willfulness as a threshold requirement for disgorgement of a defendant's profits.  *Scat Enters. v. FCA US LLC*, 2017 WL 5896182, at *1 (C.D. Cal. June 8, 2017); *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, 2015 WL 9028123, at *2 (N.D. Cal. Dec. 16, 2015); *Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *23 (C.D. Cal June 8, 2015).  But the Supreme Court decision in "*Romag* directly undercuts these arguments because intent is no longer a prerequisite to disgorgement of profits." *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, 2021 WL 4813257, at *5 (C.D. Cal. Oct. 6, 2021).

## CONCLUSION

For the foregoing reasons, the Court should deny Activision's Motion.

Date:  February 28, 2025            Respectfully submitted,

– 21 –

Jennifer A. Kash (State Bar No. 203679)
Francesca M. S. Germinario (State Bar No. 326208)
Nicole A. Bloomfield (State Bar No. 356757)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
21-3073@cases.warrenlex.com

*Attorneys for Defendant /*
*Counterclaimant Warzone.com, LLC*

## **Certificate of Compliance**

The undersigned counsel of record for Warzone.com, LLC certifies that this brief contains 6,985 words, which complies with the word limit of L.R. 11-6.1.

Date:  February 28, 2025

Francesca M. S. Germinario