MARC E. MAYER (SBN 190969)
  mem@msk.com
KARIN G. PAGNANELLI (SBN 174763)
  kgp@msk.com
LINDSAY R. EDELSTEIN (*pro hac vice*)
  lre@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Activision Publishing, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| ACTIVISION PUBLISHING, INC., a Delaware corporation, Plaintiff, v. WARZONE.COM, LLC, Defendant. | CASE NO. 2:21-cv-3073-FLA (JCx) [Assigned to Judge Fernando L. Aenlle-Rocha] [*REDACTED*] REPLY MEMORANDUM IN SUPPORT OF MOTION OF ACTIVISION PUBLISHING, INC. FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIMS OF WARZONE.COM, LLC |
|---|---|
| WARZONE.COM, LLC, Counterclaimant, v. ACTIVISION PUBLISHING, INC., a Delaware corporation, Counterdefendant. | Date: March 21, 2025<br>Time: 1:30 p.m.<br>Ctrm: 6B<br><br>Complaint Filed: Apr. 8, 2021<br>Counterclaim Filed: June 8, 2021<br>Pretrial Conference: May 19, 2025, at 1:30 p.m.<br>Trial: May 27, 2025, at 8:15 a.m. |

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..............................................................................................................1

I.  THE UNDISPUTED FACTS CONFIRM THERE IS NO
    REASONABLE LIKELIHOOD OF REVERSE CONFUSION ....................2

   A.  WZLLC's Alleged Mark Is Weak And Not Distinctive........................3

   B.  The Parties' Games Are Distinct, And Customer Purchase
       Decisions Are Well-Informed ...............................................................5

   C.  The Marks Are Not Similar In The Marketplace..................................6

   D.  The Parties Use Distinct Distribution And Marketing Channels..........8

   E.  There Is No Evidence Of Intent .............................................................8

   F.  There Is No Probative Evidence Of Actual Confusion. .......................9

   G.  WZLLC Has No Evidence Of Any Expansion Plans.........................11

II. WZLLC'S LOST-PROFITS CLAIM IS IMPERMISSIBLY
    SPECULATIVE ..............................................................................................11

III. THERE IS NO BASIS FOR EQUITABLE DISGORGEMENT .................13

CONCLUSION................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barnett v. Costco Wholesale Corp.*,
  2022 WL 1443332 (C.D. Cal. May 6, 2022) ........................................................... 2

*Benham v. World Airways, Inc.*,
  432 F.2d 359 (9th Cir. 1970) ............................................................................... 11

*Blanqi, LLC v. Bao Bei Maternity*,
  2018 WL 905908 (N.D. Cal. Feb. 15, 2018) .......................................................... 3

*Echo Drain v. Newsted*,
  307 F. Supp. 2d 1116 (C.D. Cal. 2003) ......................................................... 2, 3, 4

*Goodness Films, LLC v. TV One, LLC*,
  2014 WL 12594201 (C.D. Cal. 2014) .................................................................. 11

*Grethaka Sols. OU v. Click Labs, Inc.*,
  2024 WL 326622 (M.D. Fla. 2024) ...................................................................... 12

*Harlem Wizards Ent. Basketball, Inc. v. NBA Props., Inc.*,
  952 F. Supp. 1084 (D.N.J. 1997) ........................................................................... 6

*J.T. Colby & Co. v. Apple Inc.*,
  2013 WL 1903883 (S.D.N.Y. May 8, 2013) ........................................................ 11

*JIPC Mgmt., Inc. v. Incredible Pizza Co.*,
  2008 WL 11336396 (C.D. Cal. 2008) .................................................................... 4

*Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*,
  2016 WL 3545529 (D.N.J. 2016) ......................................................................... 13

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
  331 F. Supp. 2d 1214 (C.D. Cal. 2004) .................................................................. 7

*Oculu, LLC v. Oculus VR, Inc.*,
  2015 WL 3619204 (C.D. Cal. 2015) .................................................................... 13

