1  MARC E. MAYER (SBN 190969)
     mem@msk.com
2  KARIN G. PAGNANELLI (SBN 174763)
     kgp@msk.com
3  LINDSAY R. EDELSTEIN (*pro hac vice*)
     lre@msk.com
4  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
5  Los Angeles, CA  90067-3120
   Telephone: (310) 312-2000
6  Facsimile: (310) 312-3100

7  Attorneys for Activision Publishing, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>WARZONE.COM, LLC,<br><br>Defendant. | CASE NO. 2:21-cv-3073-FLA (JCx)<br><br>[Assigned to Judge Fernando L. Aenlle-Rocha]<br><br>**DECLARATION OF ZACHARY BYER IN SUPPORT OF RENEWED APPLICATION OF ACTIVISION PUBLISHING, INC. FOR LEAVE TO FILE CERTAIN DOCUMENTS UNDER SEAL** |
| WARZONE.COM, LLC,<br><br>Counterclaimant,<br><br>v.<br><br>ACTIVISION PUBLISHING, INC., a Delaware corporation,<br><br>Counterclaim Defendant. | |

Mitchell Silberberg & Knupp LLP

21138414.1

**DECLARATION OF ZACHARY BYER**

I, Zachary Byer, declare as follows:

1. I am the Director of Litigation and Intellectual Property for Activision Blizzard, Inc.—the parent company of Activision Publishing, Inc. I make this Declaration in support of Activision's Renewed Application for Leave to File Certain Documents Under Seal (the "Application"), filed in connection with Activision's Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (the "Motion"). I have personal knowledge of the following facts, and, if called as a witness, could and would competently testify thereto.

2. In this action, Activision produced a substantial number of documents, many of which were designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL pursuant to the Protective Order entered by the Court in this action on December 15, 2021 (the "Protective Order"). Dkt. 39.

3. As an overarching matter, it should be noted that because of the enormous popularity of the *Call of Duty* franchise, lawsuits involving Activision and the *Call of Duty* franchise routinely receive a great deal of attention. It is common for members of the gaming press, online bloggers, competitors and fans to monitor court dockets and closely scrutinize any new filings, especially those that contain internal correspondence and analysis. This case is no exception. It has been reported on by the gaming press, and Warzone.com, LLC ("WZLLC") has given interviews concerning this case. Thus, Activision's concerns about the disclosure of documents placed in the public record are not merely hypothetical. I believe that it is very likely that any documents related to this case will be downloaded by members of the public or the gaming press and further distributed online. This is especially true for any documents that might give insight into Activision's internal business strategies and processes, which Activision's competitors are keenly interested in and could use to their strategic advantage.

4. I have reviewed each the documents sought to be filed under seal in this action and given careful consideration to what portions of these documents contain competitively sensitive information and should be filed under seal. I have done so with the goal of making Activision's sealing request as narrow as possible. Following is a description of each category of documents pertinent to this Application and an explanation as to why Activision believes that certain portions of such documents should be sealed.

### Testimony Identifying the Number of Customer Service Inquiries Received by Activision

5. During the deposition of Matthew Cox, Activision's Senior Vice President and General Manager of the *Call of Duty* franchise, Mr. Cox provided testimony concerning the number of customer service inquiries related to *Call of Duty: Warzone* that Activision received during a four-year period of time and searches that were conducted in the course of this litigation to determine whether there was any evidence of consumer confusion within these inquiries. This testimony was attached as Exhibit 80 to the Declaration of Marc E. Mayer in support of Activision's Motion for Summary Judgment. *See* Dkt. 111-5 at 333-342 (at 270:2).

6. Activision's internal processes regarding the review of customer service inquiries, as well as the number of such inquiries, constitutes competitively sensitive information. Activision does not disclose to the public the number of customer service inquiries it receives on an annual basis. Activision has a legitimate concern that such information could be misconstrued if disclosed. Thus, Activision requests that this number be kept confidential. Activision does not seek to seal testimony regarding the existence of a customer service database or that it ran searches against that database; it only seeks to redact the number of inquiries it has received.

**Documents Revealing Consumer Research and Internal Communications Related to Activision's Marketing Strategies**

7. Activision produced certain documents created as part of its marketing strategy, and/or documents otherwise related to its confidential marketing efforts. Some of these documents were excerpted or referred to in expert reports submitted by WZLLC – namely, the expert report of Bo Geddes (the "Geddes Report") (Mayer Decl., Ex. 83) and the rebuttal expert report of Bo Geddes (the "Geddes Rebuttal Report") (Mayer Decl., Ex. 85). These include the following:

8. First, Activision produced a survey conducted by Activision's "Consumer Insights" team reflecting the video game preferences of certain segments of Activision's player base and what games are played by the respondents. This survey was excerpted in the Geddes Report, at ¶ 117. *See* Dkt. 111-5 at p. 454. This consumer survey is confidential and reflects Activision's internal market research and competitive analysis.