*Punchbowl, Inc. v. AJ Press LLC*,
  2024 WL 4005220 (C.D. Cal. Aug. 22, 2024) ............................................. 5, 8, 10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) .................................................................. 4, 10

*RiseandShine Corp. v. PepsiCo. Inc.*,
   2023 WL 4936000 (S.D.N.Y. 2023) ................................................................ 2

*RiseandShine Corp. v. PepsiCo, Inc.*,
   41 F.4th 112 (2d Cir. 2022) ............................................................................ 5

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ........................................................................... 3

*Romag Fasteners, Inc. v. Fossil, Inc.*,
   590 U.S. 212 (2020) ................................................................................ 12, 13

*S10 Ent. & Media LLC v. Samsung Elecs. Co.*,
   2023 WL 1936350 (C.D. Cal. 2023) ............................................................... 7

*Scat Enterprises, Inc. v. FCA US LLC*,
   2017 WL 5896182 (C.D. Cal. 2017) ............................................................. 13

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
   987 F. Supp. 2d 1023 (C.D. Cal. 2013) .......................................................... 3

*Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*,
   2023 WL 9005633 (C.D. Cal. 2023) ............................................................. 11

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
   2021 WL 4813257 (C.D. Cal. 2021) ............................................................. 13

*Tsiolis v. Interscope Records, Inc.*,
   946 F. Supp. 1344 (N.D. Ill. 1996) ................................................................. 6

*Ultra Recs. LLC v. Ultra Int'l Music Publ'g*,
   2025 WL 602943 (S.D.N.Y. 2025) ............................................................... 13

*Universal City Studios, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984) ...................................................................... 9, 10

*Valador, Inc. v. HTC Corp.*,
   242 F. Supp. 3d 448 (E.D. Va. 2017) ........................................................ 9, 10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Water Pik, Inc. v. Med-Sys., Inc.*,
   726 F.3d 1136 (10th Cir. 2013) ........................................................................... 10

*World Champ Tech LLC v. Peloton Interactive, Inc.*,
   2024 WL 665181 (N.D. Cal. 2024) ........................................................... 2, 3, 4, 7

# INTRODUCTION

Warzone.com, LLC's Opposition deliberately obscures the core issue: whether Activision's *use* of the term "Warzone" in connection with *Call of Duty: Warzone* and *Call of Duty: Warzone Mobile* is likely to cause an appreciable number of WZLLC's potential consumers to believe that WZLLC's games originate from or are affiliated with Activision or *Call of Duty*. The key facts that inform this analysis are undisputed and confirm that a reasonable jury could not find in WZLLC's favor. The manner by which the parties' products appear in the marketplace speaks for itself—as does the *absence* of evidence reflecting, for example, actual confusion, efforts by WZLLC to develop or enforce its alleged mark, WZLLC's expansion plans, or that WZLLC's mark ever was associated with its products in the broad video game marketplace.

WZLLC strains to manufacture immaterial factual disputes, recast its infringement claims as USPTO opposition proceedings, and invent a false narrative that Activision "attacked" its alleged mark. WZLLC would even have the Court ignore the dozens of uses of "Warzone" in video game titles released before and after WZLLC's games. WZLLC contends that the third-party game titles are irrelevant because they supposedly are not "trademark uses," even though these third parties use "Warzone" in *the exact same way* as WZLLC—in or as the title of video games offered via mobile app stores or other distribution platforms. WZLLC also dismisses the relevance of third-party game titles that contain additional words alongside "Warzone," such as "Warzone 2100" or "Ultimate Warzone." But WZLLC cannot have it both ways: either none of the games with words alongside "Warzone" are relevant, or all of them are. If none are relevant, then *Call of Duty: Warzone* and *Call of Duty: Warzone Mobile* do not infringe. And if all of them are relevant, then WZLLC should have enforced its alleged rights against these third parties. Either way, Activision is entitled to summary judgment on WZLLC's claims.

The evidence also establishes that WZLLC's lost-profits theory is wholly speculative and relies entirely ████████████████████████████████████████████████████████████████████████████████████

████ Finally, because WZLLC admits that Activision earned revenue through its own investment of time and money—and was not "unjustly enriched" by WZLLC's goodwill—disgorgement would be unjust and impermissibly punitive.