9. Second, Activision produced a survey conducted by Activision's Consumer Insights team that polled various groups of players concerning their reasons for not purchasing *Call of Duty: Warzone*. This survey also was excerpted in the Geddes Report, at ¶ 130. *See* Dkt. 111-5, at 458-59. This survey was for Activision's internal purposes and is comprised of data that Activision considers to be proprietary and competitively sensitive. This document could be used or exploited by Activision's competitors. It also could be interpreted (or misinterpreted) to draw conclusions as to Activision's overall marketing strategies and goals.

10. Third, Activision produced internal emails concerning its influencer marketing program and communications concerning streaming of *Call of Duty: Warzone* by Activision's influencer partners. These emails were discussed in the Geddes Report, at ¶ 132. *See* Dkt. 111-5, at 459 (discussing content of internal

emails). The email is exclusively between members of Activision's internal public relations team and contains information concerning the influencer marketing program. Activision considers this email chain to be confidential and proprietary, including because it discloses internal discussions related to its marketing programs, such as efforts to correct any issues or problems that may have arisen with such marketing.

11. Fourth, Activision produced internal marketing documents including: (1) marketing timetables; (2) advertising and promotional channels used by Activision, including specific information about Activision's customer targeting strategies; (3) Activision's internal budget projections for advertising and promotional efforts, including "daily spends" for user acquisition efforts; and (4) Activision's proposed "strike plan" for marketing *Call of Duty: Warzone*, both prior to and after its release to the public. These documents were excerpted and referred to in the Geddes Rebuttal Report. *See* Dkt. 111-5 at 484-488 (incorporating marketing documents produced by Activision). These documents are very detailed, and reveal Activision's internal marketing strategies, budgets, marketing channels, and user acquisition efforts. This information is extremely sensitive, and could be used by competitors to undercut Activision or reproduce Activision's targeting strategies.

### Documents Revealing Activision's Revenues and Gross Profits

12. In connection with this lawsuit, Activision prepared and produced certain documents containing revenue and profit figures. These figures are referred to and form the basis of certain damages calculations made by WZLLC's expert Christian Tregillis. *See* Mayer Decl., Ex. 84 (Dkt 111-5 at 472-480 ¶¶ 7, 259, Heading 3.2 & Schedule 3) (discussing Activision's revenues and profits).

13. Activision's revenue in connection with *Call of Duty: Warzone* is highly proprietary and confidential. Activision does not release such information

to the public. Such information is competitively sensitive and its disclosure would harm the company, including because Activision's competitors could use this information to gauge the relative success of their competing games.

**Documents Relating to Activision's Naming Processes**

14. Activision provided a declaration of one of its employees, Carolyn Wang. Ms. Wang's declaration (Dkt. 111-3, ¶¶ 3-8) discloses internal discussions about Activision's analysis of potential naming options for what ultimately became *Call of Duty: Warzone*. Among the topics covered by the declaration are the opinions of Activision executives concerning such naming options, alternate names under consideration by Activision's marketing team, internal evaluations and analysis conducted by Activision, and issues or concerns articulated by Activision employees or executives concerning various proposed names.

15. Additionally, Paragraph 258 of the Tregillis expert report (Dkt. 111-5 at 472-480) discusses an internal email concerning surveys that were conducted by Activision pertaining to the selection of the *Call of Duty: Warzone* title. This email was circulated only to members of Activision's internal marketing team and was never disclosed externally.

16. In light of the popularity and intense public scrutiny of the *Call of Duty* franchise, competitors could use this information to learn about Activision's marketing and business strategies and the process by which Activision tests and selects names for its video games.

17. Also, it is possible that Activision may wish to use one or more of the alternative names for future releases. If these names were to be disclosed to the public, it is possible that competitors could undermine Activision's ability to use them for forthcoming titles. Or, it is possible that members of the public could seek to disrupt Activision's business plans or generate revenue by improperly registering domain names or trademarks with these potential names.

**Activision's Trademark Clearance and Search Practices**

18. Activision provided a declaration of its former paralegal, Terry Kiel, discussing trademark clearance and search practices, including the timing of certain trademark searches conducted by Activision's legal department, the scope of trademark searches, and the materials used by Activision's legal department to assess the availability of game titles or trademarks. *See* Dkt. 111-4 ¶¶ 2-4.

19. The manner by which Activision conducts trademark searches or analyses and the documents created as a result of such searches is confidential and its disclosure could prejudice the company. For example, a litigant could use such information as a basis for discovery or to improperly compare Activision's practices in one circumstance against those in other circumstances.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of October, 2025, in Los Angeles, California.

*Zachary Byer*
Zachary Byer