## I.   THE UNDISPUTED FACTS CONFIRM THERE IS NO REASONABLE LIKELIHOOD OF REVERSE CONFUSION.

All of the material "foundational facts" underlying Activision's Motion are undisputed, including WZLLC's failure to develop its alleged mark, the different appearances of the parties' marks, the absence of evidence of mistaken purchasing decisions, differences in the parties' marketing and distribution channels, and the lack of intent. *RiseandShine Corp. v. PepsiCo. Inc.*, 2023 WL 4936000, at *3 (S.D.N.Y. 2023), *aff'd*, 2024 WL 5165388 (2d Cir. 2024).[1]  Thus, the Court may determine, as a matter of law, which *Sleekcraft* factors favor which party, as well as the ultimate issue of whether there is a likelihood (not just a possibility) of consumer confusion. *Id.* at *4.  As Activision has shown, there is no evidentiary basis by which a jury could find an appreciable likelihood of reverse confusion. *See World Champ Tech LLC v. Peloton Interactive, Inc.*, 2024 WL 665181, at *16 (N.D. Cal. 2024) (courts may "reject[] a reverse-confusion claim that lacks sufficient mark strength and supporting marketing efforts"); *Echo Drain v.*

---

[1] WZLLC's effort to create "disputed facts" in its response to Activision's Statement of Undisputed Facts ("SUF") by quibbling about word choices or adding additional irrelevant facts is improper. *Barnett v. Costco Wholesale Corp.*, 2022 WL 1443332, at *4 (C.D. Cal. May 6, 2022), *aff'd,* 2023 WL 6276294 (9th Cir. Sept. 26, 2023) (disputing a material fact without a reasonable basis or adding additional immaterial facts is sanctionable conduct).

*Newsted,* 307 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003) (granting summary judgment where there were no genuine issues of fact in *Sleekcraft* analysis).[2]

### A. WZLLC's Alleged Mark Is Weak And Not Distinctive.

WZLLC's discussion of the "strength" factor misses the point. Even if WZLLC used "Warzone" as a trademark, its rights are limited because its mark does not have inherent *or* acquired distinctiveness.

The parties do not "dispute conceptual strength of the mark." Opp. at 11. WZLLC and its expert agree, and the law is clear, that "Warzone" is descriptive or suggestive—either way, conceptually weak—because it is an English word that describes the game's military conquest theme. *See* Mayer Supp. Decl., Ex. 158, at 8:25-9:1 (WZLLC interrogatory response admitting ██████████ ██████████████████████████████████████; *Id.*, Ex. 154 at 160:3-11 (WZLLC's expert admitting *Warzone* is ███████████████████████████ █████████████████████████████); *see also Echo Drain*, at 1124 ("Because the Echo Drain mark has an intrinsic connection with [plaintiff's] music, [it's] suggestive at best."). Activision's expert's reference to the "abstract" nature of *Warzone*'s gameplay ***mechanics*** (Opp. at 11) is irrelevant.

WZLLC also cannot dispute that its mark is conceptually weak because of the dozens of other games in the marketplace called *Warzone* or that include "Warzone" in their titles. *See World Champ*, 2024 WL 665181, at *10 (mark "weakened by the presence of similar marks for similar apps in the major app stores"); *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1049 (C.D. Cal. 2013) ("Even if the Court were to conclude that Defendant's

---

[2] This Court's April 11, 2024, decision (Dkt. 69) has no bearing on this Motion, since Activision does not argue that WZLLC's claims are barred by *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989). Likewise, whether Activision applied for trademark protection is irrelevant. *See Blanqi, LLC v. Bao Bei Maternity*, 2018 WL 905908, at *3 (N.D. Cal. Feb. 15, 2018) ("[N]either the application for a trademark registration nor the existence of a pending trademark application give rise to a claim of trademark infringement.…"). All that is relevant is whether Activision's ***use in the marketplace*** is likely to cause reverse confusion.

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

commercial strength and advertising expenditures are likely to overwhelm Plaintiff's marks in the relevant market, this fact is offset by the relative weakness of Plaintiff's mark, which is suggestive only, and commonly used in restaurant names."). WZLLC disingenuously argues that *its own* use of the word "Warzone" in the title of its game is a "trademark use," but not that of any of the third-party games that used the word in exactly the same way. Even if that were true, it would be meritless. *See World Champ*, 2024 WL 665181, at *10 (considering submission of "nine other apps . . . using variants of 'Plus' or '+' along with 'Bike'"); *Echo Drain*, at 1124 (discussing use of "Echo" in band names and other titles). Since WZLLC argues (and the premise of is lawsuit is) that a title can be a trademark use (Opp. at 8-9), it cannot fairly distinguish these third-party uses from its own. WZLLC's assertion that the third parties do not possess a federal trademark registration also is specious, since WZLLC admits it does not possess one. And WZLLC's argument that game titles with additional words do not create a "crowded field" confirms that whatever limited rights WZLLC might have cannot extend to preventing others—like Activision—from using "Warzone" with variations or additions, like *Call of Duty: Warzone*.

      WZLLC also incorrectly claims that Activision failed to adequately identify third-party uses. Activision's evidence is authenticated, reliable, and often derived from multiple sources. *See* Mayer Decl., Exs. 87-146. The evidence not only reflects release dates, but also that some games (*e.g.*, *Warzone: Clash of Generals*) had millions of downloads and thousands of reviews. Some even engaged in extensive marketing, such as through Facebook, YouTube, and Twitter. This is far different from *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, 2008 WL 11336396, at *15 (C.D. Cal. 2008), where the defendant cited only business registrations without evidence that any of the third-party marks were still in use, or *Rearden LLC v. Rearden Commerce, Inc.,* 683 F.3d 1190, 1211 (9th Cir. 2012), where "[o]nly four" of 840 third-party companies were in the plaintiff's field and had an internet

presence. Almost all the third-party "Warzone"-titled games remain available for download on the app stores, the Steam store, or elsewhere.

Though WZLLC had years to strengthen or develop its weak mark, it made no serious effort to do so and ███████████████████████ WZLLC cannot prove acquired distinctiveness (*i.e.*, that the word "Warzone" is or was associated with WZLLC) through Ficker's vague and conclusory statements that WZLLC "engaged in advertising . . . . public relations activities . . . . [and] with online publications" (Ficker Decl., ¶¶8, 12). WZLLC does not offer any tangible evidence of any of these purported activities, and the few exhibits attached to Ficker's declaration show actions taken ***only during the pendency of this lawsuit***. For example, WZLLC argues that Ficker engaged in "video streams" and "utilized Twitch to interact with [his] users"— but apparently he did so only after this lawsuit was filed and, in one instance, after Activision moved for summary judgment. *See, e.g., id*., Exs.1-3. Viewing Ficker's testimony in the most favorable light, it proves that WZLLC's promotional communications were limited to ***existing*** customers and not the general video game market. Ficker Decl., ¶¶9-12 (describing updates and responses to customer feedback). It thus is not surprising that while WZLLC commissioned a survey to prove the obvious point that *Call of Duty* players associate "Warzone" with *Call of Duty: Warzone*, it offers no evidence that its ***own*** mark ever had an "'origin-indicating' quality, in the eyes of the purchasing public." *RiseandShine Corp. v. PepsiCo, Inc*., 41 F.4th 112, 120 (2d Cir. 2022).

**B.    The Parties' Games Are Distinct, And Customer Purchase Decisions Are Well-Informed.**

WZLLC's claim that the parties' games are in "close proximity" is belied by the evidence. Whether some game consumers might enjoy both "shooter" and "strategy" games is not the test. *See Punchbowl, Inc. v. AJ Press LLC*, 2024 WL 4005220, at *8 (C.D. Cal. Aug. 22, 2024) ("The relevant inquiry is not whether

5
**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

there is any overlap between those individuals who want to use an online platform to invite their children's friends to a birthday party and those who want to stay informed on… the Senate Finance Committee."). WZLLC has not offered *any* evidence that there is *actual* overlap between the parties' customers, much less that players are unable to distinguish the games' sources. *See Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1355 (N.D. Ill. 1996) ("[T]he court is mindful of… testimony that [rap and heavy metal] genres of music have similar audiences. But Tsiolis provided the court with no evidence that [his] Band is among the 'mergers' [of these audiences].").

Even a cursory review of the parties' games is enough to reject WZLLC's absurd claim that they are "shades of the same product" with only "slight differences." Opp. at 15. They are completely different and appeal to different tastes—one is a first-person shooter game with hyper-realistic graphics and the other is an "online board game" based on Hasbro's *Risk* (Mayer Decl., Ex. 81, WZ000801). *See Harlem Wizards Ent. Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1095 (D.N.J. 1997) ("Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category."). Finally, WZLLC cannot dispute that because the games are free-to-play, even an "inattentive and careless" player would realize after launching or playing either game that it is not related to the other, making a mistaken in-game purchasing decision very unlikely. *Tsiolis*, at 1356.

**C.    The Marks Are Not Similar In The Marketplace.**

WZLLC ignores all of the digital storefronts, key art, logos, and advertisements for *CODWZ* and *CODWZM*, focusing solely on the word "Warzone" without any surrounding context. WZLLC's narrow view of "similarity" is inappropriate, because Activision did not use "Warzone" alone as the name or "brand" for any of its goods or services in the marketplace. WZLLC

6

also appended words to its ***own*** mobile apps (*e.g.*, *(Risk++)*, *Turn Based Strategy*, and *Idle*), making confusion on that platform especially remote.[3]

WZLLC's purported "significant evidence of [] shorthand branding" (Opp. at 16) is nothing of the sort. Its "evidence"—such as blog posts from *Call of Duty*'s website and social media—reflects that Activision used the full name in every instance (*see, e.g.*, Kash Decl., Exs. E, M, P, Q, AI), and Activision's guidelines required that ▮▮▮▮▮▮▮▮▮▮ (Wang Decl., Ex. A) and that "Warzone Mobile" be used only "when the Call of Duty franchise wordmark has been placed above multiple IP wordmarks/logos within a layout" (Kash Decl., Ex. G, WZ012172). The other proffered documents are equally unhelpful, as they consist of (1) ***internal*** Activision documents (Exs. I, N, AH); (2) a "Forbes" article, which was not written by Activision and references "Call of Duty" (Ex. J); and (3) a third-party advertising agency's self-promotional webpage (Ex. K). None are relevant "uses in commerce" by Activision.

WZLLC's reliance on *S10 Ent. & Media LLC v. Samsung Elecs. Co.,* 2023 WL 1936350 (C.D. Cal. 2023), and *World Champ*, at *12, for the proposition that a "house mark" can aggravate reverse confusion is misplaced. Activision did not pair its business name (*i.e.*, Activision) with the disputed mark. Rather, the ***titles*** of Activision's games are *Call of Duty: Warzone* and *Call of Duty: Warzone Mobile*; that is how the games are marketed and distributed. *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1227-28 (C.D. Cal.), *aff'd,* 114 F. App'x 921 (9th Cir. 2004) (in reverse confusion case, "Abercrombie's use of its house mark will likely mitigate confusion," and "serve as a further indicator that Abercrombie is the source of its clothing line"). Given the dozens of other

---

[3] Whether the phrase "Turn Based Strategy" is part of the "official" title (*see* Ficker Decl., ¶6) is irrelevant; these words appear on ***all*** app store pages and search results. *See* Mayer Decl., Exs. 14, 17.

7

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1  "Warzone"-titled games, the inclusion of "Call of Duty" plainly mitigates
2  confusion.

### D. The Parties Use Distinct Distribution And Marketing Channels.

It is undisputed that *CODWZ* is not distributed on any of the same platforms as WZLLC's games and the parties' mobile versions appear together on app stores where they co-exist with many other "Warzone"-titled games. The parties' marketing channels also are distinct, including because WZLLC did not "spend[] money" on advertising but focused instead on its existing community through website blog posts, forums, and tournaments. Ficker Decl., ¶8.

WZLLC's argument that both parties advertise on the "web" and on "Youtube, Twitch, Reddit, SEO, and word of mouth" (Opp. at 15), proves too much. If the entire internet or social-media ecosystem was a single marketing channel, then this factor would be superfluous, since "for better or worse, to market at all in the modern economy is to market using these services." *Punchbowl,* at *11.

### E. There Is No Evidence Of Intent.

WZLLC's *only* purported evidence of "intent" is that Activision's paralegal encountered WZLLC's website during a clearance search in 2019. This alone is insufficient, especially since the parties agree that Activision did not intend to deceive. *See, e.g.*, Kash Decl., Exs. C, I, AH. WZLLC offers no evidence of a failure to conduct a trademark search, "culpabl[e] disregard[]" of the risk of confusion, or intent to copy. The evidence shows that Activision's trademark search did *not* disclose a trademark registration or exclusive use of "Warzone" for WZLLC's games.

WZLLC's claim that Activision "engage[d] in direct efforts to cancel Warzone's registration" (Opp. at 18) is demonstrably false. WZLLC *never* possessed a registration, and did not even apply for one until after it learned of Activision's application. In reality, WZLLC rejected Activision's co-existence

8
**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

offer in 2021 and demanded millions of dollars or perpetual royalties. Mayer Decl., Ex. 75. Activision also did not "stall[]" or improperly "litigat[e] for years." Opp. at 18. When the parties reached a pre-litigation impasse, Activision sought and won a declaration of non-infringement. Since remand, Activision has had to defend against WZLLC's illogical damages claims, while narrowing its requested relief to streamline the action and clarify that it remains willing to co-exist.

Finally, WZLLC's claim that Activision "did not take meaningful steps to avoid confusion" or "aggressively expand[ed] use of the mark" (Opp. at 18) is meritless. The document cited by WZLLC (Kash Decl., Ex. T) actually reflects that Activision's business team was *not* aware of WZLLC's game until June 2020 (months after releasing *CODWZ*), when a Twitch influencer inadvertently used WZLLC's game category. Activision immediately took action. Over the next four years, Activision never received *any* communications reflecting consumer confusion, and WZLLC never explains what "meaningful steps" it contends Activision should have taken.

### F. There Is No Probative Evidence Of Actual Confusion.

WZLLC relies heavily on a survey that is so fundamentally flawed "it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984). WZLLC's claim that the survey reveals "significant confusion" (Opp. at 6) is baseless for several reasons. *See* Activision's Evidentiary Objections, at 5-7, 19-21. For example, Dimofte admitted that he *did not* use accepted principles in his survey (such as the *Eveready* or *Squirt* formats). *See Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) (excluding survey because "[t]here are two common methods for surveying the likelihood of confusion.… [The expert] used neither"). Because Dimofte knew that "replicat[ing] actual market conditions"—as the law requires—would diffuse potential confusion, he withheld images of the parties'

9

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

actual products from survey respondents. *Valador*, at 462. Without reference to marketplace conditions, Dimofte instead asked methodologically unsound, leading, or abstract questions, such as "if two different video games used the same name or highly similar names, would you find it confusing?" *See, e.g.*, *Universal City*, at 118 & n.8 ("A survey question which begs its answer cannot be a true indicator of . . . confusion."). Equally problematic, while "the proper universe for a likelihood of confusion survey is the *senior* user's [*i.e.*, WZLLC's] potential customer base," *Valador*, at 460, Dimofte made no effort to ensure that the respondents were actual or likely consumers *of WZLLC's* games, or even of turn-based strategy games.

Even WZLLC admits that any one of these flaws is a basis to disregard Dimofte's survey. Opp. at 10 (acknowledging surveys must be "conducted according to accepted principles"). Together, they confirm that Dimofte's survey has no probative value and that WZLLC was able to achieve its desired results only by manipulating survey respondents. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1150 (10th Cir. 2013) (affirming summary dismissal after finding that expert survey did not support finding of likelihood of confusion).

WZLLC's only other purported evidence of "actual confusion" are the misdirected emails from *CODWZ* players. But "[a] misaddressed email, Facebook comment, or X post is a negligible friction that stems from the fact that both parties have named their services after a common word." *Punchbowl*, at *14. WZLLC's argument that "[n]on-consumer confusion … 'could influence consumer perception'" (Opp. at 20) makes no sense, because any such correspondence was not public—and there is no evidence that any journalist, trade-show organizer or other person "in a position in which to influence consumers or to serve as their proxy" erroneously communicated that WZLLC's games were made by Activision. *See Rearden*, 683 F.3d at 1216-18. In fact, the *only* time WZLLC ever received media attention was regarding this lawsuit.

### G. WZLLC Has No Evidence Of Any Expansion Plans.

WZLLC understandably gives short shrift to this factor. Even Ficker's self-serving declaration omits discussion of future plans for his games—except for a conclusory reference (Ficker Decl. ¶5) to WZLLC's general "intent to continue and expand the availability of Warzone going forward." The Court should not give any weight to this "hypothetical possibility." *See J.T. Colby & Co. v. Apple Inc.*, 2013 WL 1903883, at *19 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014) (declining to give weight to "hypothetical possibility" that senior user "might have developed a more robust presence").

## II. WZLLC'S LOST-PROFITS CLAIM IS IMPERMISSIBLY SPECULATIVE.

WZLLC fails to address either of the two critical deficiencies in its "lost-profits" claim.

***First***, WZLLC acknowledges that because its alleged lost profits are premised on the complete success of a vague, undefined, and hypothetical marketing "plan," they are, by definition, speculative. Geddes' subjective belief that ***he*** was "almost certain" (Opp. at 20) the plan would be successful is not the "reasonable certainty" required by the law. *See Goodness Films, LLC v. TV One, LLC*, 2014 WL 12594201, at *3-4 (C.D. Cal. 2014) (rejecting lost-profits claim "rel[ying] on wildly-optimistic and conclusory expert valuations, which, rather than the best evidence available, offer[ed] no reasonable basis for realistically assessing [] lost profits"); *Benham v. World Airways, Inc.*, 432 F.2d 359, 361 (9th Cir. 1970) (reversing profits award based on "cheerful prognostications" about business prospects because "[i]t is … immaterial that [plaintiff] honestly entertained the opinions he expressed"). Lost-profits claims must be premised on reliable data, such as "economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*, 2023 WL 9005633, at *3 (C.D. Cal. 2023). Geddes

11

offers no such data.  He ████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████.[4]  He could not even explain what his marketing plan was, other than ████████████████████████████ *Id.* at 208:1-9.  Geddes also admitted his "plan" was entirely dependent on contingencies which were never met and outside his control, such as ██████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████ *Id.,* 91:16-111:7; Ficker Decl., Ex. 5.  After four years, Ficker *still* has not implemented Geddes' "UI/UX design updates" that purportedly were critical to marketing.

    *Second*, WZLLC acknowledges that Activision was not the "but-for" cause of any lost profits; the real cause was WZLLC's decision to forego any marketing.  Mayer Supp. Decl., Ex. 154, at 179:17-180:11.  Ficker's claim that this decision was premised on personal "feel[ings]" about an "uncertain environment" (Ficker Decl. ¶15) does not change this fact.  The evidence reflects *not* that WZLLC and Geddes made an informed choice to dispense with advertising or they "always anticipated that the marketing plan would be initiated post release of Warzone Idle."  Ficker Decl., ¶14.  It reflects that in May 2020 Geddes asked Ficker if they ████████████████████████████████████████████████████████████ Mayer Supp. Decl., Ex. 154, at 130:16-131:13, 192:21-193:2.  WZLLC thus deprived itself of the chance to collect data that might have supported its theory and now

---

[4] *See* Mayer Supp. Decl., Ex. 154, at 52:23-53:4, 61:3-15, 63:17-23, 72:9-14, 87:21-88:2, 88:12-89:19, 90:17-91:1, 91:16-111:7, 94:23-25, 96:6-97:13, 155:3-156:6, 172:9-174:5, 183:12-184:9, 208:1-9, 213:4-12.[5]  While some courts have applied *Romag Fasteners, Inc. v. Fossil, Inc.,* 590 U.S. 212 (2020), to allow disgorgement in reverse confusion cases, the issue has never been addressed at the appellate level and "[n]owhere does the *Romag* decision discuss disgorgement of profits in the context of reverse confusion...." *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.,* 2021 WL 4813257, at *5 (C.D. Cal. 2021).  Thus, this Court may follow *Scat Enterprises, Inc. v. FCA US LLC*, 2017 WL 5896182 (C.D. Cal. 2017), and *Oculu, LLC v. Oculus VR, Inc.,* 2015 WL 3619204, at *1 (C.D. Cal. 2015).

12

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

must rely entirely on unsubstantiated "what-ifs." *See Grethaka Sols. OU v. Click Labs, Inc.*, 2024 WL 326622, at *3 (M.D. Fla. 2024) (rejecting lost-profits claim based on a business plan because "unfulfilled contingencies and expectations do not establish causation or a reasonable certainty as to amount").

### III.   THERE IS NO BASIS FOR EQUITABLE DISGORGEMENT.

"[A]n accounting for profits [or a disgorgement] is a form of equitable relief, and it does not follow as a matter of course upon the mere showing of an infringement." *Koninkijke Philips Elecs. N.V. v. Hunt Control Sys., Inc.*, 2016 WL 3545529, at *26 (D.N.J. 2016). While WZLLC seeks nearly ▮▮▮▮▮▮▮ in disgorgement, it offers no basis for such an award. By WZLLC's own Opposition brief, there is no dispute that Activision was not unjustly enriched, did not profit from consumer confusion, and did not siphon any of WZLLC's (limited) goodwill. Nor is there evidence that Activision engaged in conduct that justifies an award for deterrent purposes. WZLLC does not cite any case where disgorgement of profits was awarded in a reverse-confusion case. The only reason WZLLC seeks disgorgement is for an improper chance at a "lottery-level windfall." *Ultra Recs. LLC v. Ultra Int'l Music Publ'g,* 2025 WL 602943, at *8 (S.D.N.Y. 2025). Since disgorgement is an equitable remedy, the Court may exercise its discretion to deny such relief here.[5]

---

[5] While some courts have applied *Romag Fasteners, Inc. v. Fossil, Inc.,* 590 U.S. 212 (2020), to allow disgorgement in reverse confusion cases, the issue has never been addressed at the appellate level and "[n]owhere does the *Romag* decision discuss disgorgement of profits in the context of reverse confusion...." *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.,* 2021 WL 4813257, at *5 (C.D. Cal. 2021). Thus, this Court may follow *Scat Enterprises, Inc. v. FCA US LLC*, 2017 WL 5896182 (C.D. Cal. 2017), and *Oculu, LLC v. Oculus VR, Inc.,* 2015 WL 3619204, at *1 (C.D. Cal. 2015).

# CONCLUSION

The Court should grant Activision's Motion.

DATED: March 7, 2025

MARC E. MAYER
KARIN G. PAGNANELLI
LINDSAY R. EDELSTEIN
MITCHELL SILBERBERG & KNUPP LLP

By: */s/ Marc E. Mayer*
Marc E. Mayer (SBN 190969)
*Attorneys for Activision Publishing, Inc.*

14

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**Certificate of Compliance-L.R.11-6.2.**

The undersigned, counsel of record for Activision Publishing, Inc. certifies that this brief contains 4,197 words, which complies with the word limit of L.R. 11-6.1.

DATED: March 7, 2025                             /s/ Marc E. Mayer

15

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**